IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SOO LINE RAILROAD CO. <br> d/b/a CANADIAN PACIFIC RAILWAY <br><br>     Plaintiff, <br><br>     v. <br><br><br> BROTHERHOOD OF MAINTENANCE OF WAY <br> EMPLOYES DIVISION OF THE  INTERNATIONAL <br> BROTHERHOOD OF TEAMSTERS <br><br>     Defendant. | ) <br> ) <br> ) <br> ) <br> )    Civil Action No. 08-CV-1813 <br> )    Judge Der-Yeghiayan <br> )    Magistrate Judge Cox <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT'S MOTION TO DISMISS COMPLAINT
FOR LACK OF SUBJECT MATTER JURISDICTION**

Defendant Brotherhood of Maintenance of Way Employes Division/IBT ("BMWED" or

"Union")  respectfully submits that the complaint of plaintiff Soo Line R.R. Co. ("Soo" or

"Carrier") should be dismissed because it does not satisfy the constitutional requirements for

justiciability under Article III. The dispute described in the complaint does not involve a live case

or controversy and is not ripe for judicial intervention; rather, it seeks relief against purely

hypothetical future acts that may never occur.

## I. FACTS

On March 28, 2008, the Soo filed a complaint against BMWED seeking a declaration that

a supposedly threatened "strike, picketing or work stoppage" by BMWED would violate the

Railway Labor Act ("RLA") 45 U.S.C. §151 *et seq.*; and seeking an injunction against the

purported exercise of self-help. Soo did not allege that BMWED had actually taken any such

action or even threatened to take such action; only that Soo believed that BMWED intended to engage in a strike, picketing or self help in violation of the RLA. Complaint ¶¶15, 26.

Soo's complaint describes the RLA and its bargaining and status quo obligations (complaint ¶¶9-14) and recounts the history of recent bargaining and National Mediation Board ("NMB") supervised mediation between the parties. Complaint ¶¶17-25. The complaint asserts that a March 10, 2008 letter of BMWED accused Soo of not making good faith efforts to resolve the parties' dispute, presented a BMWED proposal as the Union's final offer to settle the dispute and stated that if Soo did not respond within 20 days BMWED would consider the parties to be at impasse such that further mediation would be fruitless. Complaint ¶23. The complaint then states that Soo responded by letter dated March 28, 2008 which said that only the NMB can declare impasse under the RLA, that Soo had bargained in good faith, that Soo was willing to continue to bargain in good faith, and that the NMB had not declared an impasse or released the parties from mediation. Complaint ¶¶ 24-25. Soo then alleges, "on information and belief", that BMWED is going to "strike, picket or engage in a work stoppage" in violation of the RLA in order to pressure the Soo to accede to BMWED's demands. Complaint ¶¶15, 26.

Absent from the Soo complaint is any allegation that BMWED has taken any action to commence or prepare for premature self help. Also absent from the Soo complaint is any allegation that BMWED actually threatened to engage in premature self help. In fact, BMWED has taken no such action and made no such threat.

The March 10, 2008 BMWED letter referred to in Soo's complaint does not assert that BMWED would strike prior to NMB release from mediation; nor does it threaten a strike or other self help prior to release from mediation. Declaration of Mark Wimmer ¶6 and Exhibit 1 thereto.

(The Wimmer Declaration and its exhibits are Exhibit A to this brief). While BMWED's letter did provide what BMWED characterized as its final offer after almost three years in bargaining, the letter sought the Carrier's agreement or a constructive counter-proposal; and BMWED did not state an intent to strike or engage in other self help if Soo did not agree or did not respond constructively. The letter did assert that if Soo would not agree or respond constructively, the Carrier should acknowledge that the parties were at impasse and inform the NMB so the parties could be released from mediation. The letter further stated that if BMWED did not receive "a substantive counterproposal" within twenty days, BMWED would consider the non-response to be "an admission that we are at impasse and we will take all appropriate and lawful steps to resolve this dispute in the best interest of our members". Wimmer Declaration ¶6 and Ex. 1.

On March 28, 2008, the same day that it filed this lawsuit, the Soo wrote to BMWED stating that twenty-nine months of contract negotiations was not "unusual or unreasonable", and that BMWED had no "standing to declare an impasse" because that is a determination for the NMB. The Carrier recounted its view of the history of the parties' negotiations and mediation and reiterated that it expected the Union to honor its RLA status quo obligations. Wimmer Declaration ¶7 and Ex. 2.

On May 9, 2008, BMWED responded to the Soo's March 28 letter, noting that the Carrier had now twice brought baseless lawsuits against BMWED during the current round of bargaining. BMWED 1) rejected the Soo's accusation that the Union had disregarded the NMB, 2) noted that four months had passed since the last mediation and years had passed since the process started, 3) stated that the March 10 letter was an attempt to clarify BMWED's position and to "restart negotiations or get the Carrier to agree with us that future mediatory effort by the

NMB would be unlikely to result in a voluntary agreement", and 4) expressed the hope that the

Soo would "acknowledge the reality of the situation" and not oppose a proffer of arbitration and a

release from mediation. Wimmer Declaration ¶9 and Ex. 3.

## II. LEGAL STANDARDS OF JUSTICIABILITY
## UNDER ARTICLE III OF THE CONSTITUTION

Article III of the Constitution limits federal court jurisdiction to "Cases" and

"Controversies". U.S. Const. Art. III, §2; *United States Parole Comm'n v. Geraghty*, 445 U.S.

388, 395 (1980); *Banks v. National Collegiate Athletic Ass'n*, 977 F.2d 1081, 1082 (7th Cir.

1992), *cert. denied,* 508 U.S. 908 (1993). In *Allen v. Wright*, 468 U.S. 737 (1984), the Court said

that "The case-or-controversy doctrines state fundamental limits on federal judicial power in our

system of government...A plaintiff must allege personal injury fairly traceable to the defendant's

allegedly unlawful conduct and likely to be redressed by the requested relief ...The injury must be,

for example, 'distinct and palpable' ...and not 'abstract' or 'conjectural' or 'hypothetical'". *Id.* at

750-751, citations omitted.  In *O'Shea v. Littleton*, 414 U.S. 488,  (1974); the Court stated that,

to satisfy the requirements of Article III,    "Abstract injury is not enough....  The injury or threat

of injury must be both 'real and immediate', not 'conjectural' or 'hypothetical.'" *Id.* at 494,

citations omitted. And in *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990), the Court said that

"To establish an Art. III case or controversy, a litigant must clearly demonstrate that he has

suffered an 'injury in fact'. That injury we have emphasized repeatedly, must be concrete in both a

qualitative and temporal sense. The complainant must allege an injury to himself that is 'distinct

and palpable, *Warth, supra.* at 501, as opposed to merely abstract, and the alleged harm must be

actual or imminent, not 'conjectural' or 'hypothetical'. *Los Angeles v. Lyons*, 461 U.S. 95, 101-

102 (1983)".

To establish the existence of a "live" case, there must be "a real and substantial controversy admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising that the law would be upon a hypothetical state of facts." *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 241 (1937); *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). In *United Public Workers of America v. Mitchell,* 330 U.S. 75, 89 (1947)(footnote omitted), the Supreme Court said that "the federal courts established pursuant to Article III of the Constitution do not render advisory opinions." *See also Deveraux v. City of Chicago*, 14 F.3d 328, 331 (7th Cir. 1994); *Super Products Corp. v. D P Way Corp,* 546 F.2d 748, 753 (7th Cir. 1976) (an actual controversy exists when parties with adverse legal interests have a substantial controversy of sufficient immediacy); *In re Kulp Foundry, Inc.*, 691 F.2d 1125, 1129 n.7 (3rd Cir. 1982); *Orix Credit Alliance v.  Wolfe*, 212 F. 3d 891, 896 (5th Cir.  2000).

One component of the case or controversy requirement is that a case is not justiciable if it is not "ripe"; a court should not engage in premature adjudication in the absence of a concrete and present dispute. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967). The Supreme Court has stated that  "'Ripeness is peculiarly a question  of timing...Its basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements'". *Thomas v. Union Carbide*, 473 U.S. 568, 581 (1985) (citations omitted). Federal court jurisdiction does not exist when a claim turns on contingent future event that may not occur as anticipated, or indeed, may not occur at all. *Id at* 580-581. *See also Bethlehem Steel Corp. v. U.S. E.P.A.*, 536 F.2d 156, 160 (7th Cir. 1976).

Furthermore, a live case or controversy must continue to exist at all stages of the case.

5

*Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997); *Qureshi v. Gonzales*, 442

F.3d 985, 988 (7th Cir. 2006), *citing Arizonans for Official English v. Arizona*, *supra;* and

*Preiser v. Newkirk*, 422 U.S. at 401.

   Declaratory judgment cases also must satisfy the case or controversy requirement. The

Supreme Court has explained that, in a case seeking relief under the Declaratory Judgment Act

the question is whether the facts alleged show that there is a <u>substantial controversy</u>, between

parties having adverse legal interests, of sufficient <u>immediacy</u> and <u>reality</u> to warrant the issuance

of a declaratory judgment. *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273

(1941). It is an absolute requirement in a declaratory action that "the controversy must be definite

and concrete", and there must be "a real and substantial controversy admitting of specific relief

through a decree of a conclusive character, as distinguished from an opinion advising what the

law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. at

241. This requirement "is as true of declaratory judgments as any other field". *United Public*

*Workers of America v. Mitchell,* 330 U.S. at 89. A Federal court acting on a case that is unripe or

that does not present claims that immediately and concretely affect the rights of the litigants

would be rendering an unconstitutional advisory opinion. *Preiser v. Newkirk*, 422 U.S. at 401;

*North Carolina v. Rice*, 404 U.S. 244, 246 (1971). The party seeking declaratory judgment must

show that a threat is sufficiently immediate to constitute an injury-in-fact. *Foster v. Center Tp. of*

*LaPorte County*, 798 F.2d 237, 242 (7th Cir. 1986). *See also Orix Credit Alliance Supra*. 212

F.3d at 896 -- "[a] declaratory judgment action, like any other action must be ripe in order to be

justiciable". Moreover, the courts do not tolerate a party using a declaratory judgment action to

shop for a court to curtail or decide future disputes. *North Shore Gas Co. v. Salomon Inc.*, 152

F.3d 642, 647 (7th Cir. 1998); *Odeco Oil and Gas Co., Drilling Division v. Bonnette*, 4 F.3d 401, 402 (5th Cir. 1993).

Because the case or controversy questions affect a court's jurisdiction, the burden is on the plaintiff to demonstrate facts sufficient to support the asserted basis for federal jurisdiction. *Renne v. Geary*, 501 U.S. 312, 316 (1991). Indeed, the Supreme Court has stated that when there is a question concerning the existence of Article III jurisdiction, "We presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record". *Id., citing and quoting Bender v. Williamsport Area School District*, 475 U.S. 534, 546 (1986)(internal quotation marks omitted). Moreover, the factual basis for jurisdiction must be established in the record; it may not be inferred from "averments in the pleadings". *Bender, supra.* 475 U.S. at 546-547.

Additionally, as is explained in more detail below, Federal courts presented with complaints alleging possible future violations of the RLA based only on strong and heated statements during bargaining, but unsupported with evidence of unlawful acts and threats of unlawful acts, have dismissed such actions for failure to satisfy the requirements of Article III. *E.g. Atlas Air, Inc. v. Air Line Pilots Ass'n*, 232 F.3d 218 (D.C. Cir. 2000); *Airline Professionals Association v. Airborne, Inc.*, 332 F. 3d 983 (6th Cir. 2003); *Federal Express Corp. v. Air Line Pilots Ass'n,* 67 F.3d 961, 964-65 (D.C. Cir. 1995).

## III. STANDARDS FOR DISMISSAL UNDER FEDERAL RULE 12(B)(1)

Because the party asserting federal jurisdiction has the burden of proof of subject matter jurisdiction through all stages of the litigation, when a question is raised as to subject matter jurisdiction, the plaintiff must provide "competent proof" of facts substantiating his/her jurisdictional allegations. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189

(1936).  *See also Perry v. Village of Arlington Heights*, 186 F.3d 826, 829 (7th Cir.1999),

*quoting Retired Chicago Police Ass'n. v. City of Chicago*, 76 F.3d 856, 862 (7th Cir.1996);  *In re*

*African-American Slave Descendants Litigation*, 304 F. Supp.2d 1027, 1046 (N.D. Ill. 2004).

Accordingly, when a defendant responds to a complaint by seeking dismissal under Fed. R. Civ. P.

12(b)(1), challenging the factual basis for jurisdiction, the court is not obligated to presume that

facts alleged in the complaint are true. *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783(7th Cir.

1979) (*citing Gibbs v. Buck*, 307 U.S. 66, 72 (1939)); *see also Gervasio v. United States*, 627

F.Supp. 428, 430 (N.D. Ill.1986).  A defendant may contend that "there is *in fact* no subject

matter jurisdiction" even if the complaint is otherwise formally and facially sufficient; the plaintiff

must then demonstrate a factual basis for subject matter jurisdiction.  *United Phosphorus, Ltd. v.*

*Angus Chemical Co.,* 322 F.3d 942, 946 (7th Cir. 2003) (denying jurisdiction on a properly plead

antitrust suit where plaintiff failed to present facts proving the alleged, requisite effect on

commerce); *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir. 1979).

 In considering a motion to dismiss for lack of subject matter jurisdiction under Rule

12(b)(1), a court may require production of evidence outside of the parties' pleadings, including

external affidavits or other documentation, to determine whether there is a factual basis for

jurisdiction. *McNutt, supra.*, 298 U.S. at 184; *United Phosphorus, Ltd.*, 322 F.3d at 946; *Capitol*

*Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993). As is noted above, the plaintiff must

carry the burden of providing competent proof of factual support for jurisdiction by a

preponderance of the evidence.  *In re African-American Slave Descendants Litigation*, 304 F.

Supp.2d at 1046, *quoting NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 237 (7th

Cir.1995).  Because the plaintiff must carry the burden of actually proving a factual basis for

jurisdiction, assertions based merely on "knowledge and belief" are not sufficient to establish subject matter jurisdiction. *Cf. America's Best Inns, Inc. v. Best Inns of Abilene, L.P.*, 980 F.2d 1072, 1074 (7th Cir.1992); *Shipbuilders Council of America v. United States*, 868 F. 2d 452, 457 (D.C. Cir. 1989); *Olin Corp. v. Consolidated Aluminum Corp.*, 5 F 3d 10, 16-17 (2d Cir. 1993) .

