IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

SOO LINE RAILROAD COMPANY d/b/a CANADIAN PACIFIC RAILWAY,

*Plaintiff,*

v.

BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS,

*Defendant.*

Civil Action No. 08 CV 1813

Judge Der-Yeghiayan
Magistrate Judge Cox

**MEMORANDUM OF PLAINTIFF SOO LINE RAILROAD COMPANY IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

## INTRODUCTION AND SUMMARY

Plaintiff Soo Line Railroad Company ("Soo") filed this civil action seeking a declaratory judgment and, if appropriate, injunctive relief, because defendant Brotherhood of Maintenance of Way Employes Division of the International Brotherhood of Teamsters ("BMWED"), the labor union representing Soo's maintenance of way employees, had made clear that it would consider itself free to use "self-help" against Soo -- that is, strike the railroad -- if Soo does not accept BMWED's demands in the parties' ongoing labor contract negotiations. A strike in these circumstances would be unlawful, because the Railway Labor Act, 45 U.S.C. § 151 *et seq.* ("RLA"), which governs the relationship between Soo and BMWED, forbids either party from exercising self-help now, while the parties are in mediation under the controlling authority of the National Mediation Board ("NMB"), a federal agency.

BMWED has an established history of striking in defiance of its RLA obligations. Because of its persistent abuses of those obligations, the union has been subject, for the past seven years, to a permanent injunction, affirmed by the Fifth Circuit, requiring it to give ten days' advance notice of a strike against any of five of the nation's largest railroad systems. Only two large railroad systems operating in the United States, those of Canadian National Railway

and Canadian Pacific Railway (the system of which Soo is a part), were not parties to that case; and BMWED has predictably made those systems its recent targets for unlawful action. BMWED did strike a Canadian National subsidiary two years ago, in plain violation of its statutory duty not to strike; and the union was enjoined (and the injunction was upheld by the Sixth Circuit). BMWED threatened to strike Soo itself just one year ago, and ultimately did not do so after Soo filed suit in this Court seeking declaratory and injunctive relief. Now, the union has challenged Soo again, and by filing this civil action, Soo has sought to protect its interests against the potentially major consequences of even a brief strike.

BMWED, having provoked this dispute, now asks the Court to dismiss the civil action for the asserted reason that it does not present a case or controversy within the meaning of Article III. As we will demonstrate, BMWED misunderstands the case law and does not acknowledge its own provocative acts that created the parties' dispute and compel a finding that the Court's jurisdiction has been properly invoked. The dispute between Soo and BMWED is a substantial controversy, and it is real and of sufficient immediacy and reality to warrant the issuance of declaratory relief.

Soo's Complaint presents a live case or controversy, assuredly within the subject matter jurisdiction of this Court.

First, although the parties' contract negotiations had been firmly within the jurisdiction of the NMB for nearly two years, BMWED delivered to Soo a letter that Soo reasonably interpreted as an announcement of BMWED's intention to use self-help against Soo, notwithstanding the statutory prohibition of such action while the parties are in mediation. This letter alone justified Soo's filing suit; but BMWED continued to show its intentions. Indeed, after Soo responded to BMWED's letter, making a point of the requirement that both parties maintain the status quo, BMWED called Soo's understanding of the RLA "specious" and "wholly mythical."

Second, BMWED distributed copies of its letter to officials of other labor unions representing Soo employees, and otherwise let it be known that BMWED intended to carry out a strike against Soo, in a plain attempt to secure the support of other unions.

Third, BMWED's actions were understood by Soo, and have to be understood by the Court, against the background of this union's history. BMWED has routinely treated the RLA's commands as irrelevancies, to be disregarded for tactical bargaining advantage. Soo, like

the rest of the railroad industry, was familiar with BMWED's past abuses of the RLA and knew that this union, even while pretending to limit itself to "lawful" action, considers itself free to engage in acts that no court would hold to be lawful.

Even now, BMWED does not suggest, much less promise, that it will not strike Soo in an attempt to force acceptance of its bargaining demands while the parties are still in mediation. A railroad strike causes immediate damage that is neither prevented nor remedied by issuance of an injunction in a civil action filed after the strike has begun. BMWED plainly wants to use the prospect of such damage as leverage in the contract bargaining, which is precisely what the RLA forbids. Soo has a legitimate interest in obtaining a declaration by this Court of BMWED's obligation not to engage in such damaging, illegal action.

