IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SOO LINE RAILROAD COMPANY<br>d/b/a CANADIAN PACIFIC RAILWAY,<br><br>*Plaintiff,*<br><br>v.<br><br>BROTHERHOOD OF MAINTENANCE OF WAY<br>EMPLOYES DIVISION OF THE INTERNATIONAL<br>BROTHERHOOD OF TEAMSTERS,<br><br>*Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 08 CV 1813<br><br>Judge Der-Yeghiayan<br>Magistrate Judge Cox |

## DECLARATION OF CATHRYN FRANKENBERG

CATHRYN FRANKENBERG deposes and says:

1.    I am  Assistant Vice President Labor Relations and Human Resources-US for Canadian Pacific Railway Company ("CPR").   In that capacity, I am responsible for, among other things, negotiating, interpreting and administering the collective bargaining agreements entered into by plaintiff Soo Line Railroad Company d/b/a Canadian Pacific Railway ("Soo") and various labor organizations representing Soo employees, including the Brotherhood of Maintenance of Way Employes Division of the International Brotherhood of Teamsters ("BMWED"). I am familiar with the collective bargaining agreements in effect between Soo and BMWED. My business address is 501 Marquette Avenue South, Minneapolis, MN 55402.

2.    I am submitting this Declaration in support of Soo's opposition to BMWED's motion to dismiss this civil action for lack of subject matter jurisdiction.  Contrary to what BMWED says in its motion to dismiss, the union and railroad very much have a real,

concrete dispute. The purpose of this Declaration is to set forth facts in support of that proposition.

3.     Soo is a "carrier" within the meaning of the Railway Labor Act ("RLA"), 45 U.S.C. § 151 First, operating a railroad system in North Dakota, Minnesota, Wisconsin, Illinois, Indiana, and Michigan. Soo is a wholly owned subsidiary of Soo Line Corporation, which in turn is an indirect wholly owned subsidiary of Canadian Pacific Railway Company, a Canada corporation.

4.     BMWED is a labor organization that represents, and negotiates collective agreements on behalf of, Soo employees who perform "maintenance of way" work. On Soo, BMWED acts through a System Division and a System Federation, each headed by a General Chairman.

5.     Soo and BMWED are parties to various labor agreements that prescribe the rates of pay, rules, and working conditions of Soo maintenance of way employees.

6.     When a railroad or union wants to modify or change an existing labor agreement, it serves a bargaining proposal on the other party under section 6 of the RLA, 45 U.S.C. § 156, commonly known as a "section 6 notice." The RLA prescribes mandatory procedures for resolving the notices, beginning with bargaining sessions conducted by the parties on their own. If agreement is not reached, the process may continue through mediation under the auspices of the National Mediation Board ("NMB"), a federal agency. If the NMB determines that mediation has been unsuccessful, the parties must consider voluntary arbitration; and if the dispute remains unresolved and threatens substantially to interfere with interstate commerce, the President of the United States may appoint a Presidential Emergency Board to recommend a solution. Throughout the entire statutory bargaining process, the parties must maintain the status

quo. Only if agreement is not reached after the process is fully exhausted do the parties become free to resort to self-help -- such as a strike or other coercive economic action by the union.

7.     In April 2005, Soo and BMWED exchanged section 6 notices, proposing changes to their existing labor agreements.

8.     Representatives from Soo and BMWED engaged in negotiations over the section 6 notices in June, September, and December 2005, and in February, March, May, and July 2006. I am the principal negotiator on behalf of Soo, and I attended all of the negotiating sessions.

9.     Negotiations did not result in agreement. In July 2006, Soo submitted the dispute over all the section 6 notices to mediation before the NMB, and the NMB docketed the case and appointed a mediator.

10.     Representatives from Soo and BMWED held an initial two-day session with the federal mediator in November 2006. In 2007, additional two-day mediation sessions were held in January, March, and April; three-day mediation sessions were held in June, July, and October; and another mediation session was held in November, 2007. I attended all of these sessions as Soo's principal negotiator. The parties exchanged various bargaining proposals, but did not reach agreement and the matter remains in mediation.

11.     Then, I received BMWED's March 10, 2008 letter (Exhibit 1 hereto).   I had no doubt what this letter meant. The letter was a repudiation by BMWED of its obligation to maintain the status quo while the parties were still in mediation; it amounted to a threat to engage in a strike of Soo. The letter did not acknowledge BMWED's obligation to maintain the status quo, or promise that BMWED would not strike. Rather, the letter accused Soo of negotiating "in patent bad faith." The meaning of these words is well understood in the railroad industry --

particularly when used by this union.  Over the years, BMWED has repeatedly made clear to the railroads that if, in the union's view, a railroad is bargaining in bad faith, then BMWED is no longer obligated to maintain the status quo and is, instead, free to strike.  Further, BMWED's letter preemptively presented a bargaining demand (which was not new) as the union's "final offer to settle this dispute," and the letter warned that if Soo did not respond within twenty days, BMWED would consider the parties to be "at impasse" and that "further mediatory efforts" would be "fruitless."  The RLA does not permit the union (or the railroad) to declare "impasse"; only the NMB, usually acting through its assigned mediator, can do that.  I had no doubt that BMWED was telling me that it would consider itself free to strike Soo, free of legal restraint imposed by the RLA if Soo did not capitulate to the union's "final" bargaining proposal.

12.    My understanding of BMWED's letter was strongly informed by my awareness of BMWED's well documented history of engaging in unlawful strikes.  That is why I was hardly reassured by BMWED's saying in its March 10 letter that it "will take all appropriate lawful steps to resolve this dispute in the best interest of our members."  This union has repeatedly shown that its view of what is "lawful" is different from what the RLA requires.

13.    I was aware that two years ago BMWED accused Grand Trunk Western Railroad of bargaining in bad faith while the parties were in mediation over section 6 Notices and, on the basis of the union's characterization, striking the railroad.  The railroad obtained a preliminary injunction against the strike.

14.    I was also aware of BMWED's long practice of engaging in illegal, surprise strikes of other major railroads, a practice that was so egregious that it eventually resulted in those railroads' obtaining a permanent injunction from a federal district court requiring BMWED to give them ten days' advance notice before engaging in a strike or other

self-help. Soo, like Grand Trunk Western Railroad, was not a party to that lawsuit and so does not have the protection of the ten-day notice requirement; rather, Soo remains vulnerable to BMWED's established way of doing business.

15.    Soo was faced with the same BMWED tactics just last year. While BMWED and Soo were in mediation over their section 6 notices in early 2007, BMWED made clear its intent to strike Soo in support of a strike that was being conducted (lawfully) in Canada by BMWED's Canadian affiliate against Soo's Canadian parent company. To protect itself, Soo filed a civil action in this Court seeking a declaration that any such strike by BMWED against Soo was illegal because Soo and BMWED were in mediation and were required to maintain the status quo. Faced with Soo's lawsuit, BMWED did not carry through with its strike. The civil action eventually was dismissed when the impetus for BMWED's threatened strike of Soo, the strike being carried out in Canada, was settled.

16.    Our concern over BMWED's March 10, 2008 letter was heightened when I learned that BMWED had distributed copies of the letter to senior leadership and General Chairmen of other unions representing Soo employees. In a telephone conversation with the mediator then overseeing mediation between Soo and the Brotherhood Railway Carmen, I learned that the President of that union had received a copy of BMWED's March 10 letter. I also learned that international officers of the United Transportation Union had received copies of the letter and that the letter was distributed to General Chairmen of other unions representing Soo employees at a March 2008 General Chairperson's Association meeting. This action further demonstrated to me that BMWED was laying the groundwork for a strike or other job action by seeking to enlist support from other unions, such as by having these other unions encourage the employees they represent to honor BMWED picket lines.

17.    All of this combined to cause me to conclude that BMWED does not intend to honor its RLA status quo obligation and that, unless Soo sought a legal declaration of the union's (and railroad's) obligations under the RLA, BMWED would go forward with its plans to conduct an unlawful strike against Soo.  Accordingly, Soo filed this lawsuit to protect its interests.