## IV. ARGUMENT

The Soo's complaint fails to set forth a justiciable claim under Article III of the Constitution. Instead, the complaint seeks declaratory and injunctive relief based on nothing more than potential and hypothetical events and acts and effectively seeks an advisory opinion; the claims presented are not ripe for adjudication. The complaint should therefore be dismissed.

The Soo's complaint contains 1)  recitation of the law regarding bargaining and mediation under the RLA and the concomitant status quo requirement/prohibition on the exercise of self help during bargaining and mediation; 2) description of the history of the current round of bargaining; and 3) an assertion "[o]n information and belief" that BMWED is going to strike or otherwise engage in self help in violation of the RLA. But there has been no actual act in preparation for, or in furtherance of, a premature strike; and the complaint does not even allege an actual strike threat. Furthermore, the parties' exchange of correspondence that is referenced in the complaint (Wimmer Declaration Ex. 1-2) does not provide any evidence of a strike action or strike threat.

Clearly, the parties disagree about resolution of the dispute and their communications are not as cordial as they might be, but there is no evidence of any actual strike action or strike threat. The Soo's complaint is really just a series of assertions about the parties' legal obligations and a request for a declaration that BMWED would violate its obligations by striking, along with a

request for an injunction against a potential strike. In essence, the Soo seeks an abstract declaration of what the law is, and an injunction against a possible violation of the law that may never occur. Such a complaint does not state a case or controversy under Article III. A complaint by BMWED for a declaration that Soo could not unilaterally change working conditions during the status quo period and a request for an injunction against such action would similarly not present a justiciable claim. Since the complaint concerns only potential and hypothetical events, the Court lacks subject matter jurisdiction over the complaint.

BMWED suspects that the Soo will rely on certain statements in BMWED's March 10 letter as a basis for invoking the Court's jurisdiction in order to obtain declaratory and injunctive relief against a potential strike. But the March 10 letter was not, and did not contain, a strike threat. Rather, the letter contained an offer for resolution of the dispute. BMWED then sought a constructive response from the Carrier or an acknowledgment that the parties were at impasse, and either a joint request for release from mediation, or non-opposition to such a request from BMWED. The letter closed by pressing Soo for "a substantive counterproposal" within twenty days, and stated that the Union would consider a non-response to be "an admission that we are at impasse", in which event BMWED would "take all appropriate and lawful steps to resolve this dispute in the best interest of our members". Wimmer Declaration ¶6 and Ex. 1.

Perhaps Soo will focus on that last sentence and ignore the remainder of the letter. But even if that sentence is considered standing alone, it still does not provide a basis for a claim that BMWED has violated the RLA, or is threatening action in violation of the RLA. That sentence did not threaten a strike or other self help; it did not even contain an ambiguous statement such as one to take any action necessary to resolve the dispute. In fact it asserted that the Union would

10

take "all appropriate and lawful steps to resolve" the dispute. A union's assertion that it will take

all appropriate and lawful steps is not, and cannot be construed to be, a threat of a strike while in

mediation. An attempt to establish subject matter jurisdiction based on the March 10 would

necessarily fail, because it would essentially be a claim that BMWED violated the RLA by

threatening lawful and appropriate actions. And even if the content of the letter did not disprove

the putative basis for jurisdiction, it certainly is insufficient for Soo to carry its burden of proving

that it has presented a justiciable claim under Article III.

　　　　BMWED further notes that the statements in the March 10 letter are commonplace in the

labor relations environment, and courts have repeatedly held that such statements are insufficient

to establish the existence of a case or controversy under Article III.

　　　　In *Federal Express Corp., supra* 67 F.3d at 964-65, the Court of Appeals for the D.C.

Circuit held that a carrier's complaint did not raise a case or controversy under Article III when

the union responded to the carrier's assertion of a right of unilateral action by saying that the

union would "take all appropriate action to remedy the company's violation of the [Railway

Labor] Act". *Id.* at 963. The Court further stated that "Labor disputes frequently inspire robust

negotiations, where some degree of 'posturing' by the parties is inevitable .... Hard bargaining is

encouraged by the RLA.... Employers and unions can be expected to take aggressive bargaining

positions and freely threaten dire consequences when they are rejected." *Id.* at 964-965. The

Court concluded stating that "We do not believe that ALPA's statement that it would 'take all

appropriate action,'...could reasonably be viewed as a direct threat to file a lawsuit in the

immediate future.". *Id.* at 965. *Cf. NLRB v. WPIX*, 906 F. 2d 898 (2d Cir. 1990) (both sides

engaged in some exaggeration, posturing and dilatory tactics, as might be expected in labor

11

negotiations).

In *Atlas Air, supra.*, 232 F.3d 218, it was held that a complaint for a declaratory judgment that a carrier's future implementation of changes would be lawful, such that a possible responsive strike would be unlawful, did not assert a claim within the subject matter jurisdiction of the courts. The mere potential for action that would be unlawful was insufficient for federal court jurisdiction. That court stated: "That a union may posture in labor negotiations or otherwise threaten to respond to future changes is insufficient to create the reasonable apprehension of litigation necessary for the claim to be justiciable". *Id*. at 227. Similarly, in *Airline Professionals Association v. Airborne, Inc., supra,* 332 F. 3d 983, the Sixth Circuit held that a union's complaint for a declaration that a company was bound by a letter agreement was speculative and hypothetical and did not present a claim within the subject matter jurisdiction of the courts. *Id* at 988. *See also North American Airlines v. International Brotherhood of Teamsters*, 2005 WL 646350 (S.D. N.Y.2005) (court lacked jurisdiction over complaint seeking declarations that employer could unilaterally implement changes of working conditions, and that union could not lawfully strike in response; statement by union that it would "respond accordingly" did not establish justiciability where there was no evidence of strike preparations or work slowdown, instead there was just "posturing and bravado of a type that is often found in labor negotiations and [that] does not make for a case or controversy"). *Id. *13-*14.

In this case too there has been no strike or actual strike threat; and the Union's statements similarly are just strongly worded comments in the midst of long-running and contentious labor negotiations that seek to hasten resolution of the dispute, just as in the cases discussed above. And just as in those cases, here too there is no evidence of actual or imminent unlawful action.

12

Instead the complaint appears to be some kind of "placeholder" to establish a case in this Court as a hedge against a possible unlawful act that may, or may not, arise in the future. While Soo may desire to preemptively initiate litigation in this Court so there is a pending case here in the event action is taken, or a threat is made, that Soo believes to be illegal, the Soo cannot "park" a complaint here in anticipation of an issue that may never arise and thereby vest this Court with subject matter jurisdiction over its complaint.

In this regard, BMWED also notes that the Soo has previously filed a complaint in this Court against BMWED without evidence of any unlawful acts or actual threat of unlawful acts. Last year, the Soo (and its corporate affiliate) filed a lawsuit against BMWED alleging, "on information and belief", that BMWED intended to strike or otherwise exercise self-help while the parties remained in mediation; it was asserted that work stoppages and/or other self help would be initiated both to resolve the present dispute, and to respond to potential Soo assistance to its parent corporation in the parent corporation's dispute with Canadian Teamster maintenance of way workers. *Soo Line Railroad Co. and Delaware and Hudson Ry. Co., v Brotherhood of Maintenance of Way Employes Division/IBT*, N.D. IL No. 07-CV-2202. ( A copy of the complaint in that case is included in Exhibit B to this Brief) In that case too, BMWED took no action to initiate a strike and made no actual strike threat; Soo just alleged that it believed there would be a strike or other concerted action. 2007 complaint (Exhibit B) ¶¶28-30. Ultimately, there was no strike or work stoppage either in support of the strike the Canadian maintenance of way workers, or to bring about resolution of the dispute still in mediation between Soo and BMWED. Soo then moved to dismiss the case and the motion was granted. (Copies of the Soo's motion and the dismissal order are also at Exhibit B to this brief).

Thus, the Soo cannot show that BMWED committed or threatened unlawful acts that would support a justiciable RLA claim. Under the Constitutional principles and Supreme Court and appellate precedent discussed above, there simply is no factual predicate for this Court to exercise jurisdiction to hear and decide the legal issues presented by the Soo, and the case is certainly not ripe for adjudication. Soo's complaint should therefore be dismissed.

## V. CONCLUSION

For the foregoing reasons, the Court should grant BMWE's motion and dismiss the Soo's complaint in its entirety.

Respectfully submitted,

Of Counsel:
William A. Bon, Esq.
General Counsel
Brotherhood of Maintenance
Of Way Employes Division/IBT
20300 Civic Center Dr. Suite320
Southfield, MI 48076-4169
(248) 948-1010

_____
Richard S. Edelman
O'Donnell, Schwartz & Anderson, P.C.
1300 L Street, N.W., Suite 1200
Washington, DC 20005
Telephone: (202) 898-1707
Facsimile: (202) 682-9726
REdelman@odsalaw.com

s/ William L. Phillips
_____
William L. Phillips
Attorney at Law
100 N.  LaSalle St. Suite 1605
Chicago, IL 60602
Telephone: (847) 644-1901
Facsimile: (312) 332-9595
bill@wlphillips.com

June 17, 2008

Attorneys for Plaintiff Brotherhood of Maintenance of Way Employes Division/IBT

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2008, a copy of the foregoing Answer was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this document through the Court's system.


s/ William L. Phillips

**EXHIBIT A TO MOTION OF
BROTHERHOOD OF MAINTENANCE OF
WAY EMPLOYES DIVISION/IBT
TO DISMISS COMPLAINT FOR LACK OF
SUBJECT MATTER JURISDICTION**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SOO LINE RAILROAD CO.<br>d/b/a CANADIAN PACIFIC RAILWAY<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br><br>BROTHERHOOD OF MAINTENANCE OF WAY<br>EMPLOYES DIVISION OF THE  INTERNATIONAL<br>BROTHERHOOD OF TEAMSTERS<br><br>　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 08-CV-1813
Judge Der Yeghiayan
Magistrate Judge Cox

## DECLARATION OF MARK S. WIMMER

I, MARK S. WIMMER, declare under penalty of perjury pursuant to 28 U.S. C. §1746 that the following is true and correct and based upon personal knowledge:

1. I am the General Chairman of the Chicago, Milwaukee, St. Paul & Pacific Federation ("Federation"), of the Brotherhood of Maintenance of Way Employees Division/IBT ("BMWED").  BMWED is an unincorporated labor organization that maintains its headquarters in Southfield, Michigan; it is a division of the International Brotherhood of Teamsters ("IBT" or "Teamsters") and part of the Teamsters Rail Conference.  BMWED is the representative for collective bargaining under Section 1 Sixth of the RLA, 45 U.S.C. §151 Sixth, of employees of the Soo Line Railroad Co. ("Soo") working in the class or craft of maintenance of way employee. Among other things, maintenance of way employees represented by BMWED are responsible for constructing,  maintaining, repairing,  rehabilitating, upgrading and renewing track and right of way, as well as bridges, buildings and other structures.

2. The Federation is the BMWED subordinate unit responsible for providing representation for maintenance of way employees on the former Chicago, Milwaukee, St. Paul & Pacific portion of the Soo. The Federation administers the BMWED-Soo collective bargaining agreement ("BMWED -Soo (Milwaukee) CBA") that applies on the former "Milwaukee Road" portion of the Soo; it was updated by BMWE and Milwaukee Road in December 1981 and adopted in its entirety when Soo purchased the Milwaukee Road in 1985; its Rules have since been revised and amended a number of times, the last complete updated version was in January 2000. The BMWED Soo Line System Division ("Division") is the BMWED subordinate unit responsible for contract administration and providing representation for maintenance of way employees on the territory of the original Soo Line Railroad.

3. I am submitting this declaration in connection with BMWED's motion for dismissal of the complaint that the Soo has filed against BMWED in this case.

4. In April of 2005 BMWED and Soo each served notices for changes in our collective bargaining agreements under the Railway Labor Act ("RLA").

5. Since September of 2005, BMWED, and Soo have been engaged in bargaining and then mediation under the auspices of the National Mediation Board, ("NMB") pursuant to Section 5 of the RLA.

6. On March 10, 2008, BMWED wrote a letter to the Soo seeking to obtain resolution of our dispute after almost three years had passed since the parties served their bargaining notices. BMWED submitted its last offer and urged Soo to either respond constructively with a counter-proposal or to acknowledge that we were at impasse and that further mediation would be fruitless. We closed that letter by stating that if we did not receive "a substantive counterproposal" within twenty days, we would consider the non-response to be "an admission

2

that we are at impasse and we will take all appropriate and lawful steps to resolve this dispute in the best interest of our members". A copy of BMWED's March 10, 2008 letter (without the attached proposal) is Exhibit 1 to this Declaration.

7. On March 28, 2008, the Soo wrote to us in answer to our March 10, 2008 letter. The Soo "reminded" us that the parties' dispute was still docketed at the NMB and that both sides were therefore obligated to maintain the status quo under the RLA. Soo opined that twenty-nine months of contract negotiations was not "unusual or unreasonable". Soo then accused BMWED of disregarding the NMB and of showing disrespect for the NMB by asserting that the parties would be at impasse if they could not reach agreement after twenty-nine months of bargaining. Soo further lectured that BMWED had no "standing to declare an impasse in a set of negotiations that are clearly under the jurisdiction of the NMB and saying the words does not change clear past practice and case law on this point". Soo then went on for many pages recounting the Soo's view of the history of the parties' negotiations and mediation experiences and closed by reiterating that Soo expected the Union to honor its RLA status quo obligations. A copy of Soo's March 28, 2008 letter is Exhibit 2 to this Declaration.

8. On the same day that Soo sent its letter to BMWED, the Soo also began this lawsuit.

9. On May 9, 2008, BMWE responded to Soo's March 28 letter. BMWED noted that this was the second time in the current round of bargaining that the Soo had brought a lawsuit against BMWED without any basis for doing so. BMWED rejected the Soo's accusation that the Union had disregarded and shown disrespect for the NMB, and noted that four months had passed between the last mediation meeting and BMWED's letter. BMWED said that the March 10 letter was "an attempt to clarify our bargaining position and attempt to restart negotiations or get the Carrier to agree with us the future mediatory effort by the NMB would be unlikely to result in a

3

voluntary agreement"; and that BMWED had hoped the Soo would "acknowledge the reality of the situation so that when BMWED sought a proffer of arbitration from the NMB and a release from mediation, the carrier would not oppose such a course of action". BMWE further stated that Soo's lengthy response and harsh of criticisms of the Union and its positions demonstrated that the parties were indeed at impasse and that the Soo should not oppose a request for cessation of mediation and a proffer of arbitration. With respect to the substance of the dispute and the Soo's recitation of its view of everything that had happened in bargaining, BMWED merely responded to a few major points, and otherwise rejected Soo's criticisms of BMWED's position and Soo's version of the history of bargaining. A copy of BMWED's May 9, 2008 letter is Exhibit 3 to this Declaration.