## STATEMENT OF THE CASE

Soo operates a railroad system in the Upper Midwest. BMWED represents the railroad's maintenance of way employees, who maintain its track, roadbed, and some structures.

The relationship between Soo and BMWED is governed by the RLA. The RLA prescribes a "detailed sequence of steps" that railroads and unions must follow in negotiating changes to the terms of their existing collective bargaining agreements (known as RLA "major disputes"). *United Airlines, Inc. v. Int'l Ass'n of Machinists*, 243 F.3d 349, 361 (7th Cir. 2001) ("*United v. IAM*"). The process is initiated by service of a bargaining proposal under RLA § 6, 45 U.S.C. § 156 (a "section 6 notice"). If negotiations do not produce agreement, the process may continue through mediation under the auspices of the NMB, pursuant to RLA § 5 First, 45 U.S.C. § 155 First. If the NMB determines that mediation is unsuccessful -- and only the NMB may make such a determination and release the parties from mediation, *Local 808, Building Maintenance, Service & Railroad Workers v. NMB*, 888 F.2d 1428, 1441 (D.C. Cir. 1990) – it may proffer voluntary arbitration, which the parties must consider, under 45 U.S.C. § 157. And if the dispute remains unresolved and threatens substantially to interfere with interstate commerce, the President of the United States may appoint a Presidential Emergency Board to recommend a solution. 45 U.S.C. § 160.

Railroads and unions must maintain the status quo during the "entire, lengthy" statutory bargaining process. *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 302-04 (1989) ("*Conrail*"). The status quo requirement is "'central' to the RLA's

design." *United v. IAM*, 243 F.3d at 361. Only *after* the process has been exhausted may the parties use "self-help," such as a strike. *E.g.*, *Conrail*, 491 U.S. at 303-04. A district court has authority to enforce the status quo obligations in a major dispute. *Chicago & North Western Ry. v. United Transportation Union*, 402 U.S. 570, 581 (1971); *United v. IAM*, 243 F.3d at 362.

BMWED and Soo are engaged in the process of negotiating changes to their existing labor agreements pursuant to these mandatory RLA procedures. The process began in April 2005, when Soo and BMWED exchanged section 6 bargaining notices, proposing changes to their agreements. When negotiations conducted by the parties did not produce agreement, Soo invoked mediation pursuant to the RLA in July 2006. Frankenberg Decl. ¶¶ 7-9.

Numerous mediation sessions were held beginning in November 2006, and continuing throughout 2007, and the parties remain in mediation, under the auspices of the NMB. The parties exchanged various bargaining proposals during this period, but have not reached agreement. Frankenberg Decl. ¶ 10.

Then, by letter to Soo dated March 10, 2008, BMWED preemptively presented a bargaining demand, which was not new, as the "union's final offer to settle this dispute." The letter accused Soo of negotiating "in patent bad faith," and the letter warned that if Soo did not respond within twenty days, BMWED would consider the parties to be "at impasse," that "further mediatory efforts" would be "fruitless," and that it "will take all appropriate lawful steps to resolve this dispute in the best interest of our members." Frankenberg Decl. ¶ 11 & Exh. 1.

Soo had no doubt as to what the March 10 letter meant. It was plain to Soo that the letter was a repudiation by BMWED of its obligation to maintain the status quo while the parties were still in mediation, and that it amounted to a threat to engage in a strike of Soo. The letter did not acknowledge BMWED's obligation to maintain the status quo or promise that the union would not strike. As shown below, over the years, this union repeatedly has made clear to the railroads that if, in the union's view, a railroad is bargaining in bad faith, then BMWED is no longer obligated to maintain the status quo but is free to strike or engage in other forms of self help. Further, the RLA does not permit the union (or the railroad) to declare "impasse"; only the NMB, typically acting through its assigned mediator, can do that. Soo reasonably understood the statements in BMWED's March 10 letter to amount to an announcement to Soo that the union

was claiming the right and proclaiming the intent to engage in self-help if Soo did not capitulate to the union's "final" bargaining proposal. Frankenberg Decl. ¶ 11.[1]

Soo's legitimate concern over BMWED's March 10, 2008 letter was heightened when it learned that BMWED had distributed copies of the letter to senior leadership and General Chairmen of other unions representing Soo employees. This action demonstrated that BMWED was laying the groundwork for a strike or other job action by seeking to enlist other unions to support its self help (*e.g.*, by encouraging the employees represented by those unions to honor BMWED picket lines). Frankenberg Decl. ¶ 16.