18.    Events since the filing of the Complaint in this civil action have only confirmed that the parties' dispute is real:

(i)    I wrote to BMWED on March 28, 2008 (Exhibit 2 hereto), reminding the union that the railroad and union are both required to maintain the status quo while the parties remain in mediation.  In its May 9, 2008 response (Exhibit 3), BMWED could readily have acknowledged that it accepts and will adhere to this core proposition  Instead, BMWED repudiated it, calling my view of the RLA "specious" and "wholly mythical." And while BMWED predictably said that our concern that BMWED was threatening to strike Soo was "fanciful," the union tellingly did not promise that it would not strike.

(ii)    As recently as late June, despite the pendency of this lawsuit, we learned that BMWED was sending a letter (using Soo's facsimile machine) to the employees it represents advising them of the strike benefits available to them.

(iii)    Members of my staff continue to receive feedback from officials from other unions regarding their hearing that BMWED is planning a job action against Soo.  These include communications from a General Chairman for the American Train Dispatchers Association who represents Soo employees and from

a local union official from a union that represents employees on the Delaware and Hudson Railway Company, an affiliate of Soo.

19.    BMWED's assertion that we have bargained in bad faith is frivolous. We have demonstrably bargained in good faith. Throughout the negotiation and mediation process, we have presented many bargaining proposals and counterproposals to BMWED and have been open to discussion of the issues with the union in an attempt to resolve the parties' differences. Our purpose has always been to reach an agreement on terms that are consistent with Soo's interests, but that the union can accept. Indeed, when BMWED, in its March 10, 2008 letter, pointed out an inadvertent mistake in Soo's then pending bargaining proposal, we corrected the mistake by means of my March 28, 2008 letter. In fact, since late 2004, we have been able to negotiate new labor agreements with all thirteen of the other unions representing our employees (the agreement with one of these unions remains to be ratified by that union's membership); only BMWED has refused to reach agreement. Certainly, the NMB is satisfied that Soo is engaging in legitimate bargaining with BMWED that may yet prove productive, as the Board has not declared an impasse or suggested that further mediatory efforts would be unsuccessful.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 4 day of July, 2008.

Cathryn Frankenberg

## CERTIFICATE OF SERVICE

James S. Whitehead, one of the attorneys for Plaintiff, hereby certifies that service of the attached was accomplished pursuant to the ECF system on:

William L. Phillips

and by United States mail, first-class postage prepaid on:

Richard S. Edelman
O'Donnell, Schwartz & Anderson
1300 L Street, N.W., Suite 1200
Washington, D.C. 20005

William A. Bon
General Counsel
Brotherhood of Maintenance of Way
Employees Division/IBT
20300 Civic Center Drive, Suite 320
Southfield, MI 48076-4169

on July 14, 2008.

/s/ James S. Whitehead

# Exhibit 1

# BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION
## OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS
### *Chicago, Milwaukee, St Paul &Pacific System Federation*
### *and*
### *Soo Line System Division*

**Mark S. Wimmer, General Chairman**
18921 York Street, NW   Suite F
Elk River, MN 55330-3001
Area Code (763) 441-6355
Fax (763) 441-1741

**Gene A. Bell, General Chairman**
6210 Sheridan Avenue, South
Richfield, MN  55423
Area Code (612) 869-2419
Fax (612) 869-7641

March 10, 2008

Ms. Cathryn Frankenberg
AVP Labor Relations & Human Resources
Canadian Pacific Railway
501 Marquette Avenue, Suite 1000
Minneapolis, MN 55402

    Re: <u>BMWED/Soo Section 6 negotiations</u>

Dear Cathryn:

We are writing to you to summarize where we believe the parties currently stand after over twenty-nine (29) months of bargaining. We are also presenting to the Carrier a final comprehensive proposal to settle this dispute. We believe that the parties either must reach a voluntary resolution to our bargaining dispute now or acknowledge that if agreement cannot be reached after numerous meetings, proposals and counter-proposals; we are at impasse and further mediatory efforts by the National Mediation Board would be fruitless.

When we first met on September 29, 2005, the Carrier presented us with a "standby" agreement that would apply to the Soo employees those terms regarding "wages, benefits and work rule changes" contained in an agreement made between the BMWED and the National Carriers' Conference Committee (NCCC) in national bargaining. The Carrier's standby proposal also contained a proviso that any difference in costs between the Soo Line Health & Welfare Plan for BMWED and the Railroad Employees' National Health & Welfare Plan (GA-23000) would be reflected in the actual on property agreements. Alternatively, the Carrier's standby proposal proposed that the parties agree to re-enter GA-23000. The BMWED rejected the "standby" approach; instead we sought to bargain over local issues regarding rates of pay, rules and working conditions. Unfortunately, after two years of attempts to bargain a truly local solution to our dispute, the Carrier's last offer to us regressed from its initial "standby" proposal from September 2005.

The Carrier's last proposal to us, dated November 6, 2007, provided the same percentage wage increases in the same progression as that contained in the 2007 National Freight Agreement between the BMWED and NCCC. However, that wage proposal <u>did not</u> include a restoration of the 60 cents per hour diverted from the employees' rates of pay during the period 2000 – 2004 to partially offset the rising cost of health insurance. The omission is particularly troubling in light of the Carrier's proposal on health insurance matters.

The Carrier's November 6, 2007 proposal regarding "Health and Welfare" proposes the Carrier continue its own self-funded insurance plan for maintenance of way employees. The proposal demands an employee monthly contribution of $371.89 retroactive to January 1, 2007. Additionally, beginning in January 1, 2008 and each January 1st thereafter into perpetuity, each employee would be required to contribute "15% of the Soo Plan costs for Active Medical, Life, AD&D, Early Retiree Medical, Vision, and Dental, plus any additional amount the Soo Plan monthly costs exceed the National Plan costs." That proposal is ludicrous, insulting, regressive and made in patent bad faith.

2

Ms. C. S. Frankenberg                                                                         March 10, 2008
re:  BMWED/Soo Section 6 negotiations

Initially, we must note that nowhere in the Carrier's proposal does it intend to return the 60 cents per hour diverted from wages during 2000 – 2004 even though the Carrier now proposes a fixed monthly contribution to health insurance. At 60 cents per hour, multiplied by 216.92 Average Composite Straight Time Equivalent monthly hours, the Carrier receives $130.15 per month in employee contributions to health insurance premiums. Because that contribution is not being returned, the Carrier's November 6th proposal amounts to an effective monthly contribution for employees of $502.40 as of January 1, 2007 ($371.89 + $130.15). On that same date, an employee subject to GA-23000 under the terms of the BMWED's "national agreement" contributed $166.25 per month towards health insurance premiums. Therefore, the Carrier's last proposal would require its maintenance of way employees to contribute a figure 202% greater than employees under GA-23000 for a medical plan that provides similar benefits to active employees. All of this when the cost of Carrier's Plan in 2007 was only about 17% greater than GA-23000. The Carrier has presented no compelling reason for such a whopping increase far in excess of any disparity between the Carrier's current costs and the costs of GA-23000. We can determine the only reason for such a proposal was malice and union animus.

The Carrier's November 6th proposal also contains a "me-too" to changes to the Supplemental Sickness Program contained in the July 1, 2007 Agreement between the BMWED and NCCC; four "tentative agreements" on minor rules changes; a promise of "incentives" for employees who bid for and stay on "key jobs"; and a proposal to change the starting times of track maintenance and B&B crews "to correspond to track maintenance blocks or production crew track blocks." As stated earlier, the entire proposal is regressive and is, in our opinion, designed to frustrate any movement toward a satisfactory voluntary agreement.

As we see it, notwithstanding the Carrier's gratuitously insulting proposal of November 6th, the key items that divide us are the return of the 3% wage increase not received in the 1990 bargaining round and the establishment of a safety committee by agreement, not unilateral management action. We will address the two issues in turn.