I, declare under penalty of perjury pursuant to 28 U.S. C. §1746 that the foregoing is true and correct and based upon personal knowledge.

6-13-08
Date

Mark S. Wimmer

Subscribed & sworn to before me this 13th day of June 2008

Rose M. Kerns



ROSE M. KERNS
NOTARY PUBLIC-MINNESOTA
My Comm. Exp. Jan. 31, 2010

4

# DECLARATION OF MARK S. WIMMER
# EXHIBIT 1



# BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION
# OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS
### *Chicago, Milwaukee, St Paul &Pacific System Federation*
### *and*
### *Soo Line System Division*

| | |
|---|---|
| **Mark S. Wimmer, General Chairman**<br>18921 York Street, NW  Suite F<br>Elk River, MN 55330-3001<br>Area Code (763) 441-6355<br>Fax (763) 441-1741 | **Gene A. Bell, General Chairman**<br>6210 Sheridan Avenue, South<br>Richfield, MN  55423<br>Area Code (612) 869-2419<br>Fax (612) 869-7641 |

March 10, 2008

Ms. Cathryn Frankenberg
AVP Labor Relations & Human Resources
Canadian Pacific Railway
501 Marquette Avenue, Suite 1000
Minneapolis, MN 55402

Re:  BMWED/Soo Section 6 negotiations

Dear Cathryn:

We are writing to you to summarize where we believe the parties currently stand after over twenty-nine (29) months of bargaining.  We are also presenting to the Carrier a final comprehensive proposal to settle this dispute.  We believe that the parties either must reach a voluntary resolution to our bargaining dispute now or acknowledge that if agreement cannot be reached after numerous meetings, proposals and counter-proposals; we are at impasse and further mediatory efforts by the National Mediation Board would be fruitless.

When we first met on September 29, 2005, the Carrier presented us with a "standby" agreement that would apply to the Soo employees those terms regarding "wages, benefits and work rule changes" contained in an agreement made between the BMWED and the National Carriers' Conference Committee (NCCC) in national bargaining.  The Carrier's standby proposal also contained a proviso that any difference in costs between the Soo Line Health & Welfare Plan for BMWED and the Railroad Employees' National Health & Welfare Plan (GA-23000) would be reflected in the actual on property agreements.  Alternatively, the Carrier's standby proposal proposed that the parties agree to re-enter GA-23000.  The BMWED rejected the "standby" approach; instead we sought to bargain over local issues regarding rates of pay, rules and working conditions.  Unfortunately, after two years of attempts to bargain a truly local solution to our dispute, the Carrier's last offer to us regressed from its initial "standby" proposal from September 2005.

The Carrier's last proposal to us, dated November 6, 2007, provided the same percentage wage increases in the same progression as that contained in the 2007 National Freight Agreement between the BMWED and NCCC.  However, that wage proposal did not include a restoration of the 60 cents per hour diverted from the employees' rates of pay during the period 2000 – 2004 to partially offset the rising cost of health insurance.  The omission is particularly troubling in light of the Carrier's proposal on health insurance matters.

The Carrier's November 6, 2007 proposal regarding "Health and Welfare" proposes the Carrier continue its own self-funded insurance plan for maintenance of way employees.  The proposal demands an employee monthly contribution of $371.89 retroactive to January 1, 2007. Additionally, beginning in January 1, 2008 and each January 1st thereafter into perpetuity, each employee would be required to contribute "15% of the Soo Plan costs for Active Medical, Life, AD&D, Early Retiree Medical, Vision, and Dental, plus any additional amount the Soo Plan monthly costs exceed the National Plan costs."  That proposal is ludicrous, insulting, regressive and made in patent bad faith.

2

Initially, we must note that nowhere in the Carrier's proposal does it intend to return the 60 cents per hour diverted from wages during 2000 – 2004 even though the Carrier now proposes a fixed monthly contribution to health insurance.  At 60 cents per hour, multiplied by 216.92 Average Composite Straight Time Equivalent monthly hours, the Carrier receives $130.15 per month in employee contributions to health insurance premiums.  Because that contribution is not being returned, the Carrier's November 6th proposal amounts to an effective monthly contribution for employees of $502.40 as of January 1, 2007 ($371.89 + $130.15).  On that same date, an employee subject to GA-23000 under the terms of the BMWED's "national agreement" contributed $166.25 per month towards health insurance premiums.  Therefore, the Carrier's last proposal would require its maintenance of way employees to contribute a figure 202% greater than employees under GA-23000 for a medical plan that provides similar benefits to active employees.  All of this when the cost of Carrier's Plan in 2007 was only about 17% greater than GA-23000.  The Carrier has presented no compelling reason for such a whopping increase far in excess of any disparity between the Carrier's current costs and the costs of GA-23000.  We can determine the only reason for such a proposal was malice and union animus.

The Carrier's November 6th proposal also contains a "me-too" to changes to the Supplemental Sickness Program contained in the July 1, 2007 Agreement between the BMWED and NCCC; four "tentative agreements" on minor rules changes; a promise of "incentives" for employees who bid for and stay on "key jobs"; and a proposal to change the starting times of track maintenance and B&B crews "to correspond to track maintenance blocks or production crew track blocks."  As stated earlier, the entire proposal is regressive and is, in our opinion, designed to frustrate any movement toward a satisfactory voluntary agreement.

As we see it, notwithstanding the Carrier's gratuitously insulting proposal of November 6th, the key items that divide us are the return of the 3% wage increase not received in the 1990 bargaining round and the establishment of a safety committee by agreement, not unilateral management action.  We will address the two issues in turn.

In 2007, the Carrier provided data to us showing a monthly difference of $205.62 over the Carrier's cost of providing active duty and off duty health insurance, life insurance, AD&D, early retirement, vision and dental compared to the National Freight Plans.  Put another way, the Carrier contended that in 2007, it cost $2467.44 more on an annualized basis to insure its maintenance of way employees over that paid by its competitors in the United States.

We have stated repeatedly, that the BMWED is willing to return to the National Freight Plans under the same terms and conditions that are applicable to BMWED represented employees on the other major freight railroad carriers.  However, we want to receive some of the economic benefit that will accrue to the Carrier from that switch.  Under our calculations, the restoration of the 3% general wage increase will cost, on average, about $1900 per employee per year (including increased payroll taxes).  Therefore, a return to GA-23000 will still provide a savings to the Carrier of about $500 per employee per year after the additional 3% wage increase is factored in.  That, to our minds is a "win-win" proposition and we are mystified why the Carrier will not entertain the proposal.  Moreover, given the fact that the maintenance of way employees on the Soo comprise a separate risk and experience pool under the Carrier's current health insurance plan, a return to GA-23000 and the use of a risk and experience pool comprised of all rail employees at the major railroads in the United States likely would save the Carrier more than $500 per employee per year into the future.

Safety is of primary importance to the BMWED.  We want our members to go to work and return home safely.  We also want the public who lives and works near the tracks to remain safe and never be affected by derailments or other accidents.  In that spirit, we have presented a safety agreement to the Carrier designed to replace the unilaterally imposed and managed safety program currently in place.  We have met stout resistance to even the idea of a safety agreement.  Safety is just too important to leave in management's hands alone.  Frankly we are baffled by the Carrier's response.

3

Ms. C. S. Frankenberg                                                                March 10, 2008
re:  BMWED/Soo Section 6 negotiations

In Canada, the Carrier's operations are governed by Part II of the Canada Labour Code. The Code mandates the establishment of Work Place Health and Safety Committees and Policy Health and Safety Committees regarding safety. Those Committees are based upon a 50-50 representation of management and labor and are designed so that the parties jointly establish a working safety program on the Carrier. Additionally, the Labour Code mandates the creation of Health and Safety Representatives, staffed by rank and file employees who are paid for their time by the Carrier. Our proposal is an attempt to mirror the standards under which the Carrier already conducts its operations in Canada. Certainly, the Carrier cannot contend that safety is less important in the United States or should be handled in an inferior way to the manner conducted in Canada? This is a matter of safety and decency, we are stunned that the Carrier has not embraced our proposal and made good faith attempts to bargain a real safety agreement.

We have attached to this letter, our final offer to settle this dispute. If you wish to engage constructively on its contents, please contact us. If we do not hear from you with a substantive counterproposal within twenty (20) days, we will consider the Carrier's non-response as an admission we are at impasse and we will take all appropriate lawful steps to resolve this dispute in the best interest of our members.

Sincerely,

Mark S. Wimmer, General Chairman
BMWED of IBT - CM&P&P System Federation

Gene A. Bell, General Chairman
BMWED of IBT - Soo Line System Division

MSW-GAB:jal
opeiu#12

Attachment:    Final BMWED Comprehensive Settlement Proposal to Soo (2 pgs)

cc:  Ms. Terri Brown
      Mr. L. R. Fenhaus
      Mr. D. Griffin
      Mr. S. Hurlburt
      Mr. H. Wise

# DECLARATION OF MARK S. WIMMER
# EXHIBIT 2



**CANADIAN PACIFIC RAILWAY**

Labor Relations

Suite 1715
501 Marquette Avenue
Minneapolis Minnesota 55402

Tel (612) 904-6183
Fax (612) 904-6184

In Response Please Refer to File:

March 28, 2008

Sent via Facsimile
<u>Original sent via US Mail</u>

Mr. Mark S. Wimmer, General Chairman
Brotherhood of Maintenance of Way Employes Division
18921 York Street, N.W., Suite F
Elk River, MN 55330

Mr. Gene A. Bell, General Chairman
Brotherhood of Maintenance of Way Employes Division
6210 Sheridan Avenue South
Richfield, MN 55423

Re: BMWED/Soo Section 6 Negotiations

Dear Mark and Gene:

This is in response to your letter dated March 10, 2008, received in this office via facsimile on March 11, 2008. As you are well aware, the "BMWED/Soo Section 6 negotiations" are presently docketed as Case No. A-13421 by the National Mediation Board (NMB). As a result, all meetings scheduled, requirements that proposals be exchanged, and/or a declaration of an impasse are within the exclusive jurisdiction of NMB. This means that the parties, BMWED and Soo, are obligated to continue maintaining the status quo in accord with the clear requirements of the Railway Labor Act (RLA). Soo intends to meet that commitment and expects BMWED to do as well.

Although you suggest to the contrary, twenty-nine months of contract negotiations are not unusual nor unreasonable under the Railway Labor Act Section 6 process. Unlike US industry covered by the National Labor Relations Act, contract terms do not have a specific expiration date, but continue in effect until modified. Soo's employee's represented by BMWED received Cost of Living Allowances throughout the open contract period (every six months since July, 2005) which amount to 3.27 % after the offset for additional healthcare contributions.

Because NMB retains exclusive jurisdiction of the "BMWED/Soo Section 6 negotiations", including setting meeting dates and locations, determining the agenda for the meetings, and determining if or when an impasse has been reached, it is incomprehensible to Soo that BMWED would so blatantly disregard and disrespect the authority of NMB. On what possible basis could BMWED imbue itself with unilateral authority to insist upon prompt voluntary resolution by the parties, coupled with a 20 day time limit within which to respond and an ultimatum for what BMWED characterizes as a "substantive proposal"?

March 28, 2008
Page 2

BMWED also erroneously alleges that if no voluntary agreement is reached now, then "… we are at an impasse and further mediatory efforts by the National Mediation Board would be fruitless."   BMWED has no standing to declare an impasse in a set of negotiations that are clearly under the jurisdiction of NMB and saying the words does not change clear past practice and case law on this point.

Throughout its March 10th letter, BMWED seems to suggest that the length of the negotiating process, the fact that no agreement has been concluded and the content of Soo's settlement proposals constitute bad faith bargaining under the RLA.  This assertion by BMWED is not borne out by a review of the negotiating history in the "BMWED/Soo Section 6 negotiations".

## History of S00/BMWED Section 6 Negotiations

### June 22, 2005

In its March 10, 2008, letter, BMWED states that the parties first met on September 29, 2005.  In fact, the parties first negotiating session, other than the perfunctory review of respective Section 6 notices, was held on June 22, 2005.  Substantive issues were not discussed because BMWED chose to augment its usual and customary team responsible for resolving Section 6 notices on Soo with representatives of the BMWED D&H negotiating team.  Specifically, Vice President Henry Wise, General Chairman Stuart Hurlburt (D&H) and Vice General Chairman Eugene Borden (D&H) were present at the Minneapolis, Minnesota "BMWED/Soo Section 6 negotiations".

Soo found it necessary to clarify that the parties were only discussing the Soo Section 6 notices and needed to understand the role of the additional BMWED participants before proceeding.  Unfortunately, this left little or no time within the previously agreed upon negotiating dates to discuss substantive issues.

### September 29, 2005

BMWED is correct that  Soo proposed a "stand-by" to the economic components of the prospective National settlement between the National Carriers Conference Committee (NCCC) and the BMWED National Bargaining team for the round commencing January, 2005.  This "stand-by" proposal was the same as what has been included as Side Letter No. 23 in the Soo/United Transportation Union-Yardmasters March 8, 2005 Agreement.

Soo's September 29, 2005, "stand-by" proposal stated:

> "This means the agreement between Soo and BMWED will have an
> equivalent value (commencing with the year 2005) to the National

March 28, 2008
Page 3

Agreement's value when wages, benefit design changes, employee cost sharing contributions and work rule changes are considered.

Further, should the Soo Line Health and Welfare Plan for BMWED represented employees (Plan) cost more or less in any year included in the aforementioned contract term than the BMWED national Plan (based on premiums Soo would have been obligated to pay if part of National), this will be taken into consideration in determining equivalent value. The parties also agree to evaluate the option of returning to the National healthcare plan, should that prove to be a more workable resolution of the benefits cost containment issue."

The principles articulated in the aforementioned "stand-by" offer made by Soo more than 2 years ago to BMWED are the basis upon which settlements have been reached with 11 other unions representing various Soo's employees. This includes all the other members of the Rail Labor Bargaining Coalition* (RLBC) of which BMWED was a part at the National table. As a result, it is disappointing and frustrating to Soo that BMWED continues to demand more, thus unnecessarily delaying a settlement.

The principles in the "stand-by" offer to BMWED form the local settlement pattern on Soo with similarly situated unions (those whose members were covered by the Soo Health and Welfare Plan for Union Employees). Soo continues to make available to BMWED a settlement based on this local pattern. In fact, the November 6, 2007, proposal that BMWED so vehemently maligns in its March 10th letter was based on the same economics contained in the settlements with the other 11 unions whose Section 6 notices have been settled on Soo.