Soo's apprehension of a BMWED strike was strongly informed by Soo's awareness of this union's demonstrated and judicially recognized history of repeatedly undertaking job actions against railroads and claiming that the RLA gives it the right to do so -- when the RLA in fact prohibits BMWED's self-help. *See Burlington Northern & Santa Fe Ry. v. Brotherhood of Maintenance Way Employees*, 143 F. Supp.2d 672 (N.D. Texas 2001), *aff'd*, 286 F.3d 803 (5th Cir. 2002) (discussed in greater detail, below). Frankenberg Decl. ¶¶ 12-15.

All of this combined to force Soo to protect its interests by filing this civil action, asking the Court to declare the legal obligations of the parties under the RLA. In particular, Soo seeks a declaration that the RLA requires BMWED to maintain the status quo while the parties are in mediation and that the union cannot strike in aid of the demands in its section 6 notices unless and until the RLA major dispute process has been fully exhausted. (Soo also seeks

---

1 In truth, there is no substance to BMWED's self-serving assertion that Soo has bargained in bad faith. Soo has demonstrably bargained in good faith. Soo's purpose has always been to reach an agreement on terms that are consistent with its interests, but that the union can accept. Indeed, when BMWED, in its March 10, 2008 letter, pointed out an inadvertent mistake in Soo's then pending bargaining proposal, Soo corrected the mistake by means of its March 28, 2008 response to the union. In fact, since late 2004, Soo has been able to negotiate new labor agreements with all thirteen of the other unions representing its employees (the agreement with one of these unions remains to be ratified by that union's membership); only BMWED has refused to reach agreement. The NMB plainly is satisfied that Soo is engaging in legitimate bargaining with BMWED that may yet prove productive, as the Board has not declared an impasse or suggested that further mediatory efforts would be unsuccessful. Frankenberg Decl.¶ 19 & Exh. 2.

appropriate injunctive relief, should grant of an injunction be necessary in order to prevent the union from engaging in action that the Court declares to be unlawful.)[2]

BMWED has asked the Court to dismiss Soo's civil action for lack of subject matter jurisdiction because it assertedly does not present a ripe case or controversy.

## ARGUMENT

### SOO'S COMPLAINT PRESENTS A CASE OR CONTROVERSY WITHIN THE COURT'S SUBJECT MATTER JURISDICTION.

BMWED's motion has no merit. The parties clearly have an actual case or controversy, presenting a federal question under the RLA, that is ripe for decision under the Declaratory Judgment Act, 28 U.S.C. § 2201.

The bedrock purpose of the ripeness doctrine is to prevent courts from entangling themselves in abstract disagreements. *E.g., Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n*, 461 U.S. 190, 200 (1983). To satisfy Article III of the Constitution, the matter presented must be a "case or controversy" -- it "must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character," a controversy that is "definite and concrete, touching the legal relations of parties having adverse interests." *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240-41 (1937).

The Declaratory Judgment Act is designed to allow courts to "clarify[] and settl[e] the legal relations at issue" and "to terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Tempco Electric Heater Corp. v. Omega Engineering, Inc.*, 819 F.2d 746, 749 (7th Cir. 1987) (internal quotations and citations omitted). Whether an actual controversy ripe for declaratory relief exists turns on a case-by-case determination. As a general matter, declaratory relief is available when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having

---

[2] There is no force in BMWED's attempt to devalue the Complaint by observing that the allegation that BMWED intends to strike the railroad was made "on information and belief." Soo, of course, does not have direct knowledge of BMWED's intent. *See, e.g., Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005) ("Where pleadings concern matters peculiarly within the knowledge of the defendants, conclusory pleading on 'information and belief' should be liberally viewed."; internal quotes and citation omitted).