In 2007, the Carrier provided data to us showing a monthly difference of $205.62 over the Carrier's cost of providing active duty and off duty health insurance, life insurance, AD&D, early retirement, vision and dental compared to the National Freight Plans. Put another way, the Carrier contended that in 2007, it cost $2467.44 more on an annualized basis to insure its maintenance of way employees over that paid by its competitors in the United States.

We have stated repeatedly, that the BMWED is willing to return to the National Freight Plans under the same terms and conditions that are applicable to BMWED represented employees on the other major freight railroad carriers. However, we want to receive some of the economic benefit that will accrue to the Carrier from that switch. Under our calculations, the restoration of the 3% general wage increase will cost, on average, about $1900 per employee per year (including increased payroll taxes). Therefore, a return to GA-23000 will still provide a savings to the Carrier of about $500 per employee per year after the additional 3% wage increase is factored in. That, to our minds is a "win-win" proposition and we are mystified why the Carrier will not entertain the proposal. Moreover, given the fact that the maintenance of way employees on the Soo comprise a separate risk and experience pool under the Carrier's current health insurance plan, a return to GA-23000 and the use of a risk and experience pool comprised of all rail employees at the major railroads in the United States likely would save the Carrier more than $500 per employee per year into the future.

Safety is of primary importance to the BMWED. We want our members to go to work and return home safely. We also want the public who lives and works near the tracks to remain safe and never be affected by derailments or other accidents. In that spirit, we have presented a safety agreement to the Carrier designed to replace the unilaterally imposed and managed safety program currently in place. We have met stout resistance to even the idea of a safety agreement. Safety is just too important to leave in management's hands alone. Frankly we are baffled by the Carrier's response.

3

Ms. C. S. Frankenberg                                                    March 10, 2008
re:  BMWED/Soo Section 6 negotiations

In Canada, the Carrier's operations are governed by Part II of the Canada Labour Code.  The Code mandates the establishment of Work Place Health and Safety Committees and Policy Health and Safety Committees regarding safety.  Those Committees are based upon a 50-50 representation of management and labor and are designed so that the parties jointly establish a working safety program on the Carrier.  Additionally, the Labour Code mandates the creation of Health and Safety Representatives, staffed by rank and file employees who are paid for their time by the Carrier.  Our proposal is an attempt to mirror the standards under which the Carrier already conducts its operations in Canada.  Certainly, the Carrier cannot contend that safety is less important in the United States or should be handled in an inferior way to the manner conducted in Canada?  This is a matter of safety and decency, we are stunned that the Carrier has not embraced our proposal and made good faith attempts to bargain a real safety agreement.

We have attached to this letter, our final offer to settle this dispute.  If you wish to engage constructively on its contents, please contact us.  If we do not hear from you with a substantive counterproposal within twenty (20) days, we will consider the Carrier's non-response as an admission we are at impasse and we will take all appropriate lawful steps to resolve this dispute in the best interest of our members.

Sincerely,

Mark S. Wimmer, General Chairman                    Gene A. Bell, General Chairman
BMWED of IBT - CMStP&P System Federation            BMWED of IBT - Soo Line System Division

MSW-GAB:jal
opeiu#12

Attachment:    Final BMWED Comprehensive Settlement Proposal to Soo (2 pgs)

cc:  Ms. Terri Brown
     Mr. L. R. Fenhaus
     Mr. D. Griffin
     Mr. S. Hurlburt
     Mr. H. Wise

# FINAL BMWED COMPREHENSIVE SETTLEMENT PROPOSAL TO SOO

## WAGES:[1]

| | |
|---|---|
| July 1, 2005 – | 2.5% increase to all hourly, daily and monthly rates of pay |
| July 1, 2006 – | 3% increase to all hourly, daily and monthly rates of pay |
| July 1, 2007 – | 3% increase to all hourly, daily and monthly rates of pay |
| January 1, 2008 – | Return $.60/hour deferred for H&W cost sharing under previous agreement in manner identical to the Agreement dated July 1, 2007 between the BMWED and NCCC. |
| January 1, 2008 – | 3% increase to all hourly, daily and monthly rates of pay |
| July 1, 2008 – | 4% increase to all hourly, daily and monthly rates of pay |
| July 1, 2009 – | 4.5% increase to all hourly, daily and monthly rates of pay |

COLA under previous agreement eliminated on effective date of agreement and previous payments under COLA recouped from any retroactive wage payments due.

Retroactive pay computed on same formula used in Agreement dated July 1, 2007 between the BMWED and NCCC.

## HEALTH & WELFARE:[2]

Effective date of Agreement – enroll all BMWED represented employees in the Railroad Employees' National Health and Welfare Plan (GA-23000); Railroad Employees' National Dental Plan (GP-12000); the Railroad Employees' National Vision Plan and the Railroad Employees' National Early Retirement Major Medical Benefit Plan (GA-46000 or ERMA) under terms identical to that provided to employees subject to the Agreement dated July 1, 2007 between the BMWED and NCCC, *e.g.,* Plan design changes and employee cost-sharing.

Preserve benefits currently enjoyed by employees who retire prior to the date of this agreement until eligible for Medicare coverage.

## SUPPLEMENTAL SICKNESS:[3]

Incorporate benefits and plan design changes from BMWED – NCCC Agreement of July 1, 2007.

---

[1]  Common to Soo and Milwaukee CBA
[2]  Common to Soo and Milwaukee CBA
[3]  Common to Soo and Milwaukee CBA

## EXPENSES FOR EMPLOYEES WORKING AWAY FROM HOME:[4]

### Employees Assigned to Fixed Headquarters Positions:

Employees assigned to fixed headquarters positions located more than fifty (50) highway miles from the employees' residences will be entitled to a per diem equal to that provided to employees without fixed headquarters. An extra lodging per diem will be provided at the start of the week if the employee's residence is more than 200 miles from the headquarters location and an extra lodging per diem will be provided at the end of the work week if the employee works more than twelve (12) hours on the final workday and his residence is located more than 200 highway miles from the headquarters location.

### Expenses and Lodging Arrangements for Mobile Employees:

Eliminate all references to "camp cars," etc. in agreement

$5 increase in per diem on effective date of agreement

Meal and lodging per diem increase January 1 of each year by percentage increase in Standard CONUS rates for Lodging and Meals and Incidental Expenses established by the General Services Administration on October 1 of the preceding calendar year

## RULES CHANGES COMMON TO SOO AND MILWAUKEE CBA:

Establish Special Board of Adjustment for expedited handling of disciplinary appeals.

Personal leave pay for employees assigned to 10 hour positions paid at 10 hours of the pro-rata rate for that position

Safety Agreement (Attachment "A").

Moratorium period extends from January 1, 2005 through December 31, 2009.

## MILWAUKEE AGREEMENT AS UPDATED IN 2006, AS MODIFIED BELOW:

All new positions or vacancies either expected to last more than 30 days or of 30 days duration must be advertised as "permanent". (elimination of advertised "temporary" positions)

Employee assigned to position by bulletin must be released to that position no later than 30 days following effective date of bulletin assigning employee to position

TA dated January 24, 2007 on Rule 11(a)(b)

TA dated March 28, 2007 on Rule 23(k)

TA dated March 29, 2007 on Rules 8(e) and 2(c)(1)

TA dated July 10, 2007 on Soni-Rail Operator

## SOO AGREEMENT, AS MODIFIED BELOW:

TA dated July 10, 2007 on Krautkraemer

Eliminate any and all requirements in Rule 12 requiring an employee to work the highest rank in a roster to retain seniority in the applicable rank.