The fact that BMWED continues to demand more than the Soo local patterns makes it extremely difficult for Soo to find a mutually acceptable way to resolve our respective Section 6 notices, while preserving the integrity of commitments to other similarly situated Soo unions.

**February 28, 2008 and March 1, 2006**

On March 1, 2006, Soo responded to a BMWED proposal dated 2-28-06 with the above referenced stand-by offer plus a proposal to address the parties' respective local work rule issues. This proposal included updating the Milwaukee Road schedule agreement, expanding that updated agreement to apply on the Soo property, establishing a single system seniority district for the various work classifications (involved dovetailing Soo/Milwaukee seniority by job classification), and applying the higher Milwaukee rates of pay for several work classifications.

*Rail Labor Bargaining Coalition (RLBC) – BLET, BMWED, ATDA, BRS, SMWIA, NCF&O, IBB&B*

March 28, 2008
Page 4

This proposal was viewed by Soo as responsive to BMWED's stated desire to address local issues. The parties agreed to proceed discussing our respective local work rule changes, using the updated Milwaukee Agreement as the foundational document.

**July 12th and 13th, 2006**

The parties met on July 12th and 13th. Soo was frustrated that BMWED seemed unwilling or unable to focus on substantive issues, but rather concentrated on process and procedure. As a result, immediately following the discussions on July 13, 2006, Soo wrote to Larry Gibbons, Director, Office of Mediation Services, NMB and requested the docketing of this case and the appointment of a mediator in accord with RLA.

NMB promptly docketed the "BMWED/Soo Section 6 negotiations" as Case No. A-13421. At that point, the scheduling of mediation sessions, the locations of the meetings, the discussion agendas, and the authority to terminate discussions all became subject to the exclusive control and responsibility of the NMB, rather than of the parties.

**November 15, 2006**

During this mediation session, BMWED provided Soo with what they stated was a complete list of the local rule revisions for the Milwaukee Agreement, with the understanding that General Chairman Bell was to provide any additional changes to the Soo Agreement no later than December 8, 2006. This date was selected to allow Soo sufficient time in advance of the January, 2007, mediation session to review the entire list of BMWED's requested local work rule revisions and prepare an informed response.

**January, 2007**

Despite this commitment, Soo did not receive BMWED's proposed revisions to the Soo Agreement until January 23, 2007, when the mediator obtained them from BMWED. BMWED's tardy response left the Soo negotiating committee no time to adequately prepare for and respond to these additional demands, thus hampering the progress of the substantive discussions.

It was understood by the parties that the BMWED's January 23, 2007, proposal contained all of BMWED's local work rule demands. All parties recognized that in the course of negotiations as one rule is changed, it may affect the application of another rule. However, the parties also talked about and acknowledged that no additional or new local work rule demands would be added to this list.

Soo considers this commitment as particularly significant since BMWED's January 23, 2007 comprehensive local work rule demands contained <u>no</u> request for a collectively

March 28, 2008
Page 5

bargained Safety Agreement, which materialized six (6) months later.   This list also did not contain the additional local work rule demands made by BMWED in its October, 2007, proposal.

**May 16, 17, 18th  2007**

On May 14, 2007, Soo received a letter from BMWED President Freddie Simpson stating he had advised General Chairmen Wimmer and Bell, VP Fenhaus, and Director Griffin "… not to meet with the Carrier regarding Mediation Case No A-13421 until after the labor dispute between TCRC-MWED and CP Rail is resolved." Thus, without consultation with nor approval from the NMB, the BMWED unilaterally cancelled the May 16th, 17th and 18th previously scheduled mediation session.

In its response, Soo stated:

- "Discussions on NMB Case No. A-14321 Soo Line-BMWED under the Railway Labor Act(RLA) have no relationship to the issues in dispute between TCRC-MWED and CP pursuant to the Canada Labor Code and are conducted by completely different negotiating teams.

- I view your decision to direct your negotiating team not to participate in the mediation scheduled for this week as evidence of BMWED's failure to meet its good faith bargaining obligations under Section 2, First of the RLA.   Soo's negotiating team continues to be available to resume mediation in the Carrier's offices in Minneapolis at 1:30 p.m. on May 16th through 3:30 p.m. on May 18th, as instructed by Mediator Brown."

BMWED's refusal to participate in a previously scheduled mediation session, without consultation with nor reasonable advance notice to NMB Mediator Terri Brown, was not only disrespectful of NMB's authority in this case, but also unnecessarily delayed the progress of these negotiations. In fact, by the time BMWED's letter was received, Mediator Brown had already departed Washington, DC, and opened the first day of mediation with BMWED in absentia.

**June, 2007**

Following several mediation sessions during which the parties exchanged various proposals addressing seniority and other local work rule demands, Soo provided BMWED with a document entitled "Soo Comprehensive Proposal to BMWED." The terms of this proposal balanced the economics of the BMWED/NCCC national wage package, the higher cost of the Soo Line Healthcare Plan (higher than National Plan), and the cost and benefits of the parties various local work rule proposals. In other words, Soo offered the same overall total compensation value (wages and benefits) as had been contained in the BMWED/NCCC National settlement and in the other Soo

March 28, 2008
Page 6

settlements. This proposal also addressed some of the parties' respective local work rule changes in a way that Soo believed might be acceptable to BMWED.

The lead in to this offer stated:

"TOTAL COMPENSATION FOR 2005-2009

Soo will make available to its BMWED represented employees Total Compensation (wages and benefits) equivalent to the NCCC/BMWED National Settlement for this round. The means that Soo's cost for this contract term will not exceed the cost for wages and benefits in the National Settlement.   For purposes of determining equivalence in benefits, the premium Soo would have paid for the National Healthcare Plan will be compared to the Per Employee Per Month cost of the Soo Plan (2005-2007 for now).

Information will be shared with BMWED during discussion of this proposal that will illustrate what Soo will expect of each BMWED represented employee to "close the gap" in cost between the Soo Plan and the National Healthcare Plan.

The fundamental issue is Soo's competitiveness with the Class 1 industry.   If BMWED expects General Wage Increases at the national level for this round, then Soo's benefits costs need to be no greater that what would be paid for monthly premiums in the National Healthcare Plan.

There are several ways to pay the additional $2,467.44 for 2007:

- Agree not to take 6% of the General Wage Increase for this round;  that amount would need to be adjusted annually, up or down to pay for the cost difference between Soo and National Plan;

- Agree to modify the Soo Plan, both employee cost sharing contributions and plan design, as delineated in the document presented that shows Side by Side comparisons of current Soo Plan, the BMWED National Plan modified by NCCC/BMWED tentative agreement changes, and the Soo Plan modified to close the 2007 cost gap between Soo Plan and National Plan. This would require a January 1, 2007 employee cost sharing contribution of $ 268.89 PEPM.

- Agree to return Soo's BMWED represented employees to the National Healthcare Plan as expeditiously as possible so they begin paying the $166.25 PEPM for the remaining months of 2007."

At the time this offer was made to BMWED, Soo was reaching Section 6 settlements with the other unions that were members of the Rail Labor Bargaining Coalition (RLBC) based on the economics of each union's National settlement.

March 28, 2008
Page 7

In this June mediation session, Soo also shared with BMWED the Soo Healthcare Plan
and National Healthcare Plan Side by Side comparisons of costs and benefit terms; the
difference in the monthly premium for the National Plan and for the Soo Plan from 2005
through 2007; the Soo Plan employee contributions if 15% of Soo costs were used for
2007; and the employee contributions to the Soo Plan if the cost gap between the
National and Soo Plans was closed for 2007. Soo considered it only fair to advise
BMWED of these costs and explain its willingness to offer the $166.25/month employee
cost sharing retroactive to January, 2007 (same as BMWED/NCCC National
settlement), in return for BMWED's expeditious resolution of the cost disparity between
the National and Soo Plans. The $166.25 was significantly less than 15% of the Soo
Plan costs and of the employee contribution required to close the cost gap.

**July and August, 2007**

Soo initially proposed a single combined agreement because it believed this would have
value to both BMWED and Soo. Unfortunately, BMWED consistently failed to provide
comprehensive local work rule counterproposals and did not provide workable
responses to Soo's local work rule issues. As a result, Soo concluded that the parties
would not be successful in negotiating a mutually acceptable single agreement. Soo
decided to remove its proposed single agreement from the table in an effort to facilitate
the progress of negotiations on the salient economic issues.

On July 24, 2007, BMWED sent a written communication to its members detailing its
version of what had occurred in the July mediation. This communication was in flagrant
violation of the mutually agreed upon Ground Rules for the mediation, which were jointly
developed with NMB oversight and signed by the parties. It was not at all helpful in
progressing towards a mutually acceptable settlement.

In addition, despite the fact that the list of BMWED's local issues had been finalized in
January, 2007, BMWED began demanding a negotiated Safety Agreement, which had
not been on the table up to that point. After more than 30 months of negotiations and
almost a year of mediation, BMWED's adding a new item to its demands widened the
gap, rather than narrowing the outstanding issues, thus making it more difficult to reach
a settlement.

Soo responded with a letter to BMWED's negotiating team objecting to the breach of the
Ground Rules and confirming the "single Rules Agreement and single Cross-System
Seniority Roster" had been removed from the table. In part, the letter said:

- "Since you are seasoned negotiators, you are well aware that there NEVER was
  a guarantee BMWED and Soo would be able to successfully negotiate a 'single
  Rules Agreement and single Cross-System Seniority Roster'. As is true for any

March 28, 2008
Page 8

set of negotiations, each party needs to be confident it is receiving good value for what it believes has been given to the other party.

- Despite repeated requests by the Company to do so, BMWED's proposals did not clearly define many of BMWED's key money demands and BMWED consistently failed to adequately respond to many of the issues Soo raised. This was true in the July mediation session, as it had been in past sessions. As a result, Soo concluded the price BMWED was extracting for the 'single Rules Agreement and single Cross-System Seniority Roster' far exceeded any value Soo might receive from this arrangement.

- The single Rules Agreement was Soo's suggestion and, therefore, perfectly permissible for Soo to remove it from the table."

In addition, Soo's letter corrected many of BMWED's statements about the Soo/BMWED negotiations as well as what was occurring at other Soo tables.

One of the troubling comments that appeared in BMWED's July 24, 2007, letter to its members was the misrepresentation that BMWED was the only union representing Soo employees that had received 3% less in General Wage Increases in the early 1990's round. Not only was that untrue as every union received a comparable economic package, but also it totally ignored the fact that additional economic benefits to BMWED employees were part of that early 1990's settlement package (such as special rate adjustments above and beyond the GWIs for 13 job classifications).

In closing this letter, Soo expressed concern about BMWED's sincerity at the mediation table, but nevertheless Soo confirmed its intent to continue meeting its good faith bargaining obligation.

- "Also, in the August 7, 2007, letter Messrs. Wimmer and Bell state: "We will report to you after the September mediation session concludes. Meanwhile, continue to ramp up and prepare your local lodges.' Again, what does that mean??? It does not sound like a comment of union leaders who intend to make good faith efforts to negotiate.

- Soo is prepared to continue mediation in an effort to reach a mutually acceptable "peaceful" resolution of our respective Section 6 notices during the September 2007 mediation session and, thereafter, if necessary."

**October, 2007**

BMWED was expected to provide a global offer at the beginning of this mediation session. Instead, BMWED issues two ultimatums, one that the proposed Safety Agreement must be part of the settlement and the second that an additional 3% General

March 28, 2008
Page 9

Wage Increase over and above the 2005-09 RLBC settlement and over and above the GWIs included in Soo's local pattern.

Neither item was acceptable to Soo, as proposed, and BMWED refused to consider any alternatives to its demand for a 3% GWI and for a collectively bargained Safety Agreement.  Rather than being responsive to Soo's request and engage in discussions on alternatives, BMWED just repeated its absolute demands for an additional 3% GWI and a Safety Agreement.

In addition, BMWED added yet more <u>new</u> local work rule demands that were <u>not</u> on the January 23, 2007, BMWED list of local work rule requests.   The new items included establishing a Special Board of Adjustment for discipline cases; establishing a PLB for rules cases;  providing a 50% annual contribution towards purchase of up to two pairs of safety shoes; Amending rule 5 (I); creating AWS certification pay for Welder Foremen; and establishing a System Truck Operator call list.

Again, adding new items, especially after the January, 2007, commitment, made it more difficult to reach a mutually acceptable agreement.   It also negatively impacted Soo's ability to trust BMWED at the bargaining table.

**November 6, 2007**

BMWED spends considerable time in its March 10, 2007, letter maligning Soo's November 6, 2007, proposal.

Soo feels the need to clarify one aspect it its November 6, 2007, proposal.   BMWED correctly stated that the $ .60/hour rate adjustment should have been restored to the BMWED rates of pay at the time the monthly employee contribution option would be put in place.  The failure of Soo to include this $.60 was an oversight and would have been corrected at the table if BMWED had brought it to our attention during the November 6, 2007, negotiating session.

BMWED's exorbitant demand for an additional 3% GWI as the supposed "price" to return to the National Plan led Soo to conclude BMWED preferred to remain in the Soo Plan.  Consistent with its June, 2007, list of benefits cost containment options, Soo proposed to modify the benefits terms and monthly employee cost sharing contribution in the Soo Plan so the cost gap with the National Plan was eliminated. This included the $371.89 monthly employee contribution (retroactive to January 1, 2007 to date of settlement).

Furthermore, Soo explained that the $371.89 would <u>not</u> be the monthly prospective employee contribution if BMWED opted to stay in the Soo Plan.  Instead, this was the retroactive premium plus the value of missed savings opportunities from delayed

March 28, 2008
Page 10

benefits design changes.   BMWED should not be surprised by this principle as it was clearly articulated in the January 26, 2006, Soo/BLET arbitrated contract settlement.

In admonishing the BLET represented employees in the Soo/BLET Arbitrated settlement, Arbitrator Eishen stated:

> "To an objective and impartial observer, there is a recognizable difference between the laudable exercise of democratic rights and recalcitrant rejection of fair and reasonable contract terms achieved through hard bargaining by responsible labor leaders.   In the final analysis, such unreasonable intransigence not only goes unrewarded but it also bears a cost.   For that reason, the Agreement imposed in my Award includes an additional one-time per capita retroactive contribution of $ 400, as an offset for the time-lag in H&W benefits design implementation."

In the "BMWED/Soo Section 6 negotiations", Soo would define "unreasonable intransigence" as BMWED's unwillingness to accept economic contract terms comparable to similarly situated Soo unions.