adverse legal interests, of sufficient immediacy and reality." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *accord*, e.g., *Oneida Tribe of Indians v. State of Wisconsin*, 951 F.2d 757, 760 (7th Cir. 1991).[3]

There is nothing hypothetical about the dispute between Soo and BMWED; it is real and "of sufficient immediacy." Soo filed this civil action because it held a reasonable, good faith apprehension, founded on BMWED's words and conduct, that the union will strike in support of its section 6 notices even though the parties remain in mediation. The union's March 10 letter accused Soo of bargaining in "bad faith," words that are well understood in the railroad industry to announce a claim by the union -- particularly by *this* union -- of a right to strike with impunity. BMWED's letter, declaring the parties to be at "impasse," in effect announced that BMWED considers further negotiation to be pointless and that the union considers itself free to pursue self-help unless Soo capitulates to BMWED's final bargaining demand. *Communicating that message was the reason for BMWED's sending the letter*. The surrounding circumstances – particularly BMWED's distribution of copies of the March 10 letter to several other unions, which was a clear signal of BMWED's plan to strike and to enlist other unions in support -- reinforced Soo's apprehension. All this, when coupled with Soo's awareness of BMWED's documented history of engaging in unlawful strikes, gave Soo a reasonable basis for believing that BMWED was preparing to initiate self-help against the railroad. Soo knows that self-help would be illegal under the RLA, and knows that BMWED also knows this; but Soo also knows that BMWED's history shows that this union does not hesitate to undertake conduct that is unlawful under the RLA.

In this Court, BMWED does not deny that threatened self-help by a union over a matter in mediation before the NMB causes injury to the railroad sufficient to create a ripe case or controversy. Nor could the union do so; such conduct plainly meets Article III requirements. It is critical to the proper functioning of the RLA that neither side obtain leverage by creating

---

[3] *Also see Aetna Life Insurance v. Haworth*, 300 U.S. at 242 ("There is here a dispute between parties who face each other in an adversary proceeding. . . . The dispute is definite and concrete, not hypothetical or abstract. Prior to this suit, the parties had taken adverse positions with respect to their existing obligations . . . . Such a dispute is manifestly susceptible of judicial determination. It calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present rights upon established facts.").

undue economic pressure on the other by use of self-help during bargaining and mediation. *Detroit & Toledo Shore Line R.R. v. United Transportation Union*, 396 U.S. 142, 149-51 (1969); *accord United v. IAM*, 243 F.3d at 365 ("the unilateral resort to self-help on the part of union members puts severe economic pressures on [the carrier] thereby undermining its bargaining position during the period of negotiation and mediation. This is precisely the kind of action that the RLA status quo provisions seek to prevent . . . ."). A threatened strike over a dispute in mediation forces the railroad to choose between acceding to the union's bargaining demands or giving up its statutory right to continue to mediate without suffering a strike. Creation of such a dilemma itself is injury sufficient to establish ripeness. *E.g.*, *Whitney v. Heckler*, 780 F.2d 963, 968-69 (11th Cir. 1986) ("it is well established that an issue is ripe for judicial review when the challenging party is placed in the dilemma of incurring the disadvantages of complying or risking penalties for non-compliance"; citations omitted); *see Metropolitan Milwaukee Ass'n of Commerce v. Milwaukee County*, 325 F.3d 879, 883 (7th Cir. 2003). It is equally clear that even a brief rail strike would be very costly to the railroad,[4] with potentially dire consequences for the nation's transportation system and the public.[5]

Instead, BMWED denies that Soo actually has any reasonable basis for thinking that the union will engage in self help, and BMWED therefore asserts that the dispute over the union's status quo obligation under the law is hypothetical, not real. BMWED's position is wholly disingenuous. BMWED mischaracterizes its March 10 letter as merely an invitation to bargain further, when it was the opposite of that; and the union glosses over the threatening language in its letter and its related provocative conduct surrounding the letter. BMWED makes much of the fact that its March 10 letter said that the union "will take all appropriate lawful steps to resolve this dispute in the best interest of our members." But this language only crystallizes,

4 *Chicago & North Western Transportation Co. v. Railway Labor Executives' Ass'n*, 908 F.2d 144, 148 (7th Cir. 1990) ("[T]he transportation industry does not produce a storable commodity, and so it cannot produce for inventory in anticipation of a strike or accelerate production afterward to make up for lost production during the strike. It is therefore peculiarly vulnerable to a strike.").