Adoption of agreement on these issues will be full and final settlement of parties' Section 6 notices

---

[4]   Common to Soo and Milwaukee CBA

# Exhibit 2



**CANADIAN**
**PACIFIC**
**RAILWAY** ™

Labor Relations

Suite 1715
501 Marquette Avenue
Minneapolis Minnesota 55402

Tel (612) 904-6183
Fax (612) 904-6184

In Response Please Refer to
File:

Sent via Facsimile
<u>Original sent via US Mail</u>

March 28, 2008

Mr. Mark S. Wimmer, General Chairman
Brotherhood of Maintenance of Way Employes Division
18921 York Street, N.W., Suite F
Elk River, MN  55330

Mr. Gene A. Bell, General Chairman
Brotherhood of Maintenance of Way Employes Division
6210 Sheridan Avenue South
Richfield, MN  55423

Re:   BMWED/Soo Section 6 Negotiations

Dear Mark and Gene:

This is in response to your letter dated March 10, 2008, received in this office via facsimile on March 11, 2008.  As you are well aware, the "BMWED/Soo Section 6 negotiations" are presently docketed as Case No. A-13421 by the National Mediation Board (NMB).  As a result, all meetings scheduled, requirements that proposals be exchanged, and/or a declaration of an impasse are within the exclusive jurisdiction of NMB.  This means that the parties, BMWED and Soo, are obligated to continue maintaining the status quo in accord with the clear requirements of the Railway Labor Act (RLA).  Soo intends to meet that commitment and expects BMWED to do as well.

Although you suggest to the contrary, twenty-nine months of contract negotiations are not unusual nor unreasonable under the Railway Labor Act Section 6 process.  Unlike US industry covered by the National Labor Relations Act, contract terms do not have a specific expiration date, but continue in effect until modified.  Soo's employee's represented by BMWED received Cost of Living Allowances throughout the open contract period (every six months since July, 2005) which amount to 3.27 % after the offset for additional healthcare contributions.

Because NMB retains exclusive jurisdiction of the "BMWED/Soo Section 6 negotiations", including setting meeting dates and locations, determining the agenda for the meetings, and determining if or when an impasse has been reached, it is incomprehensible to Soo that BMWED would so blatantly disregard and disrespect the authority of NMB.  On what possible basis could BMWED imbue itself with unilateral authority to insist upon prompt voluntary resolution by the parties, coupled with a 20 day time limit within which to respond and an ultimatum for what BMWED characterizes as a "substantive proposal"?

March 28, 2008
Page 2

BMWED also erroneously alleges that if no voluntary agreement is reached now, then "… we are at an impasse and further mediatory efforts by the National Mediation Board would be fruitless."  BMWED has no standing to declare an impasse in a set of negotiations that are clearly under the jurisdiction of NMB and saying the words does not change clear past practice and case law on this point.

Throughout its March 10th letter, BMWED seems to suggest that the length of the negotiating process, the fact that no agreement has been concluded and the content of Soo's settlement proposals constitute bad faith bargaining under the RLA.  This assertion by BMWED is not borne out by a review of the negotiating history in the "BMWED/Soo Section 6 negotiations".

### History of S00/BMWED Section 6 Negotiations

### June 22, 2005

In its March 10, 2008, letter, BMWED states that the parties first met on September 29, 2005.  In fact, the parties first negotiating session, other than the perfunctory review of respective Section 6 notices, was held on June 22, 2005.  Substantive issues were not discussed because BMWED chose to augment its usual and customary team responsible for resolving Section 6 notices on Soo with representatives of the BMWED D&H negotiating team.  Specifically, Vice President Henry Wise, General Chairman Stuart Hurlburt (D&H) and Vice General Chairman Eugene Borden (D&H) were present at the Minneapolis, Minnesota "BMWED/Soo Section 6 negotiations".

Soo found it necessary to clarify that the parties were only discussing the Soo Section 6 notices and needed to understand the role of the additional BMWED participants before proceeding.  Unfortunately, this left little or no time within the previously agreed upon negotiating dates to discuss substantive issues.

### September 29, 2005

BMWED is correct that  Soo proposed a "stand-by" to the economic components of the prospective National settlement between the National Carriers Conference Committee (NCCC) and the BMWED National Bargaining team for the round commencing January, 2005.  This "stand-by" proposal was the same as what has been included as Side Letter No. 23 in the Soo/United Transportation Union-Yardmasters March 8, 2005 Agreement.

Soo's September 29, 2005, "stand-by" proposal stated:

> "This means the agreement between Soo and BMWED will have an equivalent value (commencing with the year 2005) to the National

March 28, 2008
Page 3

Agreement's value when wages, benefit design changes, employee cost sharing contributions and work rule changes are considered.

Further, should the Soo Line Health and Welfare Plan for BMWED represented employees (Plan) cost more or less in any year included in the aforementioned contract term than the BMWED national Plan (based on premiums Soo would have been obligated to pay if part of National), this will be taken into consideration in determining equivalent value. The parties also agree to evaluate the option of returning to the National healthcare plan, should that prove to be a more workable resolution of the benefits cost containment issue."

The principles articulated in the aforementioned "stand-by" offer made by Soo more than 2 years ago to BMWED are the basis upon which settlements have been reached with 11 other unions representing various Soo's employees. This includes all the other members of the Rail Labor Bargaining Coalition* (RLBC) of which BMWED was a part at the National table. As a result, it is disappointing and frustrating to Soo that BMWED continues to demand more, thus unnecessarily delaying a settlement.

The principles in the "stand-by" offer to BMWED form the local settlement pattern on Soo with similarly situated unions (those whose members were covered by the Soo Health and Welfare Plan for Union Employees). Soo continues to make available to BMWED a settlement based on this local pattern. In fact, the November 6, 2007, proposal that BMWED so vehemently maligns in its March 10th letter was based on the same economics contained in the settlements with the other 11 unions whose Section 6 notices have been settled on Soo.

The fact that BMWED continues to demand <u>more</u> than the Soo local patterns makes it extremely difficult for Soo to find a mutually acceptable way to resolve our respective Section 6 notices, while preserving the integrity of commitments to other similarly situated Soo unions.

**February 28, 2008 and March 1, 2006**

On March 1, 2006, Soo responded to a BMWED proposal dated 2-28-06 with the above referenced stand-by offer <u>plus</u> a proposal to address the parties' respective local work rule issues. This proposal included updating the Milwaukee Road schedule agreement, expanding that updated agreement to apply on the Soo property, establishing a single system seniority district for the various work classifications (involved dovetailing Soo/Milwaukee seniority by job classification), and applying the higher Milwaukee rates of pay for several work classifications.

* *Rail Labor Bargaining Coalition (RLBC) – BLET, BMWED, ATDA, BRS, SMWIA, NCF&O, IBB&B*

March 28, 2008
Page 4

This proposal was viewed by Soo as responsive to BMWED's stated desire to address local issues. The parties agreed to proceed discussing our respective local work rule changes, using the updated Milwaukee Agreement as the foundational document.

## July 12th and 13th, 2006

The parties met on July 12th and 13th. Soo was frustrated that BMWED seemed unwilling or unable to focus on substantive issues, but rather concentrated on process and procedure. As a result, immediately following the discussions on July 13, 2006, Soo wrote to Larry Gibbons, Director, Office of Mediation Services, NMB and requested the docketing of this case and the appointment of a mediator in accord with RLA.

NMB promptly docketed the "BMWED/Soo Section 6 negotiations" as Case No. A-13421. At that point, the scheduling of mediation sessions, the locations of the meetings, the discussion agendas, and the authority to terminate discussions all became subject to the exclusive control and responsibility of the NMB, rather than of the parties.

## November 15, 2006

During this mediation session, BMWED provided Soo with what they stated was a complete list of the local rule revisions for the Milwaukee Agreement, with the understanding that General Chairman Bell was to provide any additional changes to the Soo Agreement no later than December 8, 2006. This date was selected to allow Soo sufficient time in advance of the January, 2007, mediation session to review the entire list of BMWED's requested local work rule revisions and prepare an informed response.

## January, 2007

Despite this commitment, Soo did not receive BMWED's proposed revisions to the Soo Agreement until January 23, 2007, when the mediator obtained them from BMWED. BMWED's tardy response left the Soo negotiating committee no time to adequately prepare for and respond to these additional demands, thus hampering the progress of the substantive discussions.

It was understood by the parties that the BMWED's January 23, 2007, proposal contained all of BMWED's local work rule demands. All parties recognized that in the course of negotiations as one rule is changed, it may affect the application of another rule. However, the parties also talked about and acknowledged that no additional or new local work rule demands would be added to this list.