An unfortunate outcome of BMWED's intransigence has been unnecessarily delaying the implementation of benefit design changes.  Such changes could have reduced the cost of the Soo Plan for both the Company and its BMWED represented employees.  A portion of the $371.89 was intended to pay for the lost savings opportunity due to delays in benefit design changes (such as, 90/10 co-insurance for PPO) since January, 2007.

The other 11 similarly situated Soo unions with whom a settlement has been reached opted to return their members to the National Plan as it seemed to be the best option for the Soo employees they represented to address the cost difference between the Plans. A return to the National Plan would be  mutually beneficial to Soo and its BMWED represented employees, not a one way street as characterized by BMWED in its March 10th letter.

Therefore, Soo is baffled by BMWED's continuing delay in resolving the healthcare cost issue.  Every month that goes by, Soo's employees unnecessarily pay more in premiums.  In addition, each time Soo's BMWED represented employees or their eligible dependents receive medical treatment, they pay more in co-insurance and co-pays than they would if covered by the National Healthcare Plan.

<u>What about the 3% GWI that BMWED alleges is owed to their members?</u>

It appears BMWED is suggesting this is leftover from a contract negotiated 17 years ago and yet, they conveniently ignore the fact that there were many items in the Soo/BMWED settlement that were above and beyond what was in that round's National BMWED settlement.  The additional items include allowing employees to be eligible for

March 28, 2008
Page 11

the Early Retiree Medical Plan at age 60 rather than age 61 as applied under the National Healthcare Plan; additional rate adjustments for 13 pay classifications; elimination of entry rates for 13 pay classifications and reducing the entry rate period for all other classifications.

So, in a true accounting, Soo's BMWED represented employees would likely owe Soo money if one were to compare the value of the NCCC/BMWED National settlements during this 17 year period with the BMWED/Soo settlements. The 3% GWI that BMWED is demanding seems to be a red herring getting in the way of a constructive settlement.

Comments

*BMWED is well aware that safety is of paramount importance to Soo. Soo's* commitment is clearly demonstrated by our excellent safety culture, by multiple years winning of Harriman safety awards, by the active participation of employees in local health and safety committees, by Soo's selection by FRA as the second railroad to implement its Close Call Reporting test program, as well as by the statements of Faye Ackermans on October 25, 2007, before the U.S. House of Representatives Committee on Transportation and Infrastructure Hearing on "the Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads", including positive *comments from members of the Committee on our safety program and culture.* BMWED's suggestion to the contrary is patently offensive and untrue.

While BMWED correctly states there is a different regulatory regime in Canada which requires collaboration with unions on various aspects of safety, BMWED is absolutely incorrect that safety on Soo is in management's hands alone. Notwithstanding the absence of US regulations similar to Part II of the Canada Labour Code, Soo has chosen to include the General Chairmen as partners on the Transportation, Mechanical, and Engineering Department Safety Advisory Boards. As further evidence of this voluntary commitment to partner with union leaders on safety, Soo's Safety Advisory *Boards are co-chaired by management and union leadership.*

In the US railroad industry, the Federal Employer's Liability Act (FELA), a fault based adversarial way to determine liability and appropriate compensation for workplace injuries, places the responsibility for a safe workplace squarely on railroad management. This is why US railroad management teams have more say in workplace safety than union leaders, who do not share in this legal responsibility nor potential liability. In contrast, workplace injuries in CP's Canadian operation are handled under a no-fault system similar to workers' compensation arrangements in the US. This is fundamentally different than the aforementioned FELA fault based system and results in different degrees of management/union accountability.

March 28, 2008
Page 12

Soo firmly believes that every employee is responsible for safety. As a result, employees are encouraged to actively participate on local Safety and Health committees which have been established throughout our system. Soo's employees, including those represented by BMWED, actively participate on these local Health and Safety teams. Unfortunately, in what appears to be a negotiating ploy, the BMWED General Chairmen have withdrawn from the Safety Advisory Board and have directed their members not to participate in any voluntary safety and health meetings or events. If an employee violates this directive, BMWED has threatened to assess a fine.

BMWED's suggestion that safety can only be achieved through a collectively bargained Safety Agreement is also untrue, as should be evident by Soo's excellent safety record and industry recognized safety culture. Scott MacDonald, AVP Operations, and his team continue to be willing to work with BMWED outside the Section 6 process to reasonably modify the Soo Engineering Services Safety Management Protocol and Safety Advisory Board Terms of Reference to address many of BMWED's concerns. Unfortunately, BMWED has refused to resume the discussions with the AVP Operations and, instead, has chosen to issue an ultimatum at the Section 6 bargaining table that a collectively bargained Safety Agreement is a non-negotiable demand.

Soo is baffled as to why BMWED continues to insist on a negotiated Safety Agreement when all other unions representing Soo employees in the Transportation, Mechanical, and Engineering Departments are comfortable participating on Safety Advisory Boards and local Health and Safety Committees using the written, jointly developed protocols as their operational framework. In fact, the two other unions on the Engineering Services Safety Advisory Board that also represent employees in the Engineering Department do not have issues with the written protocols currently in place. So, why does BMWED??

The Attachment to your March 10, 2008, letter is referred to as your "final offer to settle this dispute", when, in fact, it reflects demands not materially different than what BMWED presented at the October, 2007, mediation session and verbally reiterated in the November 6, 2007, mediation session. BMWED's decision to remove the six (6) new local work rule demands that first appeared in BMWED's October, 2007, proposal is not a substantive change in bargaining position.

With regard to its November 6, 2007, proposal Soo recognizes its oversight of not adding the $.60/hour to the rates of pay concurrent with the introduction of employee cost-sharing contributions. Even though there is no obligation to do so, Soo, as a gesture of good faith, hereby modifies its November 6, 2007, proposal to BMWED to include this $.60/hour adjustment.

Soo has met and continues to meet all its RLA obligations to negotiate in good faith throughout the "BMWED/Soo Section 6 negotiations", as is evidenced by this detailed negotiating history. By this letter, we have honored your request for a response and

March 28, 2008
Page 13

have made a good faith adjustment to our November 6, 2007, proposal.  Further, when Mediator Brown sets another mediation date, Soo will be prepared to resume discussions.

You are reminded that the "BMWED/Soo Section 6 negotiations" are clearly under the jurisdiction of the NMB which requires that both parties adhere to the RLA status quo obligations.  NMB has not declared an impasse and has definitely not terminated mediation in Case No. A-13421.

Given this fact, Soo expects BMWED to honor its RLA status quo obligation which includes respecting the exclusive authority of NMB to determine when meetings will be resumed and if/when an impasse has been reached in the "BMWED/Soo Section 6 negotiations."

Sincerely,

Cathryn S. Frankenberg
AVP Labor Relations & Human Resource - US

cc:   Terri Brown, NMB
      L. R. Fenhaus
      Don Griffin
      Stuart Hurlburt
      Henry Wise
      Andrew Shields
      Brock Winter
      Scott MacDonald
      Glyn Hughes
      Mike Hanson
      Don McCall
      Bjarne Henderson
      Mike Kluska
      Anthony Stillittano
      Larry Gibbons, NMB

# DECLARATION OF MARK S. WIMMER
# EXHIBIT 3



# BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION
# OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS
*Chicago, Milwaukee, St Paul &Pacific System Federation*
*and*
*Soo Line System Division*

---

**Mark S. Wimmer, General Chairman**
18921 York Street, NW   Suite F
Elk River, MN  55330-3001
Area Code (763) 441-6355
Fax (763) 441-1741

**Gene A. Bell, General Chairman**
6210 Sheridan Avenue, South
Richfield, MN  55423
Area Code (612) 869-2419
Fax (612) 869-7641

PRIORITY MAIL - SIGNATURE CONFIRMATION
RECEIPT #2305 1590 0001 6581 3553

May 9, 2008

Ms. Cathryn Frankenberg
AVP Labor Relations & Human Resources
Canadian Pacific Railway
501 Marquette Avenue, Suite 1000
Minneapolis, MN 55402

Re: **Letter of March 28, 2008**

Dear Cathryn:

This is in response to your letter dated March 28, 2008, which was responsive to our letter of March 10, 2008 regarding the parties' respective positions in Mediation Case No. A-13421. While you devoted 13 pages to a broadside attack on the BMWED, much of that attack was based on a specious, wholly mythical view of both the Railway Labor Act and BMWED's bargaining position. We will address matters you raised which we believe are substantive in an effort to keep this dispute focused. We also will refrain from making comments regarding the Carrier's second lawsuit against us in this round of bargaining containing the usual stock of fanciful allegations of our intended, overt or covert illegal behavior. Two lawsuits in two years are not the acts of a Carrier that wants to make a voluntary deal, nor are they the actions of a Carrier with the confidence necessary to engage in real *quid pro quo* bargaining with its employees.

Contrary to your claim, the BMWED has not attempted to "blatantly disregard and disrespect the authority of NMB." As you well know, the parties' last mediation session in November ended very soon after it started because neither side saw an opportunity to compromise from its position and continued discussions on that date would have been pointless. When we wrote our March 10 letter, more than four months had passed since that date. In that period, the NMB had not scheduled another meeting of the parties, nor had either side communicated a new, compromise offer. Our letter of March 10 was an attempt to clarify our bargaining position and attempt to either restart negotiations or get the Carrier to agree with us that future mediatory effort by the NMB would be unlikely to result in a voluntary agreement. We had hoped that you would acknowledge the reality of the situation so that when BMWED sought a proffer of arbitration from the NMB and a release from mediation, the Carrier would not oppose such a course of action. At least your 13 page missive is Exhibit "A" that the parties are at an impasse and we hope you will not attempt to oppose a BMWED request for a proffer. Of our other obligations under the RLA in general we will say nothing, nor will we comment on the Carrier's RLA obligations as well, given the Carrier has sued us, for a second time, for no real purpose other than to harass the Union and chill bargaining and exchanges between the parties.

While your lengthy letter castigated us for various sins of omission and commission, you did not engage us on the primary issue of dispute between the parties – the linkage between the Carrier's return of the maintenance of way craft into GA-23000 and the division of the cost-savings that will accrue to the Carrier from that agreement. As you know, it was the Soo that opted out of the National Plan in the first place (over the union's objections) and the Soo then obtained the union's agreement to forego the 3% General Wage Increase under the national agreement as part of a local package for what then seemed to be a better health

2

Ms. C. S. Frankenberg                                                                         May 9, 2008
re:   Letter of 3/28/08

benefits plan. Now that the National Plan offers advantageous cost savings to the Soo it wants to go back
to the National Plan, but not back to national levels of pay. As we pointed out in our March 10, 2008 letter,
the enrollment of the maintenance of way group will save the Carrier more than $2400 per employee per year
based on the figures you provided to us. We noted that a restoration of a 3% GWI that BMWED members
did not receive in 1991 when other members in "national handling" did, would cost, on average, about $1900
per employee per year. We thought such a trade was a 'win-win' for both sides, yet you never really
addressed our point, nor did you take issue with our calculation of the Carrier's cost-savings from a return to
GA-23000 or our average cost of the additional 3% GWI. In fact, in the Carrier's proposal of June 13, 2007
(10:30 AM), the $2467 figure was valued at 6% of future GWIs, so our request for an additional 3% GWI in
exchange for the return to GA-23000 was, by the Carrier's own reckoning, methodologically sound and would
provide economic benefits to both parties to the deal.

Instead, the Carrier has taken the position that it will offer no more than the "same overall total compensation
value (wages and benefits) as had been contained in the BMWED/NCCC National Settlement and in the other
Soo settlements." This position conveniently ignores the $2400 per employee per year windfall the Carrier
will receive by returning to GA-23000. No other carrier in National Handling received such a benefit from the
RLBC/NCCC settlement, the TCU/NCCC settlement, the IBEW/NCCC settlement, or the tentative UTU/NCCC
settlement. Therefore, while those settlements certainly can be instructive for both parties, they are not
definitive because they are not fully comparable. We once again must remind the Carrier that it chose to
compel local bargaining beginning with the 1984 round and local negotiations mean the parties are free to
fashion local resolutions to their local problems. The Carrier's health insurance costs under its self-funded
plan are a local problem that invites a local resolution. One such example of local bargaining deviating from
the "national" norm is the BMWE/CN(IC) settlement for this same period. In that agreement, BMWED
accepted 1% less in GWIs than the RLBC settlement; however BMWED members contribute only $100 per
month in cost-sharing payments (beginning in 2008 and fixed through the duration of the agreement) as part
of CN's return to GA-23000.

We also are dismayed by the Carrier's attempt, without any supporting calculation, to allege that the value of
the 1991 local settlement was richer than the 1991 BMWE/NCCC arrangement imposed by Pub. L. 102-29.
That argument might be relevant to a claim for reparations by BMWED back to 1991 or some intermediate
point. However, we have linked the 3% GWI to the return to GA-23000 and view it as a prospective exchange
of value unrelated to any accounting of the currently unquantified "value" of certain benefits the Carrier
contends were available since 1991 compared with the undisputed loss of a 3% GWI in the wage settlement.
As we will note below, one other union on the property has made such a linkage between a return to GA-
23000 and a general wage increase unrelated to anything in the national settlements. That is all we are
proposing and the Carrier's intransigence on this point baffles us.

The Carrier's claim of an emerging local pattern also is exaggerated.

First, there has been no local "pattern" since the UTU's strike in 1994. That strike concerned the Carrier's
claims that UTU should acquiesce to an alleged local "pattern" created by settlements with other unions
locally, including BMWED. The UTU would not capitulate, struck and PEB 225 recommended the adoption
of the "national" rather than alleged "local" pattern as resolution of the dispute. As a result of that labor
dispute, UTU remained in GA-23000 and received a 3% GWI that BMWED members did not receive.

Second, some of the agreements reached between the Carrier and other unions do not track the alleged
"pattern" of the national settlements. We note in particular that the October 1, 2007 agreement between the
Carrier and the IBEW provided an additional $0.37 per hour to the journeyman rate "concurrent" with the
effective date of resolution of the health and welfare insurance Section 6 notices served in 2005. Therefore,

3

we can only conclude that the IBEW received an additional $0.37 per hour in compensation over the IBEW/NCCC settlement as a result of the IBEW's agreement to return its members to coverage under GA-23000.