5 *American Train Dispatchers Dep't of Int'l Brotherhood of Locomotive Engineers v. Fort Smith R.R.*, 121 F.3d 267, 268 (7th Cir. 1997) ("A strike by even a small part of our nation's railroad workers could bring much of interstate commerce to a halt and disrupt the daily lives of millions of Americans.").

rather than defuses, the controversy. BMWED's repeatedly demonstrated understanding of what is "lawful" under the RLA is directly at odds with what the RLA provides.

The record is undeniable. For years, this union engaged in strikes and other job actions against the nation's other major railroads, claiming its actions were consistent with the RLA. Finally, the affected railroads sought relief under the RLA against the union's conduct. The railroads obtained a permanent injunction requiring BMWED to give those railroads ten days' advance notice of any strike or other self-help. *Burlington Northern & Santa Fe Ry. v. Brotherhood of Maintenance Way Employees*, 143 F. Supp.2d 672, 696 (N.D. Texas 2001). The district court found that BMWED "has struck, attempted to strike, or threatened to strike plaintiffs at least eighteen times, including nine cases in which pickets went up and/or operations were disrupted until the affected plaintiff was able to obtain a temporary restraining order," and that in "each case BMWE planned its strike in secret and made every effort to implement the strike before the affected carrier could obtain a temporary restraining order." *Id*. at 679. The court held that the injunction was justified by this "pattern, practice, and policy" of engaging in unlawful self-help, *id.* at 694, and was necessary "to give effect to the purpose of the RLA to achieve resolution of disputes as far as possible through responsible bargaining," *id.* at 695. The Fifth Circuit affirmed, concluding that the injunction was appropriate because of the union's "history of systematic abuse" by its "ongoing, repeated practice of surprise strikes that are doomed to be held illegal and enjoined." *Burlington Northern & Santa Fe Ry. v. Brotherhood of Maintenance Way Employees*, 286 F.3d 803, 807-08 (5th Cir. 2002).

If Soo had been a party to that lawsuit, it would not need to file this declaratory judgment action, because BMWED would be required by court order to give Soo ten days' advance notice of any self-help, and Soo could seek appropriate injunctive relief after receiving such notice. Soo, however, does not have that protection and therefore remains vulnerable to BMWED's long-practiced tactics. Soo is a subsidiary of CP Rail, one of two Class I railroads operating in the United States that are not covered by the ten-day order. The other railroads in a similar position are the subsidiaries of Canadian National Railway, including Grand Trunk Western Railroad.

Two years ago, BMWED did to Grand Trunk Western precisely what BMWED's actions reveal that the union intends to do to Soo. BMWED engaged in a surprise strike of Grand Trunk Western while the parties were in mediation over section 6 notices. The union

engaged in self-help that the RLA plainly prohibits, purporting to defend its conduct on the basis of a manufactured, baseless contention that Grand Trunk Western had been bargaining in bad faith. The district court issued a preliminary injunction against the strike and the Sixth Circuit affirmed in *Grand Trunk Western R.R. v. BMWED*, 497 F.3d 568 (6th Cir. 2007).

Just one year ago, while Soo and BMWED were in mediation over their section 6 notices, BMWED made clear its intent to strike Soo in support of a strike that was being conducted (lawfully) in Canada by BMWED's Canadian affiliate against Soo's Canadian parent company. Soo filed a civil action in this Court seeking a declaratory judgment that any such strike by BMWED against Soo was illegal because the parties were in mediation and required to maintain the status quo. *Soo Line R.R., et al. v. BMWED*, C.A. 07 CV 2202 (N.D. Ill., filed April 18, 2008). Faced with Soo's lawsuit, BMWED did not carry through with its strike. The case eventually was rendered moot when the strike in Canada was settled, and the civil action was dismissed by order entered August 16, 2007.[6]