Soo considers this commitment as particularly significant since BMWED's January 23, 2007 comprehensive local work rule demands contained no request for a collectively

March 28, 2008
Page 5

bargained Safety Agreement, which materialized six (6) months later.   This list also did not contain the additional local work rule demands made by BMWED in its October, 2007, proposal.

**May 16, 17, 18th  2007**

On May 14, 2007, Soo received a letter from BMWED President Freddie Simpson stating he had advised General Chairmen Wimmer and Bell, VP Fenhaus, and Director Griffin "… not to meet with the Carrier regarding Mediation Case No A-13421 until after the labor dispute between TCRC-MWED and CP Rail is resolved." Thus, without consultation with nor approval from the NMB, the BMWED unilaterally cancelled the May 16th, 17th and 18th previously scheduled mediation session.

In its response, Soo stated:

- "Discussions on NMB Case No. A-14321 Soo Line-BMWED under the Railway Labor Act(RLA) have no relationship to the issues in dispute between TCRC-MWED and CP pursuant to the Canada Labor Code and are conducted by completely different negotiating teams.

- I view your decision to direct your negotiating team not to participate in the mediation scheduled for this week as evidence of BMWED's failure to meet its good faith bargaining obligations under Section 2, First of the RLA.   Soo's negotiating team continues to be available to resume mediation in the Carrier's offices in Minneapolis at 1:30 p.m. on May 16th through 3:30 p.m. on May 18th, as instructed by Mediator Brown."

BMWED's refusal to participate in a previously scheduled mediation session, without consultation with nor reasonable advance notice to NMB Mediator Terri Brown, was not only disrespectful of NMB's authority in this case, but also unnecessarily delayed the progress of these negotiations.  In fact, by the time BMWED's letter was received, Mediator Brown had already departed Washington, DC, and opened the first day of mediation with BMWED in absentia.

**June, 2007**

Following several mediation sessions during which the parties exchanged various proposals addressing seniority and other local work rule demands, Soo provided BMWED with a document entitled "Soo Comprehensive Proposal to BMWED."  The terms of this proposal balanced the economics of the BMWED/NCCC national wage package, the higher cost of the Soo Line Healthcare Plan (higher than National Plan), and the cost and benefits of the parties various local work rule proposals.  In other words, Soo offered the same overall total compensation value (wages and benefits) as had been contained in the BMWED/NCCC National settlement and in the other Soo

March 28, 2008
Page 6

settlements. This proposal also addressed some of the parties' respective local work rule changes in a way that Soo believed might be acceptable to BMWED.

The lead in to this offer stated:

"TOTAL COMPENSATION FOR 2005-2009

Soo will make available to its BMWED represented employees Total Compensation (wages and benefits) equivalent to the NCCC/BMWED National Settlement for this round.  The means that Soo's cost for this contract term will not exceed the cost for wages and benefits in the National Settlement.   For purposes of determining equivalence in benefits, the premium Soo would have paid for the National Healthcare Plan will be compared to the Per Employee Per Month cost of the Soo Plan (2005-2007 for now).

Information will be shared with BMWED during discussion of this proposal that will illustrate what Soo will expect of each BMWED represented employee to "close the gap" in cost between the Soo Plan and the National Healthcare Plan.

The fundamental issue is Soo's competitiveness with the Class 1 industry.   If BMWED expects General Wage Increases at the national level for this round, then Soo's benefits costs need to be no greater that what would be paid for monthly premiums in the National Healthcare Plan.

There are several ways to pay the additional $2,467.44 for 2007:

- Agree not to take 6% of the General Wage Increase for this round;  that amount would need to be adjusted annually, up or down to pay for the cost difference between Soo and National Plan;

- Agree to modify the Soo Plan, both employee cost sharing contributions and plan design, as delineated in the document presented that shows Side by Side comparisons of current Soo Plan, the BMWED National Plan modified by NCCC/BMWED tentative agreement changes, and the Soo Plan modified to close the 2007 cost gap between Soo Plan and National Plan. This would require a January 1, 2007 employee cost sharing contribution of $ 268.89 PEPM.

- Agree to return Soo's BMWED represented employees to the National Healthcare Plan as expeditiously as possible so they begin paying the $166.25 PEPM for the remaining months of 2007."

At the time this offer was made to BMWED, Soo was reaching Section 6 settlements with the other unions that were members of the Rail Labor Bargaining Coalition (RLBC) based on the economics of each union's National settlement.

March 28, 2008
Page 7

In this June mediation session, Soo also shared with BMWED the Soo Healthcare Plan and National Healthcare Plan Side by Side comparisons of costs and benefit terms; the difference in the monthly premium for the National Plan and for the Soo Plan from 2005 through 2007; the Soo Plan employee contributions if 15% of Soo costs were used for 2007; and the employee contributions to the Soo Plan if the cost gap between the National and Soo Plans was closed for 2007. Soo considered it only fair to advise BMWED of these costs and explain its willingness to offer the $166.25/month employee cost sharing retroactive to January, 2007 (same as BMWED/NCCC National settlement), in return for BMWED's expeditious resolution of the cost disparity between the National and Soo Plans. The $166.25 was significantly less than 15% of the Soo Plan costs and of the employee contribution required to close the cost gap.

**July and August, 2007**

Soo initially proposed a single combined agreement because it believed this would have value to both BMWED and Soo. Unfortunately, BMWED consistently failed to provide comprehensive local work rule counterproposals and did not provide workable responses to Soo's local work rule issues. As a result, Soo concluded that the parties would not be successful in negotiating a mutually acceptable single agreement. Soo decided to remove its proposed single agreement from the table in an effort to facilitate the progress of negotiations on the salient economic issues.

On July 24, 2007, BMWED sent a written communication to its members detailing its version of what had occurred in the July mediation. This communication was in flagrant violation of the mutually agreed upon Ground Rules for the mediation, which were jointly developed with NMB oversight and signed by the parties. It was not at all helpful in progressing towards a mutually acceptable settlement.

In addition, despite the fact that the list of BMWED's local issues had been finalized in January, 2007, BMWED began demanding a negotiated Safety Agreement, which had not been on the table up to that point. After more than 30 months of negotiations and almost a year of mediation, BMWED's adding a new item to its demands widened the gap, rather than narrowing the outstanding issues, thus making it more difficult to reach a settlement.

Soo responded with a letter to BMWED's negotiating team objecting to the breach of the Ground Rules and confirming the "single Rules Agreement and single Cross-System Seniority Roster" had been removed from the table. In part, the letter said:

- "Since you are seasoned negotiators, you are well aware that there NEVER was a guarantee BMWED and Soo would be able to successfully negotiate a 'single Rules Agreement and single Cross-System Seniority Roster'. As is true for any

March 28, 2008
Page 8

set of negotiations, each party needs to be confident it is receiving good value for what it believes has been given to the other party.

- Despite repeated requests by the Company to do so, BMWED's proposals did not clearly define many of BMWED's key money demands and BMWED consistently failed to adequately respond to many of the issues Soo raised. This was true in the July mediation session, as it had been in past sessions. As a result, Soo concluded the price BMWED was extracting for the 'single Rules Agreement and single Cross-System Seniority Roster' far exceeded any value Soo might receive from this arrangement.

- The single Rules Agreement was Soo's suggestion and, therefore, perfectly permissible for Soo to remove it from the table."

In addition, Soo's letter corrected many of BMWED's statements about the Soo/BMWED negotiations as well as what was occurring at other Soo tables.

One of the troubling comments that appeared in BMWED's July 24, 2007, letter to its members was the misrepresentation that BMWED was the only union representing Soo employees that had received 3% less in General Wage Increases in the early 1990's round. Not only was that untrue as every union received a comparable economic package, but also it totally ignored the fact that additional economic benefits to BMWED employees were part of that early 1990's settlement package (such as special rate adjustments above and beyond the GWIs for 13 job classifications).

In closing this letter, Soo expressed concern about BMWED's sincerity at the mediation table, but nevertheless Soo confirmed its intent to continue meeting its good faith bargaining obligation.