Third, at least one settlement made by the Carrier in this round contemplates that a "different" result may be reached by another union. The October 1, 2007 IBEW settlement contains a "me too" side letter that provides "should a subsequent settlement for this same contract term between Soo and one or more of the unions representing its employees resolve issue(s) on the return to the National Plan in a more favorable manner, a comparable resolution will be made available to the IBEW." There is no local "pattern" if one of the "pattern" agreements contains a "me too" clause. The Carrier's "pattern" argument amounts to claim that it has achieved a favorable agreement, from its perspective, with a number of unions and now hopes it can coerce, cajole or otherwise pressure the other unions to agree on identical terms. However, the acceptance of a "me too" clause also means that if the Carrier can't achieve its goal, the other unions are off the hook because they will receive the "best" deal negotiated by anyone. Therefore, we view our bargaining as where it should be, a dialog between two parties attempting to resolve the particular, local issues. There is no local "pattern" and, as shown above, the national settlements are not dispositive.

Up to this point, we have received nothing from the Carrier that proposes a *quid pro quo* settlement that resolves the Carrier's desire to effect a substantial cost savings and our desire to share in the economic benefits of that deal. Your letter of March 28 offered nothing new in that regard, so we must assume the Carrier will not budge from its position that any agreement must slavishly mirror the RLBC/NCCC settlement. As we demonstrated, that agreement is not dispositive of our local issues and we believe we remain at an impasse and any further mediatory effort by the Board would be futile.

Finally, without engaging in a categorical refutation, point by point, of the Carrier's view of the parties' bargaining history, we do feel compelled to respond to some of them.

Your letter takes great issue with the fact that the BMWED has put new work rules issues on the table after we presented a putative exhaustive list of rules in January 2007. Those work rules were identified and presented in list form within the context of negotiations concerning a single collective agreement to replace the current separate agreements applicable to the former Soo and Milwaukee properties and reflected the compromises and trade offs from such a decision. When that enterprise collapsed in July and August 2007 and the Carrier determined that it was no longer interested in bargaining over a single agreement, BMWED was no longer bound by that list because the bargaining had effectively returned to "square one." Additionally, another ten months passed after the original list was prepared. While the Carrier may not feel that 29 months is a long period in which to bargain collectively, it certainly cannot believe that bargaining positions are like flies trapped in amber. Unlike fossilized insects, bargaining relationships and proposals continue to evolve until the parties reach a voluntary agreement.

Moreover, your assertion that "BMWED consistently failed to provide comprehensive work rule counterproposals and did not provide workable responses to Soo's local work rule issues," is nothing more than a big, fat, lie. Between April and June 2007, both parties exchanged numerous work rules and seniority proposals. For example, on June 12, 2007, BMWED presented a two-page bullet point response to the Carrier dealing with "Bulletined Positions", "Expenses for Headquartered Crews", a counterproposal to a Carrier demand to increase the number of right of selection positions, a counterproposal on starting times that stated a willingness to explore greater flexibility for starting mobile crews and several other minor local rules. The following day, BMWED presented a two-page bullet point proposal on both system and division operations in response to a Carrier proposal and on June 14, we presented a two-page proposal on how to combine the applicable Soo and Milwaukee seniority classifications under the Milwaukee CBA. Finally, on July 10, 2007,

4

Ms. C. S. Frankenberg                                                                                    May 9, 2008
re:   Letter of 3/28/08

we presented a six-page "comprehensive outline" proposal for settlement of the round of bargaining. The Carrier's response was that our proposal was "too rich" without any substantive explanation and it broke off talks. The next response we received was a "square one" clone of the RLBC/NCCC settlement in October. At no point did the Carrier say with any specificity what in our counterproposals was too rich, you just said they were "too rich" and "we think you overvalue your proposals to us". Never did we receive any data driven criticism of our proposals that would have expanded system operations and permitted a rearrangement of division boundaries within the Twin Cities. Don't lecture us on our alleged failures to bargain, we worked hard to develop proposals which we believed addressed the Carrier's legitimate needs in the context of an agreement that would be acceptable to the employees who would work under it. That's called collective bargaining.

Your criticism of BMWED's cessation of bargaining after Soo filed a baseless legal action against the union is ridiculous. The Carrier sued the union when no strike action had been taken or threatened. Yet the lawsuit sought to prevent BMWED from responding if the Carrier assisted its corporate affiliate that was lawfully being struck by another branch of the IBT. BMWED simply did not believe that there was a reasonable environment for bargaining when the carrier had sued BMWED union without cause and in order to aid a struck affiliate. If Soo was really interested in bargaining it should have thought about the consequences of its action before initiating frivolous litigation against the union.

Finally, you have taken exception to BMWED's bargaining proposal to establish, by agreement, safety committees. In particular, you noted that Scott MacDonald, the Carrier's AVP for Operations, was willing to discuss changes to the safety committee protocols currently in place for its U.S. maintenance of way operations. Without casting any doubt on Mr. MacDonald's sincerity, we must stress that protocols ultimately are unenforceable because if the Carrier unilaterally changes them or repudiates them, we have no remedy. A collectively bargained arrangement requires the parties to work through difference of opinion because neither side can walk away from the relationship. That, in our opinion, will strengthen the safety culture on the Carrier in a way that voluntary committees and protocols with no enforcement mechanism never will.

Sincerely,

Mark S. Wimmer, General Chairman                    Gene A. Bell, General Chairman
BMWED of IBT - CMStP&P System Federation           BMWED of IBT - Soo Line System Division

MSW/GAB:jal/opeiu#12

cc:      Mr. T. A. Barrette
         Mr. T. Blumhagen
         Mr. D. Bogart
         Ms. Terri Brown
         Mr. R. Dusterhoft
         Mr. L. R. Fenhaus
         Mr. D. Griffin
         Mr. J. P. Hoffa
         Mr. S. Hurlburt
         Mr. J. Murphy
         Mr. J. D. Petty
         Mr. F. Simpson
         Mr. H. Wise

**EXHIBIT B TO MOTION OF
BROTHERHOOD OF MAINTENANCE OF
WAY EMPLOYES DIVISION/IBT
TO DISMISS COMPLAINT FOR LACK OF
SUBJECT MATTER JURISDICTION**

*JH*

**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

APR 2 0 2007 *rg*
APR. 20, 2007
MICHAEL W. DOBBINS
CLERK. U.S. DISTRICT COURT

| | |
|---|---|
| SOO LINE RAILROAD COMPANY<br>d/b/a Canadian Pacific Railway<br>501 Marquette Avenue, South<br>Minneapolis, MN 55402<br><br>    and<br><br>DELAWARE AND HUDSON RAILWAY<br>COMPANY, INC.<br>d/b/a Canadian Pacific Railway<br>200 Clifton Corporate Park<br>Clifton Park, NY 12065,<br><br>                    *Plaintiffs,*<br><br>      v.<br><br>BROTHERHOOD OF MAINTENANCE OF WAY<br>EMPLOYES DIVISION OF THE INTERNATIONAL<br>BROTHERHOOD OF TEAMSTERS<br>20300 Civic Center Drive, Suite 320<br>Southfield, MI 48076,<br><br>                   *Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>**07CV2202**<br>**JUDGE GETTLEMAN**<br>**MAG.JUDGE DENLOW**<br><br>) Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

<u>**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

1.      Plaintiffs Soo Line Railroad Company d/b/a Canadian Pacific Railway

("Soo") and Delaware and Hudson Railway Company, Inc. d/b/a Canadian Pacific Railway

("D&H") bring this action against defendant Brotherhood of Maintenance of Way Employes

Division of the International Brotherhood of Teamsters ("BMWED"), pursuant to the

Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the Railway Labor Act ("RLA"), 45

U.S.C. §§ 151 *et seq.* Plaintiffs seek a declaration of the parties' rights and obligations under the

RLA with respect to disputes arising out of ongoing negotiations and mediation over proposed

changes to the parties' existing collective bargaining agreements, and disputes arising out of the interpretation and application of terms of the parties' existing collective bargaining agreements. In particular, plaintiffs seek a declaration that the parties' disputes are subject to resolution exclusively through the procedures mandated by the RLA and that BMWED may not lawfully strike, picket, engage in a work stoppage or slowdown, or engage in other economic self-help in connection with those disputes. Plaintiffs also seek appropriate injunctive relief to prevent an unlawful strike or other self-help by BMWED.

## PARTIES

2.     Plaintiff Soo is a corporation organized and existing under the laws of the State of Minnesota, with its principal offices located at 501 Marquette Avenue South, Minneapolis, Minnesota 55402. Soo is a common carrier by railroad engaged in interstate commerce and is a "carrier" within the meaning of, and subject to, the Railway Labor Act ("RLA"), 45 U.S.C. § 151 First, and the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. § 10101. Soo operates a railroad system in North Dakota, Minnesota, Wisconsin, Illinois, Indiana, and Michigan. Soo is a wholly owned subsidiary of Soo Line Corporation, which in turn is an indirect wholly owned subsidiary of Canadian Pacific Railway Company ("CPR"), a Canada corporation.

3.     Plaintiff D&H is a corporation organized and existing under the laws of the State of Delaware, with its principal offices located at 200 Clifton Corporate Park, Clifton, New York 12065. D&H is a common carrier by railroad engaged in interstate commerce and is a "carrier" within the meaning of, and subject to, the RLA and ICCTA. D&H operates in New York, New Jersey, Pennsylvania, Maryland, and the District of Columbia. D&H is a wholly

- 2 -

owned subsidiary of Soo's parent, Soo Line Corporation, and, therefore, is also an indirect wholly owned subsidiary of CPR.

4.    Defendant BMWED is an unincorporated labor organization that is a "representative" of employees within the meaning of, and subject to, the RLA, 45 U.S.C. § 151 Sixth. At all times mentioned herein, pursuant to a certification issued by the National Mediation Board ("NMB"), BMWED has represented, for purposes of collective bargaining under the RLA, persons employed by Soo in the "craft or class" of maintenance of way employees. At all times mentioned herein, pursuant to a separate certification issued by the NMB, BMWED has represented, for purposes of collective bargaining under the RLA, persons employed by D&H in the "craft or class" of maintenance of way employees.

5.    On Soo and D&H, BMWED acts through System Divisions or System Federations, each headed by a General Chairman. BMWED, through its officials and officers, regularly conducts business and acts for its members and other employees it represents in this judicial district. The BMWED General Chairman with responsibility for Soo employees on Soo's former "Milwaukee Road" properties is Mark S. Wimmer. The BMWED General Chairman for other Soo employees is Gene A. Bell. The BMWED General Chairman with responsibility for D&H employees is Stuart A. Hurlburt, Jr.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over the subject matter of this civil action under 28 U.S.C. § 1331, because federal questions arising under the RLA are presented. The RLA and the Declaratory Judgment Act authorize the requested relief.

7.    Venue is properly laid in this judicial district under 28 U.S.C. § 1391(b)(1) and (b)(2).

- 3 -

## APPLICABLE LEGAL STANDARDS

8.     The RLA prescribes mandatory and exclusive procedures for resolving labor disputes between railroads and their employees.  Under the RLA, collective bargaining agreements between railroads and labor unions do not, as a general matter, expire on a date certain but, rather, continue in effect until changed.  The RLA procedures governing the establishment and modification of labor agreements -- so-called "major disputes" -- are set forth in  §§ 5 First, 6, and 10 of the RLA, 45 U.S.C. §§ 155 First, 156, and 160.  Under those RLA provisions, a party seeking to change "rates of pay, rules or working conditions" must serve a notice under RLA § 6 initiating bargaining (a so-called "Section 6 Notice").  If agreement is not reached, the process may continue through mediation under the auspices of the NMB, 45 U.S.C. § 155 First.  If mediation is unsuccessful (and only the NMB can release the parties from mediation), the parties must consider voluntary arbitration under 45 U.S.C. § 157.  And if the dispute remains unresolved and threatens substantially to interfere with interstate commerce, the President may appoint a Presidential Emergency Board to recommend a solution, pursuant to 45 U.S.C. § 160.

9.     Throughout the statutory bargaining process, the parties must maintain the status quo.  Only if agreement is not reached after the process has been exhausted do the parties become free to resort to "self-help" -- *i.e.*, the union may strike and the carrier may unilaterally institute its proposed changes to the labor agreement.  However, it is unlawful for a union to engage in a strike or other coercive self-help in aid of its bargaining demands prior to conclusion of the statutory process.  A district court has jurisdiction to enforce the mandatory RLA bargaining process by enjoining a union's premature strike or other coercive self-help.

10.     The RLA prescribes a different set of mandatory and exclusive procedures, set forth in RLA § 3, 45 U.S.C. § 153, for resolving disputes over the "interpretation

- 4 -

or application" of existing agreements concerning rates of pay, rules and working conditions (so-called "minor disputes"). These procedures include mandatory arbitration before the National Railroad Adjustment Board, 45 U.S.C. § 153 First (i), or, alternatively, before a special board of adjustment established by a carrier and a labor union under 45 U.S.C. § 153 Second.

11.     It is unlawful for a union to engage in a strike or other coercive self-help over a dispute that is governed by RLA § 3. A district court has jurisdiction to enforce RLA § 3 by enjoining a strike over such a dispute.

12.     As a matter of law, when a railroad's action is based on an interpretation of its existing collective bargaining agreement that is at least arguably justified -- that is, not "obviously insubstantial" or "frivolous" -- a dispute over the railroad's right to take the action is a "minor dispute" that must be resolved through arbitration, and a strike or other self-help by the union is unlawful and may be enjoined.

13.     Pending resolution of a dispute that falls within the exclusive jurisdiction of an RLA arbitration board, a railroad is entitled as a matter of law to continue to apply its interpretation of the labor agreement under which the dispute has arisen, unless and until the dispute is resolved against the railroad's interpretation by an RLA § 3 arbitration board.

14.     Section 2 First of the RLA, 45 U.S.C. § 152 First, requires labor unions and the employees they represent to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." Labor unions are required to make affirmative efforts to

- 5 -

ensure that the employees they represent do not engage in actions that contravene the duty imposed by § 2 First. The obligations imposed by RLA § 2 First are judicially enforceable.

## EVENTS REQUIRING RELIEF

**A.    The Disputes Over RLA Bargaining And Status Quo Obligations**

15.    Soo and D&H have disputes with BMWED over the union's obligation not to strike, picket, engage in a work stoppage or slowdown, or engage in other coercive economic self-help while the parties are in mediation over proposed changes to their labor agreements that are contained in the parties' Section 6 Notices, and also over the union's obligation not to use economic coercion to force other changes to the parties' labor agreements, apart from the proposed changes that are already in mediation, instead of following the prescribed RLA process for modifying labor agreements.