This long history of BMWED's violations of its RLA obligations distinguishes this civil action from cases, cited by BMWED, in which courts found, in particular circumstances, that a statement by a union that it would "take all appropriate actions" did not give rise to a reasonable apprehension of conduct by the union sufficient to create an actual controversy. *Federal Express Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 965 (D.C. Cir. 1995) (apprehension of being sued); *see North American Airlines, Inc. v. Int'l Brotherhood of Teamsters*, 2005 WL 646350, WL *13 (S.D.N.Y. 2005) (apprehension of a strike).[7] When *this*

---

[6] BMWED's view of the parties' dispute in that lawsuit shows that its attack on the justiciability of the instant case is no more than an unfounded argument of convenience. After the strike in Canada was settled, Soo sought the concurrence of BMWED to dismissal of the case, because the impetus for BMWED's threatened strike of Soo -- the strike in Canada -- had been eliminated. BMWED would not agree. When Soo filed a motion to dismiss the case, BMWED opposed the motion on the ground that the question whether BMWED was entitled to strike under the RLA was important and should be resolved by declaratory judgment. Thus, BMWED explicitly saw in the parties' conflicting positions in that lawsuit an actual case or controversy ripe for decision under the Declaratory Judgment Act. In this regard, BMWED was correct -- up until the time that last year's case was mooted by the elimination of the circumstances that had given rise to the union's strike threat in the first place. The instant civil action now equally presents a ripe controversy -- one that is still very much alive.

[7] BMWED's heavy reliance on these cases, and on *Atlas Air, Inc. v. Air Line Pilots Ass'n*, 232 F.3d 218 (D.C. Cir. 2000), is misplaced for other reasons as well. In each of those cases, the (continued … )

union uses such language, its meaning is clear. Indeed, in *Burlington Northern & Santa Fe Ry. v. Brotherhood of Maintenance Way Employees*, the district court explicitly relied on the fact that "BMWE's position is, and historically has been, that it 'will do what it has to do' to protect its members" to support its conclusion that BMWED's policy was to engage in surprise strikes (which in fact were unlawful). 143 F. Supp.2d at 679 n.3.

BMWED would have the Court read its March 10, 2008 letter divorced from this critical context. But the Seventh Circuit has made clear that in evaluating whether a plaintiff had a reasonable apprehension that the defendant would engage in particular conduct, it is appropriate to consider that the plaintiff was aware that the defendant has a history of engaging in such conduct against other individuals in similar circumstances. *See Norfolk & Western Ry. v. Guthrie*, 233 F.3d 532, 534 (7th Cir. 2000) (fact that plaintiff railroad was aware that defendant law firm had on eight occasions sued a different railroad when that railroad tried to institute disciplinary proceedings against employees who were clients of the law firm supported plaintiff railroad's reasonable apprehension of being sued by the law firm in like circumstances).

BMWED seems to contend that no case or controversy exists because Soo assertedly has not alleged (or shown) that the threat of a strike by BMWED is sufficiently imminent to support the issuance of a strike injunction. BMWED is confusing two different questions. Whether this civil action presents an actual controversy permitting the railroad to invoke the Court's Article III jurisdiction and *ask* for a declaration of the rights of the parties is not the same question as the very different issue of whether the railroad is entitled to obtain the remedy of a strike injunction, the grant of which is specifically regulated by a statute, the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.*, that would permit the issuance of a strike injunction

---

( … continued)
carrier was seeking a declaration that, because it was negotiating with the union for a first labor agreement, it would be lawful under the RLA for *the carrier* unilaterally to change existing working conditions while the negotiations were in progress. The courts held that the lawsuits did not present controversies ripe for adjudication because the carriers in fact had not made or proposed any unilateral changes to which the unions objected and might never do so. Such dispositions have nothing to do with our case. Soo is not seeking advice as to whether some conduct that it might decide to take in the future, and that might or might not be opposed by the union, would be lawful under the RLA. Soo and BMWED are in mediation and BMWED has already made plain its (unfounded) objection to Soo's conduct and its purpose to strike the railroad in response.