- "Also, in the August 7, 2007, letter Messrs. Wimmer and Bell state: "We will report to you after the September mediation session concludes. Meanwhile, continue to ramp up and prepare your local lodges.' Again, what does that mean??? It does not sound like a comment of union leaders who intend to make good faith efforts to negotiate.

- Soo is prepared to continue mediation in an effort to reach a mutually acceptable "peaceful" resolution of our respective Section 6 notices during the September 2007 mediation session and, thereafter, if necessary."

**October, 2007**

BMWED was expected to provide a global offer at the beginning of this mediation session. Instead, BMWED issues two ultimatums, one that the proposed Safety Agreement must be part of the settlement and the second that an additional 3% General

March 28, 2008
Page 9

Wage Increase over and above the 2005-09 RLBC settlement and over and above the GWIs included in Soo's local pattern.

Neither item was acceptable to Soo, as proposed, and BMWED refused to consider any alternatives to its demand for a 3% GWI and for a collectively bargained Safety Agreement. Rather than being responsive to Soo's request and engage in discussions on alternatives, BMWED just repeated its absolute demands for an additional 3% GWI and a Safety Agreement.

In addition, BMWED added yet more new local work rule demands that were not on the January 23, 2007, BMWED list of local work rule requests. The new items included establishing a Special Board of Adjustment for discipline cases; establishing a PLB for rules cases; providing a 50% annual contribution towards purchase of up to two pairs of safety shoes; Amending rule 5 (l); creating AWS certification pay for Welder Foremen; and establishing a System Truck Operator call list.

Again, adding new items, especially after the January, 2007, commitment, made it more difficult to reach a mutually acceptable agreement. It also negatively impacted Soo's ability to trust BMWED at the bargaining table.

**November 6, 2007**

BMWED spends considerable time in its March 10, 2007, letter maligning Soo's November 6, 2007, proposal.

Soo feels the need to clarify one aspect it its November 6, 2007, proposal. BMWED correctly stated that the $ .60/hour rate adjustment should have been restored to the BMWED rates of pay at the time the monthly employee contribution option would be put in place. The failure of Soo to include this $.60 was an oversight and would have been corrected at the table if BMWED had brought it to our attention during the November 6, 2007, negotiating session.

BMWED's exorbitant demand for an additional 3% GWI as the supposed "price" to return to the National Plan led Soo to conclude BMWED preferred to remain in the Soo Plan. Consistent with its June, 2007, list of benefits cost containment options, Soo proposed to modify the benefits terms and monthly employee cost sharing contribution in the Soo Plan so the cost gap with the National Plan was eliminated. This included the $371.89 monthly employee contribution (retroactive to January 1, 2007 to date of settlement).

Furthermore, Soo explained that the $371.89 would not be the monthly prospective employee contribution if BMWED opted to stay in the Soo Plan. Instead, this was the retroactive premium plus the value of missed savings opportunities from delayed

March 28, 2008
Page 10

benefits design changes.   BMWED should not be surprised by this principle as it was clearly articulated in the January 26, 2006, Soo/BLET arbitrated contract settlement.

In admonishing the BLET represented employees in the Soo/BLET Arbitrated settlement, Arbitrator Eishen stated:

> "To an objective and impartial observer, there is a recognizable difference between the laudable exercise of democratic rights and recalcitrant rejection of fair and reasonable contract terms achieved through hard bargaining by responsible labor leaders.   In the final analysis, such unreasonable intransigence not only goes unrewarded but it also bears a cost.   For that reason, the Agreement imposed in my Award includes an additional one-time per capita retroactive contribution of $ 400, as an offset for the time-lag in H&W benefits design implementation."

In the "BMWED/Soo Section 6 negotiations", Soo would define "unreasonable intransigence" as BMWED's unwillingness to accept economic contract terms comparable to similarly situated Soo unions.

An unfortunate outcome of BMWED's intransigence has been unnecessarily delaying the implementation of benefit design changes.  Such changes could have reduced the cost of the Soo Plan for both the Company and its BMWED represented employees.  A portion of the $371.89 was intended to pay for the lost savings opportunity due to delays in benefit design changes (such as, 90/10 co-insurance for PPO) since January, 2007.

The other 11 similarly situated Soo unions with whom a settlement has been reached opted to return their members to the National Plan as it seemed to be the best option for the Soo employees they represented to address the cost difference between the Plans. A return to the National Plan would be  mutually beneficial to Soo and its BMWED represented employees, not a one way street as characterized by BMWED in its March 10th letter.

Therefore, Soo is baffled by BMWED's continuing delay in resolving the healthcare cost issue.  Every month that goes by, Soo's employees unnecessarily pay more in premiums.  In addition, each time Soo's BMWED represented employees or their eligible dependents receive medical treatment, they pay more in co-insurance and co-pays than they would if covered by the National Healthcare Plan.

<u>What about the 3% GWI that BMWED alleges is owed to their members?</u>

It appears BMWED is suggesting this is leftover from a contract negotiated 17 years ago and yet, they conveniently ignore the fact that there were many items in the Soo/BMWED settlement that were above and beyond what was in that round's National BMWED settlement.  The additional items include allowing employees to be eligible for

March 28, 2008
Page 11

the Early Retiree Medical Plan at age 60 rather than age 61 as applied under the
National Healthcare Plan; additional rate adjustments for 13 pay classifications;
elimination of entry rates for 13 pay classifications and reducing the entry rate period for
all other classifications.

So, in a true accounting, Soo's BMWED represented employees would likely owe Soo
money if one were to compare the value of the NCCC/BMWED National settlements
during this 17 year period with the BMWED/Soo settlements. The 3% GWI that
BMWED is demanding seems to be a red herring getting in the way of a constructive
settlement.

<u>Comments</u>

BMWED is well aware that safety is of paramount importance to Soo. Soo's
commitment is clearly demonstrated by our excellent safety culture, by multiple years
winning of Harriman safety awards, by the active participation of employees in local
health and safety committees, by Soo's selection by FRA as the second railroad to
implement its Close Call Reporting test program, as well as by the statements of Faye
Ackermans on October 25, 2007, before the U.S. House of Representatives Committee
on Transportation and Infrastructure Hearing on "the Impact of Railroad Injury, Accident,
and Discipline Policies on the Safety of America's Railroads", including positive
comments from members of the Committee on our safety program and culture.
BMWED's suggestion to the contrary is patently offensive and untrue.

While BMWED correctly states there is a different regulatory regime in Canada which
requires collaboration with unions on various aspects of safety, BMWED is absolutely
incorrect that safety on Soo is in management's hands alone. Notwithstanding the
absence of US regulations similar to Part II of the Canada Labour Code, Soo has
chosen to include the General Chairmen as partners on the Transportation, Mechanical,
and Engineering Department Safety Advisory Boards. As further evidence of this
voluntary commitment to partner with union leaders on safety, Soo's Safety Advisory
Boards are co-chaired by management and union leadership.

In the US railroad industry, the Federal Employer's Liability Act (FELA), a fault based
adversarial way to determine liability and appropriate compensation for workplace
injuries, places the responsibility for a safe workplace squarely on railroad
management. This is why US railroad management teams have more say in workplace
safety than union leaders, who do not share in this legal responsibility nor potential
liability. In contrast, workplace injuries in CP's Canadian operation are handled under a
no-fault system similar to workers' compensation arrangements in the US. This is
fundamentally different than the aforementioned FELA fault based system and results in
different degrees of management/union accountability.

March 28, 2008
Page 12


Soo firmly believes that every employee is responsible for safety. As a result, employees are encouraged to actively participate on local Safety and Health committees which have been established throughout our system. Soo's employees, including those represented by BMWED, actively participate on these local Health and Safety teams. Unfortunately, in what appears to be a negotiating ploy, the BMWED General Chairmen have withdrawn from the Safety Advisory Board and have directed their members not to participate in any voluntary safety and health meetings or events. If an employee violates this directive, BMWED has threatened to assess a fine.