**1.    Soo's Negotiations With BMWED**

16.    Soo and BMWED are parties to various labor agreements that prescribe the rates of pay, rules, and working conditions of Soo maintenance of way employees. As pertinent here, these include two agreements: (1) a basic "schedule agreement" entered into by Soo and the Brotherhood of Maintenance of Way Employes ("BMWE") (as BMWED was then known, before it became a division of the Teamsters), effective January 1, 2000, applicable to employees working on Soo's former "Milwaukee Road" property ("the Soo Agreement (former Milwaukee Road Property)"), and (2) a basic "schedule agreement" entered into by Soo and BMWE, effective December 31, 2001, applicable to Soo's other maintenance of way employees ("the Soo Agreement").

- 6 -

17.    On April 7, 2005, BMWED served on Soo a Section 6 Notice proposing changes to the Soo Agreement and a separate Section 6 Notice proposing changes to the Soo Agreement (former Milwaukee Road Property).

18.    On April 18, 2005, Soo served its own Section 6 Notice on BMWED proposing its own changes to the Soo Agreement (former Milwaukee Road Property).    On April 20, 2005, Soo served a Section 6 Notice on BMWED proposing changes to the Soo Agreement.

19.    Soo and BMWED engaged in concurrent negotiating sessions covering both the Section 6 Notices relating to the Soo Agreement and the Section 6 notices relating to the Soo Agreement (former Milwaukee Road Property).    Negotiating sessions were held in June, September, and December 2005, and in February, March, May, and July 2006, but no agreement was reached.

20.    On July 13, 2006, in accordance with RLA § 5, Soo submitted the dispute over all of the Section 6 Notices to mediation before the NMB.    The NMB docketed the case on July 19, 2006 as NMB Case Number A-13421 and appointed Terri D. Brown as mediator.

21.    Representatives from Soo and BMWED held an initial session with the mediator on November 14 and 15, 2006.    Further two-day mediation sessions were held on January 23 and 24, 2007, and March 28 and 29, 2007.    Soo and BMWED remain in mediation over their Section 6 Notices, with the next mediation session scheduled for April 24 and 25, 2007.    Mediation sessions have also been scheduled for May, June, July, and September 2007.

**2.    D&H's Negotiations With BMWED**

22.    D&H and BMWED are parties to a basic "schedule agreement" that governs the rates of pay, rules and working conditions of D&H's maintenance of way employees, effective December 21, 1999, and revised March 21, 2007 ("the D&H Agreement").

23.    D&H negotiates its own labor agreements with BMWED and is not a party to Soo's negotiations with BMWED. On December 30, 2004, BMWED served a Section 6 Notice on D&H proposing changes to the D&H Agreement. On March 24, 2005, D&H served its own Section 6 Notice on BMWED proposing changes to the D&H Agreement.

24.    Negotiations were held over the D&H and BMWED Section 6 Notices in August and September 2005, March and June 2006, and March 2007, but agreement was not reached.

25.    On March 26, 2007, in accordance with RLA § 5, D&H submitted the dispute over the Section 6 Notices to mediation before the NMB. The NMB docketed the case on April 2, 2007 as NMB Case Number A-13443, and appointed Ernie Dubester as mediator on April 6, 2007. The case remains in mediation (separate from the mediation between BMWED and Soo).

**3.    CPR's Negotiations With TCRC-MWED In Canada**

26.    CPR is engaged in a labor dispute in Canada with the union that represents its maintenance of way employees, the Teamsters Canada Rail Conference–Maintenance of Way Employees Division ("TCRC-MWED"). TCRC-MWED is a subdivision or subordinate unit of the International Brotherhood of Teamsters, of which BMWED is also a Division. The bargaining relationship between CPR and TCRC-MWED is governed by the Canada Labour Code, not the RLA.

27.    CPR and TCRC-MWED were parties to a collective bargaining agreement that was in effect from January 1, 2004 until December 31, 2006. Since June 2006, pursuant to the Canada Labour Code, CPR and TCRC-MWED have been engaged in negotiations and then in "conciliation" over the terms of a new labor agreement. When no agreement was reached by April 1, 2007, TCRC-MWED became entitled under the Canada Labour Code to strike CPR following a 21-day cooling-off period and the provision to CPR of a required 72 hours' notice of a strike. TCRC-MWED has announced on its website that it has conducted a strike vote among the CPR employees it represents, and that a majority of the employees have approved a strike against CPR.

28.    On information and belief, TCRC-MWED intends to conduct a strike against CPR as soon as it is permitted to do so under Canadian law.

4.    **BMWED's Intention To Strike Soo And D&H**

29.    On information and belief, BMWED intends to strike, picket, or engage in a work stoppage or slowdown or other coercive economic self-help against Soo and D&H, and to encourage and induce Soo and D&H maintenance of way employees to participate in such strike or other self-help, in aid of the bargaining demands in BMWED's Section 6 Notices directed to Soo and D&H, even though BMWED and the railroads are in mediation under the auspices of the NMB over those Notices and a strike would therefore be unlawful. BMWED's unlawful purpose will be to put economic pressure on Soo and D&H in order to force the railroads to accede to the demands made in the union's Section 6 Notices. On information and belief, BMWED intends to coordinate its strike or other self-help against Soo and D&H so as to coincide with a strike of CPR in Canada by TCRC-MWED.

- 9 -

30.    On information and belief, BMWED also intends to strike, picket, or engage in a work stoppage or slowdown or other coercive economic self-help against Soo and D&H, and to encourage and induce Soo and D&H maintenance of way employees to participate in such strike or other self-help, in an attempt to force Soo and D&H to accede to unlawful demands regarding these railroads' dealings with their parent company, CPR. BMWED intends to attempt to prevent Soo and D&H from dealing with CPR during any strike of CPR by TCRC-MWED, and, in particular, to prevent Soo and D&H from sending management personnel to Canada to help CPR operate during a strike. Nothing in the parties' labor agreements imposes any restrictions on Soo's or D&H's ability to deal with CPR, including without limitation helping CPR operate during a strike. No demand seeking the imposition of any such restrictions has been made the subject of a BMWED Section 6 Notice to either Soo or D&H. Even assuming *arguendo* that a demand for the adoption of such restrictions in the parties' labor agreements would be a mandatory subject of bargaining under the RLA (which Soo and D&H deny), the only lawful method of obtaining such restrictions would be through the mandatory RLA processes for modifying labor agreements -- not through economic self help.

**B.    The Disputes Over The Interpretation Or Application Of Labor Agreement Requirements**

31.    Soo and D&H also have disputes with BMWED over the obligations of BMWED-represented employees to report for duty at the times and places scheduled by Soo or D&H and to perform their assigned duties for their employers. These are disputes over the interpretation or application of Soo's and D&H's labor agreements with BMWED.

32.    The Soo Agreement, the Soo Agreement (former Milwaukee Road Property), and the D&H Agreement each contain provisions that require employees to report to

work at the times and places directed by Soo or D&H, respectively, and that limit the circum-stances in which an employee may take time off from work.

33.    The pertinent provisions in the Soo Agreement, the Soo Agreement (former Milwaukee Road Property), and the D&H Agreement are similar. Each Agreement, for instance, has provisions that establish a basic eight-hour work day and a basic forty-hour work week, with specified schedules and starting times (which are subject to adjustment). Soo Agreement, Rules 22, 23, 25, 26; Soo Agreement (former Milwaukee Road Property), Rules 19, 21, 22, 23; D&H Agreement, Rules 9, 10, 12.

34.    Each Agreement prescribes disciplinary procedures (Soo Agreement, Rule 20; Soo Agreement (former Milwaukee Road Property), Rule 18; D&H Agreement, Rule 25) for enforcing compliance with the subject railroad's operating rules, which expressly provide that "[e]mployees must report for duty at the designated time and place" and "must not leave their assignment . . . without proper authority" (General Code of Operating Rules, Rule 1.15, applicable on both Soo and D&H).

35.    The Agreements (including incorporated National Vacation Rules) also specify the circumstances in which an employee is relieved of his obligation to report for work (subject to the contractually prescribed terms and conditions). These circumstances include authorized vacations, jury duty, court attendance, bereavement leave, and other authorized leaves of absence. Under the Agreements, before an employee may actually take time off for any of the permitted reasons, he must first obtain approval of management. Nothing in the Agreements authorizes an employee to take time off from work to strike, engage in picketing, or to express support or sympathy for other striking workers (by not crossing a picket line or otherwise).

36.    The Agreements also prescribe mandatory and exclusive claims procedures for resolving disputes by means other than strikes or picketing. Soo Agreement, Rule 21; Soo Agreement (former Milwaukee Road Property), Rule 47; D&H Agreement, Rule 24.

37.    Soo and D&H interpret these provisions of the Soo Agreement, the Soo Agreement (former Milwaukee Road Property), and the D&H Agreement, taken together and in the context of the parties' longstanding practices, as requiring Soo and D&H maintenance of way employees to report for work as scheduled, notwithstanding any strike of CPR by TCRC-MWED.

38.    As previously described, on information and belief, BMWED intends to strike or otherwise engage in coercive economic self-help against Soo and D&H, in connection with the impending strike of CPR by TCRC-MWED. It is apparent that BMWED disagrees with Soo's and D&H's interpretation of the parties' labor agreements as requiring Soo and D&H maintenance of way employees to report to work as scheduled, notwithstanding any strike of CPR by TCRC-MWED.

39.    Accordingly, Soo and D&H have a dispute with BMWED as to whether, under the applicable labor agreements, Soo and D&H maintenance of way employees have an obligation to report to work as scheduled, notwithstanding any strike of CPR by TCRC-MWED.

40.    This circumstance presents a dispute regarding the interpretation or application of the parties' labor agreements, and it is subject to the mandatory and exclusive procedures for resolving such disputes, including arbitration before an RLA arbitration board, that are prescribed by the agreements themselves and by RLA § 3.

41.    On information and belief, rather than submitting this RLA § 3 dispute to the mandatory and exclusive procedures for resolving such disputes under the parties' labor

agreements and the RLA, BMWED intends to defy its RLA obligations by striking, picketing, or engaging in a work stoppage, slowdown, or other coercive economic self-help against Soo and D&H, and by encouraging employees to participate in such strike or other self-help, over the dispute.

## C.    Irreparable Harm

42.    A strike, picket, work stoppage, slowdown, or other economic self-help by BMWED, and/or the employees it represents, against Soo or D&H will, unless restrained and enjoined, cause immediate, substantial, and irreparable injury to Soo, D&H, their customers, and the public in amounts that cannot be definitely ascertained in that, among other facts:

(a)    Such acts would delay, disrupt, and impede Soo and D&H train operations and the railroads' ability to complete shipments of merchandise and other cargo;

(b)    Disruption at one point on the Soo system will adversely affect operations in other territories served by Soo in the upper Midwestern United States, including Soo's St. Paul and Chicago service areas;

(c)    Disruption at one point on D&H will adversely affect operations in other parts of D&H's service area in the Northeast;

(d)    The unlawful acts will render Soo and D&H unable to continue to provide railroad transportation services to their customers and thus unable to carry out their obligations as rail carriers engaged in interstate commerce;

(e)    The resulting interruption, curtailment or cessation of rail transportation services will cause serious and immediate disruption, and injury to customers served directly and indirectly by Soo and by D&H, and to those

customers' customers, and will deprive various shippers and consignees, some of which do not have practicable access to alternative modes of transportation, of essential transportation facilities;

(f)     The interruption, curtailment or cessation of Soo or D&H rail services will have a disruptive effect on freight operations throughout various parts of the country, including but not limited to the interchange of freight between Soo and other carriers or between D&H and other carriers (including CSX Transportation and Norfolk Southern Railway Company) and will, as a consequence, severely interrupt the flow of interstate commerce and disrupt the movement of freight to and from Canada;

(g)     Soo and D&H will, as a consequence of their inability to provide rail service, suffer the immediate and potentially permanent loss of customers who will be forced to turn to alternative means of transportation and competing carriers;

(h)     As a further consequence of their inability to provide rail service, Soo and D&H will lose good will, be deprived of operating revenue and be unable to use and adequately maintain the property, facilities and equipment in which they have made enormous capital investments; and

(i)     The loss of customers and revenues may compel Soo and D&H to lay off employees, who may thereby lose their means of livelihood.

43.     The injuries that will be inflicted upon Soo and D&H by denial of the injunctive relief sought herein would be far greater than any that might be inflicted on BMWED by the granting of the relief.

- 14 -

## COUNT ONE

### Claim For Declaratory and Injunctive Relief Pursuant To
### Sections 5 First, 6, And 10 Of The Railway Labor Act
### In Connection With Bargaining Disputes That Are In Mediation

44.     Plaintiffs repeat and reassert the allegations of paragraphs 1 through 43, as though fully set forth herein.

45.     BMWED is in mediation with Soo, under the auspices of the NMB, over the proposed changes to the Soo Agreement and the Soo Agreement (former Milwaukee Road Property) contained in the parties' Section 6 Notices.  BMWED is separately in mediation with D&H, under the auspices of the NMB, over the proposed changes to the D&H Agreement contained in the parties' Section 6 Notices.  To the extent that BMWED is seeking to obtain concessions from Soo and D&H on the subjects addressed in the Section 6 Notices, BMWED may do so only by adhering to the mandatory RLA bargaining process, and is required to maintain the status quo while the parties are in mediation.  Only after first exhausting the RLA process, which it has not done, could BMWED obtain a right to strike or use other economic self-help over these bargaining disputes.  Soo and D&H at all times have been ready, willing, and able to comply, and have complied, with the requirements of the RLA with respect to the ongoing bargaining disputes.

46.     BMWED cannot lawfully strike, picket, or engage in a work stoppage, slowdown, or other economic self-help, or encourage Soo or D&H employees to engage in a strike or other self-help, in aid of the demands in BMWED's Section 6 Notices, while the parties are in mediation over those notices.  Such conduct violates §§ 5, 6, and 10 of the RLA.

47.     Soo and D&H are entitled to a declaration that BMWED cannot strike, picket, or engage in a work stoppage, slowdown, or other economic self-help in aid of the

- 15 -

demands in its Section 6 Notices while the parties are in mediation, and to appropriate injunctive relief.

## COUNT TWO

### Claim For Declaratory And Injunctive Relief Pursuant To Sections 5 First, 6, And 10 Of The Railway Labor Act In Connection With Bargaining Demands That Have Not Been The Subject of A Section 6 Notice

48.    Plaintiffs repeat and reassert the allegations of paragraphs 1 through 47, as though fully set forth herein.

49.    BMWED's existing labor agreements with Soo and with D&H impose no obligations or restrictions on either carrier with respect to their dealings with CPR. To the extent that BMWED strikes, pickets, or engages in a work stoppage, slowdown, or other economic self-help in an effort to coerce Soo and D&H into refusing to deal with CPR during the pendency of its dispute with TCRC-MWED -- specifically including refraining from sending Soo or D&H management personnel to Canada to assist CPR in its efforts to operate during a strike by TCRC-MWED -- or otherwise to put pressure on CPR to settle its dispute with TCRC-MWED, BMWE is necessarily seeking to modify the Soo Agreement, Soo Agreement (former Milwaukee Road Property), and D&H Agreement to include restrictions on Soo's and D&H's ability to deal with CPR.