only if "unlawful acts have been threatened and will be committed unless restrained," *id.* § 107(a). We have shown that Soo and BMWED have a controversy of "sufficient immediacy" to support declaratory relief. No further showing is needed. Even if the Court should eventually decide that a strike injunction is not appropriate on the facts presented in evidence, such a finding would not imply a lack of subject matter jurisdiction to hear the case in the first instance. *See Norfolk & Western Ry. v. Brotherhood of Railroad Signalmen*, 164 F.3d 847, 856 (4th Cir. 1998) (district court's issuance of declaratory judgment establishing the rights of the parties was appropriate even though the union's actions did not amount to a strike threat sufficiently imminent to warrant the grant of injunctive relief).[8]

Conspicuously, even now, in its motion to dismiss, BMWED does not acknowledge that it is legally obligated to maintain the status quo, and may not strike, while these parties remain in mediation. Nor has BMWED ever made the straightforward promise that it will not strike. This just confirms that the union's assertion that this civil action presents a hypothetical dispute is but hollow rhetoric. *Cf. Burlington Northern & Santa Fe Ry. v. Brotherhood of Maintenance Way Employees*, 143 F. Supp.2d at 679 n.3 ("the court accepts plaintiffs' characterization of a situation as a threat to strike if BMWE refused to provide assurances that it would not strike").[9]

---

[8] Insofar as the district court in *North American Airlines, Inc. v. Int'l Brotherhood of Teamsters*, 2005 WL 646350, reasoned that it is necessary for the court to find that a strike is sufficiently imminent to justify the granting of a strike injunction as a prerequisite to concluding that there is a case or controversy ripe for declaratory relief, the decision is clearly incorrect and should not be followed.

[9] This is confirmed by other events subsequent to the filing of this civil action. In its March 28, 2008 letter to BMWED, Soo reminded BMWED that the railroad and union are both required to maintain the status quo while the parties remain in mediation. In its May 9, 2008 response, rather than acknowledging that it accepts and will honor this core proposition, BMWED repudiated it, labeling Soo's view of the RLA "specious" and "wholly mythical." Further, as recently as late June, despite the pendency of this lawsuit, BMWED was sending a letter (using Soo's facsimile machine) to the employees it represents, advising them of the strike benefits available to them. Moreover, Soo has continued to receive feedback from local officials from other unions regarding their hearing that BMWED is planning to strike Soo. Frankenberg Decl. ¶ 18 & Exh. 3. *Cf. GTE Directories Publishing Corp. v. Trimen America, Inc*, 67 F.3d 1563, 1569 (11th Cir. 1995) (although justiciability must exist when the complaint is filed, later events reinforced the conclusion that an actual controversy existed at the time plaintiff filed suit).

BMWED's conduct gave (and continues to give) Soo a reasonable basis for its apprehension that the union will not adhere to its RLA status quo obligation and will strike the railroad in support of the union's section 6 bargaining demands. In the absence of an advance judicial determination of the parties' RLA obligations, the risk that a strike will occur is real and substantial. The Court therefore has jurisdiction to eliminate the uncertainty and insecurity the union's action has generated, by issuing declaratory relief. And the Court should do so. *Cf. Brotherhood of Maintenance of Way Employees v. Atchison, Topeka & Santa Fe Ry.*, 840 F. Supp. 1221, 1236 (N.D. Ill. 1993) (despite lack of actual strike or strike date, court issues strike injunction; the railroads should not have to wait "until the trigger is pulled before seeking the protection to which they are entitled").

## CONCLUSION

For the foregoing reasons, the Court should deny BMWED's motion to dismiss.

Respectfully submitted,

__/s/ James S. Whitehead______

James S. Whitehead
Patrick S. Casey
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Jeffrey S. Berlin
Mark E. Martin
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8178

*Attorneys for Plaintiff Soo Line Railroad Company*

**CERTIFICATE OF SERVICE**

James S. Whitehead, one of the attorneys for Plaintiff, hereby certifies that service of the attached was accomplished pursuant to the ECF system on:

William L. Phillips

and by United States mail, first-class postage prepaid on:

Richard S. Edelman
O'Donnell, Schwartz & Anderson
1300 L Street, N.W., Suite 1200
Washington, D.C. 20005

William A. Bon
General Counsel
Brotherhood of Maintenance of Way
Employees Division/IBT
20300 Civic Center Drive, Suite 320
Southfield, MI 48076-4169

on July 14, 2008.

/s/ James S. Whitehead