BMWED's suggestion that safety can only be achieved through a collectively bargained Safety Agreement is also untrue, as should be evident by Soo's excellent safety record and industry recognized safety culture. Scott MacDonald, AVP Operations, and his team continue to be willing to work with BMWED outside the Section 6 process to reasonably modify the Soo Engineering Services Safety Management Protocol and Safety Advisory Board Terms of Reference to address many of BMWED's concerns. Unfortunately, BMWED has refused to resume the discussions with the AVP Operations and, instead, has chosen to issue an ultimatum at the Section 6 bargaining table that a collectively bargained Safety Agreement is a non-negotiable demand.

Soo is baffled as to why BMWED continues to insist on a negotiated Safety Agreement when all other unions representing Soo employees in the Transportation, Mechanical, and Engineering Departments are comfortable participating on Safety Advisory Boards and local Health and Safety Committees using the written, jointly developed protocols as their operational framework. In fact, the two other unions on the Engineering Services Safety Advisory Board that also represent employees in the Engineering Department do not have issues with the written protocols currently in place. So, why does BMWED??

The Attachment to your March 10, 2008, letter is referred to as your "final offer to settle this dispute", when, in fact, it reflects demands not materially different than what BMWED presented at the October, 2007, mediation session and verbally reiterated in the November 6, 2007, mediation session. BMWED's decision to remove the six (6) new local work rule demands that first appeared in BMWED's October, 2007, proposal is not a substantive change in bargaining position.

With regard to its November 6, 2007, proposal Soo recognizes its oversight of not adding the $.60/hour to the rates of pay concurrent with the introduction of employee cost-sharing contributions. Even though there is no obligation to do so, Soo, as a gesture of good faith, hereby modifies its November 6, 2007, proposal to BMWED to include this $.60/hour adjustment.

Soo has met and continues to meet all its RLA obligations to negotiate in good faith throughout the "BMWED/Soo Section 6 negotiations", as is evidenced by this detailed negotiating history. By this letter, we have honored your request for a response and

March 28, 2008
Page 13

have made a good faith adjustment to our November 6, 2007, proposal. Further, when Mediator Brown sets another mediation date, Soo will be prepared to resume discussions.

You are reminded that the "BMWED/Soo Section 6 negotiations" are clearly under the jurisdiction of the NMB which requires that both parties adhere to the RLA status quo obligations. NMB has not declared an impasse and has definitely not terminated mediation in Case No. A-13421.

Given this fact, Soo expects BMWED to honor its RLA status quo obligation which includes respecting the exclusive authority of NMB to determine when meetings will be resumed and if/when an impasse has been reached in the "BMWED/Soo Section 6 negotiations."

Sincerely,

Cathryn S. Frankenberg
AVP Labor Relations & Human Resource - US

cc:    Terri Brown, NMB
       L. R. Fenhaus
       Don Griffin
       Stuart Hurlburt
       Henry Wise
       Andrew Shields
       Brock Winter
       Scott MacDonald
       Glyn Hughes
       Mike Hanson
       Don McCall
       Bjarne Henderson
       Mike Kluska
       Anthony Stillittano
       Larry Gibbons, NMB

# Exhibit 3



# BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION
## OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS
*Chicago, Milwaukee, St Paul &Pacific System Federation*
*and*
*Soo Line System Division*

| **Mark S. Wimmer, General Chairman** | **Gene A. Bell, General Chairman** |
|---|---|
| 18921 York Street, NW　Suite F | 6210 Sheridan Avenue, South |
| Elk River, MN　55330-3001 | Richfield, MN　55423 |
| Area Code (763) 441-6355 | Area Code (612) 869-2419 |
| Fax (763) 441-1741 | Fax (612) 869-7641 |

PRIORITY MAIL - SIGNATURE CONFIRMATION
RECEIPT #2305 1590 0001 6581 3553

May 9, 2008





Ms. Cathryn Frankenberg
AVP Labor Relations & Human Resources
Canadian Pacific Railway
501 Marquette Avenue, Suite 1000
Minneapolis, MN 55402

Re: **Letter of March 28, 2008**

Dear Cathryn:

This is in response to your letter dated March 28, 2008, which was responsive to our letter of March 10, 2008 regarding the parties' respective positions in Mediation Case No. A-13421. While you devoted 13 pages to a broadside attack on the BMWED, much of that attack was based on a specious, wholly mythical view of both the Railway Labor Act and BMWED's bargaining position. We will address matters you raised which we believe are substantive in an effort to keep this dispute focused. We also will refrain from making comments regarding the Carrier's second lawsuit against us in this round of bargaining containing the usual stock of fanciful allegations of our intended, overt or covert illegal behavior. Two lawsuits in two years are not the acts of a Carrier that wants to make a voluntary deal, nor are they the actions of a Carrier with the confidence necessary to engage in real *quid pro quo* bargaining with its employees.

Contrary to your claim, the BMWED has not attempted to "blatantly disregard and disrespect the authority of NMB." As you well know, the parties' last mediation session in November ended very soon after it started because neither side saw an opportunity to compromise from its position and continued discussions on that date would have been pointless. When we wrote our March 10 letter, more than four months had passed since that date. In that period, the NMB had not scheduled another meeting of the parties, nor had either side communicated a new, compromise offer. Our letter of March 10 was an attempt to clarify our bargaining position and attempt to either restart negotiations or get the Carrier to agree with us that future mediatory effort by the NMB would be unlikely to result in a voluntary agreement. We had hoped that you would acknowledge the reality of the situation so that when BMWED sought a proffer of arbitration from the NMB and a release from mediation, the Carrier would not oppose such a course of action. At least your 13 page missive is Exhibit "A" that the parties are at an impasse and we hope you will not attempt to oppose a BMWED request for a proffer. Of our other obligations under the RLA in general we will say nothing, nor will we comment on the Carrier's RLA obligations as well, given the Carrier has sued us, for a second time, for no real purpose other than to harass the Union and chill bargaining and exchanges between the parties.

While your lengthy letter castigated us for various sins of omission and commission, you did not engage us on the primary issue of dispute between the parties – the linkage between the Carrier's return of the maintenance of way craft into GA-23000 and the division of the cost-savings that will accrue to the Carrier from that agreement. As you know, it was the Soo that opted out of the National Plan in the first place (over the union's objections) and the Soo then obtained the union's agreement to forego the 3% General Wage Increase under the national agreement as part of a local package for what then seemed to be a better health

2

benefits plan. Now that the National Plan offers advantageous cost savings to the Soo it wants to go back to the National Plan, but not back to national levels of pay. As we pointed out in our March 10, 2008 letter, the enrollment of the maintenance of way group will save the Carrier more than $2400 per employee per year based on the figures you provided to us. We noted that a restoration of a 3% GWI that BMWED members did not receive in 1991 when other members in "national handling" did, would cost, on average, about $1900 per employee per year. We thought such a trade was a "win-win" for both sides, yet you never really addressed our point, nor did you take issue with our calculation of the Carrier's cost-savings from a return to GA-23000 or our average cost of the additional 3% GWI. In fact, in the Carrier's proposal of June 13, 2007 (10:30 AM), the $2467 figure was valued at 6% of future GWIs, so our request for an additional 3% GWI in exchange for the return to GA-23000 was, by the Carrier's own reckoning, methodologically sound and would provide economic benefits to both parties to the deal.

Instead, the Carrier has taken the position that it will offer no more than the "same overall total compensation value (wages and benefits) as had been contained in the BMWED/NCCC National Settlement and in the other Soo settlements." This position conveniently ignores the $2400 per employee per year windfall the Carrier will receive by returning to GA-23000. No other carrier in National Handling received such a benefit from the RLBC/NCCC settlement, the TCU/NCCC settlement, the IBEW/NCCC settlement, or the tentative UTU/NCCC settlement. Therefore, while those settlements certainly can be instructive for both parties, they are not definitive because they are not fully comparable. We once again must remind the Carrier that it chose to compel local bargaining beginning with the 1984 round and local negotiations mean the parties are free to fashion local resolutions to their local problems. The Carrier's health insurance costs under its self-funded plan are a local problem that invites a local resolution. One such example of local bargaining deviating from the "national" norm is the BMWE/CN(IC) settlement for this same period. In that agreement, BMWED accepted 1% less in GWIs than the RLBC; however BMWED members contribute only $100 per month in cost-sharing payments (beginning in 2008 and fixed through the duration of the agreement) as part of CN's return to GA-23000.