50.    Even assuming *arguendo* that a demand for such restrictions, if contained in a Section 6 Notice, would be a mandatory subject of bargaining under the RLA (which Soo and D&H deny), BMWED may lawfully seek changes in its existing labor agreements with Soo and D&H only by following the mandatory RLA procedures for modifying agreements, beginning with the service of Section 6 Notices proposing changes in the agreements respecting Soo's and D&H's dealings with CPR. The BMWED Section 6 Notices that are now in

- 16 -

mediation do not address this subject. Soo and D&H are ready, willing, and able to comply with the requirements of the RLA with respect to any lawful Section 6 Notices served on them by BMWED.

51.    BMWE has not exhausted the mandatory procedures prescribed under RLA §§ 5 First, 6, and 10, in connection with any demand regarding CPR or TCRC-MWED. Accordingly, BMWED cannot lawfully strike, picket, or engage in a work stoppage, slowdown, or other economic self-help, or encourage Soo or D&H employees to engage in a strike or other self-help, in an effort to coerce acceptance of any proposals concerning CPR or TCRC-MWED. Such conduct violates RLA §§ 5, 6, and 10.

52.    Soo and D&H are entitled to a declaration that BMWED cannot strike, picket, or engage in a work stoppage, slowdown, or other economic self-help in an effort to force acceptance of demands for changes in the parties' existing labor agreements that have not been the subject of valid Section 6 Notices, and to appropriate injunctive relief.

## COUNT THREE

### Claim For Declaratory And Injunctive Relief
### Pursuant to Section 2 First Of The Railway Labor Act

53.    Plaintiffs repeat and reassert the allegations of paragraphs 1 through 52, as though fully set forth herein.

54.    BMWED is required by RLA § 2 First to "exercise every reasonable effort to make and maintain agreements . . . and to settle all disputes, whether arising out of the application of agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carriers and the employees thereof."

55.     The use by BMWED of economic self-help in aid of bargaining proposals that are currently in mediation, or to force acceptance of other changes to existing labor agreements without following the mandatory RLA procedures for negotiating changes to labor agreements, violates BMWED's duty under RLA § 2 First to "exert every reasonable effort" to settle disputes without interruption of rail transportation.   Soo and D&H are entitled to a declaration to this effect, and to appropriate injunctive relief.

## COUNT FOUR

### Claim For Declaratory And Injunctive Relief
### Pursuant To Sections 2 First and 3 Of The Railway Labor Act

56.     Plaintiffs repeat and reassert the allegations of paragraphs 1 through 55, as though fully set forth herein.

57.     The disputes between Soo and BMWED and between D&H and BMWED over the obligations of Soo and D&H employees, respectively, to report for work despite any strike by TCRC-MWED of CPR are disputes over the interpretation or application of the Soo and D&H labor agreements with BMWED and are therefore subject to resolution exclusively under RLA § 3.

58.     Soo and D&H interpret the terms of their existing labor agreements with BMWED, including the parties' longstanding practices, to prohibit BMWED-represented Soo or D&H employees from engaging in any strike, picket, work stoppage, slowdown, or other economic self-help, including without limitation refusal to cross picket lines, in connection with TCRC-MWED's strike of CPR.

59.     BMWED interprets its labor agreements differently and necessarily takes the position that those agreements do not prohibit Soo or D&H employees from engaging in a

strike, picket, work stoppage, slowdown, or other economic self-help, including without limitation refusal to cross picket lines, in connection with TCRC-MWED's strike of CPR.

60.    As a result, there is a dispute between Soo and BMWED and a dispute between D&H and BMWED over the interpretation and application of BMWED's labor agreements with the respective railroads. Under RLA § 3, these contractual disputes are subject to mandatory arbitration. Soo and D&H are ready, willing, and able to submit the disputes to the § 3 procedures, including arbitration.

61.    The Court has jurisdiction to grant an injunction barring BMWED, and individuals acting in concert with BMWED, from engaging in a strike, picket, work stoppage, slowdown, or other self-help, including without limitation refusal to cross picket lines, in connection with a dispute over the interpretation or application of BMWED's labor agreements with Soo and D&H.

62.    The position of Soo and D&H that employees are required to report for work at the times and places scheduled by Soo or D&H notwithstanding any strike of CPR by TCRC-MWED is based on an interpretation of the applicable Soo and D&H labor agreements that is at least arguably justified by the language of the agreements and by the past practices of the parties. Accordingly, Soo and D&H are entitled to proceed in accordance with their interpretation of the labor agreements, and to expect and require their BMWED-represented employees to adhere to the terms of those agreements, unless and until the railroads' interpretation is rejected in arbitration under the RLA. The contractual disputes in this case have not been resolved in arbitration.

63.    To the extent that BMWED encourages and induces Soo and D&H employees to engage in a strike, picket, work stoppage, slowdown, or other self-help, including

without limitation refusal to cross picket lines, BMWED violates its obligations under RLA § 2 First to resolve its disputes with Soo and D&H over the interpretation and application of the parties' labor agreements exclusively through the procedures of RLA § 3, and "to exert every reasonable effort to make and maintain agreements."

64.     To the extent that BMWED fails to make affirmative efforts to ensure that Soo and D&H employees do not engage in a strike, picket, work stoppage, slowdown, or other self-help, including without limitation refusal to cross picket lines, BMWED violates its obligations under RLA § 2 First.

65.     Soo and D&H are entitled to a declaration that the disputes over the obligations of Soo and D&H employees to report for work as scheduled, notwithstanding any strike of CPR by TCRC-MWED, are disputes over the "interpretation or application" of existing labor agreements, which are subject to resolution exclusively in arbitration under RLA § 3, and that a strike, picket, work stoppage, slowdown, or other economic self-help over these disputes violates BMWED's obligations under RLA §§ 2 First and 3. Soo and D&H are also entitled to appropriate injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs Soo and D&H request that judgment be entered in their favor and against defendant BMWED, and respectfully pray that the Court:

(1)     Grant judgment declaring that a strike, picket, work stoppage, slowdown, or other economic self-help by BMWED against Soo or D&H in aid of the subjects of the Soo, D&H, or BMWED Section 6 Notices that are currently in mediation under the auspices of the National Mediation Board violates BMWED's obligations under RLA §§ 5 First, 6, and 10, 45 U.S.C. §§ 155 First, 156, 160;

(2)    Grant judgment declaring that a strike, picket, work stoppage, slowdown, or other economic self-help by BMWED against Soo or D&H to force acceptance of bargaining demands to change the parties' existing agreements that have not been the subjects of a Section 6 Notice violates BMWED's obligations under RLA §§ 5 First, 6, and 10, 45 U.S.C. §§ 155 First, 156, 160;

(3)    Grant judgment declaring that a strike, picket, work stoppage, slowdown, or other economic self-help by BMWED against Soo or D&H in connection with the disputes that are currently in mediation or to force acceptance of other bargaining proposals that have not been the subject of a Section 6 Notice violates BMWED's obligations under RLA § 2 First, 45 U.S.C. § 152 First;

(4)    Grant judgment declaring that the disputes between Soo and BMWED and between D&H and BMWED over the obligations of Soo and D&H employees to report for work as scheduled, notwithstanding any strike of CPR by TCRC-MWED, are disputes over the interpretation or application of existing labor agreements between BMWED and the respective plaintiff railroads; that these disputes are within the exclusive jurisdiction of the National Railroad Adjustment Board or privately established adjustment boards, as provided in RLA § 3, 45 U.S.C. § 153; that BMWED may not lawfully engage in a strike, picket, work stoppage, slowdown, or other self-help against Soo or D&H in connection with these disputes; and that a strike, picket, work stoppage, slowdown, or other economic self-help over these disputes violates BMWED's obligations under RLA §§ 2 First and 3, 45 U.S.C. § 152 First, § 153;

(5)    Enter a permanent injunction enjoining BMWED and its officers, agents, servants, employees, members, and all persons acting in concert or participation with any

- 21 -

of them, from striking, picketing, engaging in a work stoppage or slowdown, or otherwise exercising coercive self-help against Soo or D&H in connection with the parties' disputes as set forth herein, and from encouraging or inducing any other person to strike, picket, engage in a work stoppage or slowdown, or otherwise exercise coercive self-help against Soo or D&H in connection with those disputes;

(6)    Grant such temporary and preliminary injunctive relief against BMWED as may be appropriate;

(7)    Award plaintiffs their costs and expenses, including attorneys' fees, incurred in this proceeding; and

(8)    Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

James S. Whitehead
Illinois Bar No. 3004333
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7703

Jeffrey S. Berlin
Mark E. Martin
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8178

*Attorneys for Plaintiffs Soo Line Railroad
Company and Delaware and Hudson Railway
Company, Inc.*

- 22 -

## VERIFICATION

Cathryn Frankenberg deposes and says that she is Assistant Vice President Labor Relations and Human Resources-U.S. for Canadian Pacific Railway, with offices at Suite 1000, 501 Marquette Ave. S., Minneapolis, Minnesota 55402; that she has read the foregoing Verified Complaint For Declaratory And Injunctive Relief and knows the contents thereof; and that the facts and allegations contained therein are true in substance and fact to the best of her knowledge, information and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _18_ day of April, 2007.

Cathryn Frankenberg

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.0
### Eastern Division

Soo Line Railroad Company, et al.

                                      Plaintiff,

v.
                                       Case No.:
                                       1:07−cv−02202
                                       Honorable Robert W.
                                       Gettleman

Brotherhood of Maintenance of Way Employes
Division of the International Brotherhood of
Teamsters

                                       Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, August 16, 2007:

      MINUTE entry before Judge Robert W. Gettleman :Motion to dismiss [10] is granted and this case is dismissed without prejudice. Civil case terminated. Status hearing held on 8/16/2007.Mailed notice(gds, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

are rejected." *Id.* at ___. The Court concluded stating that "We do not believe that ALPA's statement that it would 'take all appropriate action,'...could reasonably be viewed as a direct threat to file a lawsuit in the immediate future.". *Id.* at 965. *Cf. NLRB v. WPIX*, 906 F. 2d 898 (2d Cir. 1990)–both sides engaged in some exaggeration, posturing and dilatory tactics, as might be expected in labor negotiations...." .

In *Atlas Air, Inc. v. Air Line Pilots Ass'n*, 232 F.3d 218 (D.C. Cir. 2000), it was held that a complaint for a declaratory judgment that a carrier's future implementation of changes would be lawful such that a possible responsive strike would be unlawful did not assert a claim within the subject matter jurisdiction of the courts. The mere potential for action that would be unlawful was insufficient for federal court jurisdiction. That court stated: "That a union may posture in labor negotiations or otherwise threaten to respond to future changes is insufficient to create the reasonable apprehension of litigation necessary for the claim to be justiciable". *Id.* at 227. Similarly, in *Airline Professionals Association v. Airborne, Inc.*, 332 F. 3d 983 (6th Cir. 2003), the Sixth Circuit held that a union's complaint for a declaration that a company was bound by a letter agreement was speculative and hypothetical and did not present a claim within the subject matter jurisdiction of the courts. *See also North American Airlines v. International Brotherhood of Teamsters*, 2005 WL 646350 (S.D. N.Y.2005)–court lacked jurisdiction over complaint seeking declarations that employer could unilaterally implement changes of working conditions, and that union could not lawfully strike in response; statement by union that it would "respond accordingly" did not establish justiciability where there was no evidence of strike preparations or work slowdown, instead there was just "posturing and bravado of a type that is often found in labor negotiations and [that] does not make for a case or controversy". Id. *13-*14.

12

## IV. CONCLUSION

For the foregoing reasons, the Court should grant BMWE's motion and dismiss the Soo's complaint in its entirety.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SOO LINE RAILROAD COMPANY<br>d/b/a CANADIAN PACIFIC RAILWAY<br>COMPANY, *et al.*, | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-cv-2202 |
| | ) | |
| BROTHERHOOD OF MAINTENANCE OF WAY | ) | Judge Robert W. Gettleman |
| EMPLOYES DIVISION OF THE INTERNATIONAL | ) | |
| BROTHERHOOD OF TEAMSTERS, | ) | |
| | ) | |
| *Defendant.* | ) | |

**REVISED NOTICE OF MOTION[1]**

To:     William L. Phillips
        Attorney for Defendant

PLEASE TAKE NOTICE that one of the attorneys for Plaintiffs Soo Line Railroad
Company d/b/a Canadian Pacific Railway Company, *et al.,* will appear before the Honorable
Robert W. Gettleman in the courtroom normally assigned to him in the United States
Courthouse, 219 South Dearborn Street, Chicago, IL at 9:00 a.m. on Thursday, August 16, 2007,
to present Plaintiffs' Motion for Dismissal Pursuant to Rule 41(a)(2).

/s/ James S. Whitehead
James S. Whitehead
Illinois Bar No. 3004333
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois  60603
(312) 853-7703

---

[1] Originally, Plaintiffs filed notice of their intent to present this motion on Tuesday, August 14,
2007. Upon request by counsel for Defendant, Plaintiffs have agreed to present this motion on
Thursday, August 16, instead.

Jeffrey S. Berlin
Mark E. Martin
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8178

*Attorneys for Plaintiffs Soo Line Railroad*
*Company and Delaware and Hudson Railway*
*Company, Inc.*

2

**CERTIFICATE OF SERVICE**

James S. Whitehead, one of the attorneys for Plaintiffs Soo Line Railroad Company d/b/a Canadian Pacific Railway Company, *et al.*, certifies that he caused a copy of the attached to be served on all counsel of record through the Courts' ECF system on August 10, 2007.


/s/ James S. Whitehead

3

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois −
### Eastern Division

Soo Line Railroad Company, et al.

                                            Plaintiff,

v.
                                            Case No.:
                                            1:07−cv−02202
                                            Honorable Robert W.
                                            Gettleman

Brotherhood of Maintenance of Way Employes
Division of the International Brotherhood of
Teamsters

                                            Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Thursday, August 16, 2007:

      MINUTE entry before Judge Robert W. Gettleman :Motion to dismiss [10] is granted and this case is dismissed without prejudice. Civil case terminated. Status hearing held on 8/16/2007.Mailed notice(gds, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.