We also are dismayed by the Carrier's attempt, without any supporting calculation, to allege that the value of the 1991 local settlement was richer than the 1991 BMWE/NCCC arrangement imposed by Pub. L. 102-29. That argument might be relevant to a claim for reparations by BMWED back to 1991 or some intermediate point. However, we have linked the 3% GWI to the return to GA-23000 and view it as a prospective exchange of value unrelated to any accounting of the currently unquantified "value" of certain benefits the Carrier contends were available since 1991 compared with the undisputed loss of a 3% GWI in the wage settlement. As we will note below, one other union on the property has made such a linkage between a return to GA-23000 and a general wage increase unrelated to anything in the national settlements. That is all we are proposing and the Carrier's intransigence on this point baffles us.

The Carrier's claim of an emerging local pattern also is exaggerated.

First, there has been no local "pattern" since the UTU's strike in 1994. That strike concerned the Carrier's claims that UTU should acquiesce to an alleged local "pattern" created by settlements with other unions locally, including BMWED. The UTU would not capitulate, struck and PEB 225 recommended the adoption of the "national" rather than alleged "local" pattern as resolution of the dispute. As a result of that labor dispute, UTU remained in GA-23000 and received a 3% GWI that BMWED members did not receive.

Second, some of the agreements reached between the Carrier and other unions do not track the alleged "pattern" of the national settlements. We note in particular that the October 1, 2007 agreement between the Carrier and the IBEW provided an additional $0.37 per hour to the journeyman rate "concurrent" with the effective date of resolution of the health and welfare insurance Section 6 notices served in 2005. Therefore,

3

we can only conclude that the IBEW received an additional $0.37 per hour in compensation over the IBEW/NCCC settlement as a result of the IBEW's agreement to return its members to coverage under GA-23000.

Third, at least one settlement made by the Carrier in this round contemplates that a "different" result may be reached by another union. The October 1, 2007 IBEW settlement contains a "me too" side letter that provides "should a subsequent settlement for this same contract term between Soo and one or more of the unions representing its employees resolve issue(s) on the return to the National Plan in a more favorable manner, a comparable resolution will be made available to the IBEW." There is no local "pattern" if one of the "pattern" agreements contains a "me too" clause. The Carrier's "pattern" argument amounts to claim that it has achieved a favorable agreement, from its perspective, with a number of unions and now hopes it can coerce, cajole or otherwise pressure the other unions to agree on identical terms. However, the acceptance of a "me too" clause also means that if the Carrier can't achieve its goal, the other unions are off the hook because they will receive the "best" deal negotiated by anyone. Therefore, we view our bargaining as where it should be, a dialog between two parties attempting to resolve the particular, local issues. There is no local "pattern" and, as shown above, the national settlements are not dispositive.

Up to this point, we have received nothing from the Carrier that proposes a *quid pro quo* settlement that resolves the Carrier's desire to effect a substantial cost savings and our desire to share in the economic benefits of that deal. Your letter of March 28 offered nothing new in that regard, so we must assume the Carrier will not budge from its position that any agreement must slavishly mirror the RLBC/NCCC settlement. As we demonstrated, that agreement is not dispositive of our local issues and we believe we remain at an impasse and any further mediatory effort by the Board would be futile.

Finally, without engaging in a categorical refutation, point by point, of the Carrier's view of the parties' bargaining history, we do feel compelled to respond to some of them.

Your letter takes great issue with the fact that the BMWED has put new work rules issues on the table after we presented a putative exhaustive list of rules in January 2007. Those work rules were identified and presented in list form within the context of negotiations concerning a single collective agreement to replace the current separate agreements applicable to the former Soo and Milwaukee properties and reflected the compromises and trade offs from such a decision. When that enterprise collapsed in July and August 2007 and the Carrier determined that it was no longer interested in bargaining over a single agreement, BMWED was no longer bound by that list because the bargaining had effectively returned to "square one." Additionally, another ten months passed after the original list was prepared. While the Carrier may not feel that 29 months is a long period in which to bargain collectively, it certainly cannot believe that bargaining positions are like flies trapped in amber. Unlike fossilized insects, bargaining relationships and proposals continue to evolve until the parties reach a voluntary agreement.

Moreover, your assertion that "BMWED consistently failed to provide comprehensive work rule counterproposals and did not provide workable responses to Soo's local work rule issues," is nothing more than a big, fat, lie. Between April and June 2007, both parties exchanged numerous work rules and seniority proposals. For example, on June 12, 2007, BMWED presented a two-page bullet point response to the Carrier dealing with "Bulletined Positions", "Expenses for Headquartered Crews", a counterproposal to a Carrier demand to increase the number of right of selection positions, a counterproposal on starting times that stated a willingness to explore greater flexibility for starting mobile crews and several other minor local rules. The following day, BMWED presented a two-page bullet point proposal on both system and division operations in response to a Carrier proposal and on June 14, we presented a two-page proposal on how to combine the applicable Soo and Milwaukee seniority classifications under the Milwaukee CBA. Finally, on July 10, 2007,

4

Ms. C. S. Frankenberg                                                                                    May 9, 2008
re:    Letter of 3/28/08

we presented a six-page "comprehensive outline" proposal for settlement of the round of bargaining. The Carrier's response was that our proposal was "too rich" without any substantive explanation and it broke off talks. The next response we received was a "square one" clone of the RLBC/NCCC settlement in October. At no point did the Carrier say with any specificity what in our counterproposals was too rich, you just said they were "too rich" and "we think you overvalue your proposals to us". Never did we receive any data driven criticism of our proposals that would have expanded system operations and permitted a rearrangement of division boundaries within the Twin Cities. Don't lecture us on our alleged failures to bargain, we worked hard to develop proposals which we believed addressed the Carrier's <u>legitimate</u> needs in the context of an agreement that would be acceptable to the employees who would work under it. That's called collective bargaining.

Your criticism of BMWED's cessation of bargaining after Soo filed a baseless legal action against the union is ridiculous. The Carrier sued the union when no strike action had been taken or threatened. Yet the lawsuit sought to prevent BMWED from responding if the Carrier assisted its corporate affiliate that was lawfully being struck by another branch of the IBT. BMWED simply did not believe that there was a reasonable environment for bargaining when the carrier had sued BMWED union without cause and in order to aid a struck affiliate. If Soo was really interested in bargaining it should have thought about the consequences of its action before initiating frivolous litigation against the union.

Finally, you have taken exception to BMWED's bargaining proposal to establish, by agreement, safety committees. In particular, you noted that Scott MacDonald, the Carrier's AVP for Operations, was willing to discuss changes to the safety committee protocols currently in place for its U.S. maintenance of way operations. Without casting any doubt on Mr. MacDonald's sincerity, we must stress that protocols ultimately are unenforceable because if the Carrier unilaterally changes them or repudiates them, we have no remedy. A collectively bargained arrangement <u>requires</u> the parties to work through difference of opinion because neither side can walk away from the relationship. That, in our opinion, will strengthen the safety culture on the Carrier in a way that voluntary committees and protocols with no enforcement mechanism never will.

Sincerely,

Mark S. Wimmer, General Chairman
BMWED of IBT - CMStP&P System Federation

MSW/GAB:jal/opeiu#12

Gene A. Bell, General Chairman
BMWED of IBT - Soo Line System Division

cc:    Mr. T. A. Barrette
       Mr. T. Blumhagen
       Mr. D. Bogart
       Ms. Terri Brown
       Mr. R. Dusterhoft
       Mr. L. R. Fenhaus
       Mr. D. Griffin
       Mr. J. P. Hoffa
       Mr. S. Hurlburt
       Mr. J. Murphy
       Mr. J. D. Petty
       Mr. F. Simpson
       Mr. H. Wise